UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Karen L. Bartlett

v.                          Civil No. 08-cv-00358-JL

Mutual Pharmaceutical
Company, Inc.

**SUMMARY ORDER**

Attached are the court's rulings on Mutual's objections to the deposition testimony of one of Bartlett's potential witnesses, Andrea Werynski, and the court's rulings on Bartlett's objections to Mutual's counter-designated deposition testimony of witnesses Werynski, Robert Dettery, Dr. Claes Dohlman, and Dr. Nam Heui Kim, all of whom have been deemed unavailable to testify at trial under Rule 32(a)(4) of the Federal Rules of Civil Procedure (see doc. 275).

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  August 18, 2010

cc:    Bryan Ballew, Esq.
       Keith M. Jensen, Esq.
       Patrick J. O'Neal, Esq.
       Eric Roberson, Esq.
       Christine M. Craig, Esq.
       Timothy P. Beaupre, Esq.
       Jeffrey D. Geoppinger, Esq.
       Joseph P. Thomas, Esq.
       Paul J. Cosgrove, Esq.
       Linda E. Maichl, Esq.
       Stephen J. Judge, Esq.
       Pierre A. Chabot, Esq.

**Bartlett v Mutual**

---

Witness_ Andria Werynski - Vol. 1.txt: 1:1 - 1:21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
2
3
4 KAREN L. BARTLETT and
GREGORY S. BARTLETT,
5    Plaintiffs,
Case No.: 08-cv-358-JL
6             Judge Joseph N. Laplante
V
7
8 MUTUAL PHARMACEUTICAL
COMPANY, INC. and UNITED
9 RESEARCH LABORATORIES, INC,
Defendants.
10
11
12           Oral deposition of ANDRIA
13 WERYNSKI, taken at the law offices of
14 Segal, McCambridge, Singer & Mahoney,
15 Ltd., United Plaza, 30 South 17th
16 Street, Suite 1700, Philadelphia,
17 Pennsylvania, on Tuesday, September 1,
18 2009, at 9:08 a.m., before Jennifer L.
19 Bermudez, a Registered Professional
20 Reporter, and Notary Public, pursuant to
21 notice.

---

Witness_ Andria Werynski - Vol. 1.txt: 3:6 - 4:1

Q. Please state your name for the
7 record.
8 A. Andria Werynski.
9 Q. And what do you do for a living,
10 Ms. Werynski?
11 A. I'm the manager of regulatory
12 affairs.
13 Q. With who?
14 A. URL Mutual.
15 Q. And since when have you held that
16 title, please?
17 A. Approximately September 2007.
18 Q. What was your title before that?
19 A. Assistant manager, regulatory
20 affairs.
21 Q. When did you obtain that title?
22 A. Approximately August 2006.
23 Q. And what did you do before that?
24 A. Regulatory affairs associate.
25 Q. When did you obtain that title?
00004
1 A. December 2003.

---

Witness_ Andria Werynski - Vol. 1.txt: 4:6 - 4:8

Q. So you are coming up on your sixth
7 anniversary at URL Mutual?
8 A. Yes.

---

Witness_ Andria Werynski - Vol. 1.txt: 4:15 - 6:7

Bartlett v Mutual

Q. And do you have any advance
16 degrees, Ms. Werynski?
17 A. I have a Master's in quality
18 assurance and regulatory affairs.
19 Q. Is your employer URL Mutual?
20 A. Yes.
21 Q. Has that been true since December
22 2003?
23 A. Yes.
24 Q. Which entities do you do
25 regulatory affairs for?
00005
1 A. Mutual Pharmaceutical Company.
2 Q. Any others?
3 A. United Research Laboratories.
4 Q. Just those two?
5 A. Yes.
6 Q. What about AR Holdings?
7 A. Yes. That's correct. We are the
8 regulatory agent for AR Holdings.
9 Q. What does that mean?
10 A. AR Holdings doesn't own any
11 applications -- or I'm sorry. They own
12 the applications. They are transferred,
13 the brands are transferred to them upon
14 approval.
15 Q. And those are just the four NDAs?
16 A. Yes.
17 Q. And an NDA is for a brand name
18 drug?
19 A. Correct. And, actually, I don't
20 believe they hold the Bactrim NDA. I
21 think they just hold the --
22 Q. And when you say "they," who is
23 the pronoun you are --
24 A. AR Holding.
25 Q. Who holds the Bactrim brand name?
00006
1 A. Mutual.
2 Q. So Mutual holds one NDA,
3 therefore?
4 A. Correct.
5 Q. And AR Holdings holds the other
6 three NDAs?
7 A. Yes.

| Objection (5:25 to 6:7): -402 | Ruling: Overruled. Some limited reference to other drugs that Mutual manufactures is permissible as background information. |
| --- | --- |

---

Witness_ Andria Werynski - Vol. 1.txt: 8:13 - 9:10

Q. How many of Mutual's ANDAs are
14 presently marketed and distributed?
15 A. I don't know.
16 Q. What's your best estimate?
17 A. 30.
18 Q. And how many ANDAs or generic
19 applications does Mutual hold, to your
20 best estimate?
21 A. 220.
22 Q. How many of those 220 do you
23 actively work on since December of '03?
24 A. All of them.
25 Q. Is it correct that you file annual

**Bartlett v Mutual**

00009
1  reports and what's called periodic
2  report on all 220 of them?
3  A.  Yes.
4  Q.  And, in other words, the fact that
5  you are distributing them or not, the 30
6  versus the 220, is it correct to state
7  that does not have a difference in terms
8  of when or how often either annual
9  reports or periodic reports are filed?
10  A.  Yes.

| Objection:<br>-402 | Ruling:  Overruled. |
|---|---|

---

**Witness_ Andria Werynski - Vol. 1.txt:  12:9 - 12:22**

Q.  From December '03,
10  chronologically, back to present,
11  please, tell me who were the persons you
12  reported to since you began, please.
13  A.  As a research associate and an
14  assistant manager, I reported to Sherry
15  Schultz.
16  Q.  And since you became the manager
17  of RA, you have reported to
18  Ms. Phillips?
19  A.  No.  I reported to Robert Dettery
20  until Ms. Phillips started.
21  Q.  When did Ms. Phillips start?
22  A.  Approximately July 2008.

---

**Witness_ Andria Werynski - Vol. 1.txt:  13:3 - 13:6**

Did you report to
4  Mr. Dettery immediately when you became
5  the manager of RA?
6  A.  Yes.

---

**Witness_ Andria Werynski - Vol. 1.txt:  13:11 - 14:8**

Q.  What is Sherry Schultz's title,
12  please?
13  A.  Manager, regulatory affairs.
14  Q.  So you reported to her from
15  December '03 through approximately
16  September '07?
17  A.  Correct.
18  Q.  Who did Ms. Schultz report to when
19  you reported to her?
20  A.  Robert Dettery.
21  Q.  Do you presently understand that
22  Ms. Phillips reports to Mr. Dettery?
23  A.  Yes.
24  Q.  The entire time you have been with
25  the URL and Mutual companies, has
00014
1  Mr. Dettery been the top person in
2  charge of all regulatory affairs
3  matters?
4  A.  Yes.
5  Q.  From the day you arrived through
6  today, ultimately, the buck has always
7  stopped with Mr. Dettery in terms of
8  regulatory affairs decisions, correct?

| Objection (14:5 to 14:15):<br>-Argumentative<br>-Vague | Ruling:  Overruled. |
|---|---|

**Bartlett v Mutual**

---

**Witness_ Andria Werynski - Vol. 1.txt: 14:12 - 14:18**

THE WITNESS:  No.  I mean, he
13  reports to people as well, above him.
14  BY MR. JENSEN:
15  Q.  Yes, ma'am.
16     But there's no one above him in
17  regulatory affairs, correct?
18  A.  Correct.

---

**Witness_ Andria Werynski - Vol. 1.txt: 15:12 - 15:21**

Q.  Since you have been there in 2003,
13  has anyone ever, to your knowledge,
14  changed any decision Mr. Dettery has
15  made regarding any regulatory affairs
16  matter?
17  A.  No.
18  Q.  So, to your knowledge, since you
19  have been there, the regulatory affairs
20  buck has always stopped with
21  Mr. Dettery, correct?

---

**Witness_ Andria Werynski - Vol. 1.txt:  Page 16, Line 1**

A.  To my knowledge, yes.

---

**Witness_ Andria Werynski - Vol. 1.txt: 16:13 - 16:17**

Your best recollection is you have
14  never had a conversation with anyone at
15  the FDA regarding anything to do with
16  sulindac; is that true?
17  A.  Yes.

---

**Witness_ Andria Werynski - Vol. 1.txt: 16:22 - 17:20**

Other than being
23  involved potentially in the work of an
24  annual report or a periodic report for
25  sulindac, would that encompass all of
00017
1  your involvement with sulindac since you
2  have been with URL Mutual in December
3  2003?
4  A.  I don't know.
5  Q.  What other involvement might you
6  have had when you say "I don't know," I
7  might have done other things?
8  A.  A supplement to make a change.
9  Q.  Yes, ma'am.
10     Anything else?
11  A.  No.
12  Q.  So periodic reports, annual
13  reports or supplements to make a change,
14  if you were involved in those, would
15  have been your only involvement
16  regarding anything to do with sulindac
17  from your arrival in December 2003 to
18  date?
19     Do I now have that correctly

**Bartlett v Mutual**

---

20  stated?

---

Witness_ Andria Werynski - Vol. 1.txt:  17:24 - 18:13

THE WITNESS:  Yes.
25  BY MR. JENSEN:
00018
1  Q.   And before we might hypothetically
2  look at any annual reports or quarterly
3  reports, do you presently, sitting here,
4  have a recollection of being involved in
5  any quarterly, annual or supplemental
6  reports regarding sulindac?
7  A.   Yes.
8  Q.   And when do you best recollect you
9  were first so involved?
10  A.   Maybe 2008.
11  Q.   Do you believe you were first
12  involved with sulindac in 2008 in any
13  way, shape or form?

| Objection (18:1 to 18:23): -402 (as to time and issue) | Ruling:  Sustained. |
|---|---|

---

Witness_ Andria Werynski - Vol. 1.txt:  18:16 - 18:23

THE WITNESS:  Yes.
17  BY MR. JENSEN:
18  Q.   And then why is it your belief
19  that you were first involved in sulindac
20  in the year 2008?
21  A.   Because I became responsible for
22  reviewing periodic reports prior to
23  submission.

---

Witness_ Andria Werynski - Vol. 1.txt:  19:23 - 20:2

Prior to 2008, would your
24  involvement with sulindac have been
25  limited to helping out on an as-needed
00020
1  basis with any filings prior to that
2  year?

| Objection (19:23 to 20:6): -402 (as to time and issue) | Ruling:  Sustained. |
|---|---|

---

Witness_ Andria Werynski - Vol. 1.txt:  Page 20, Line 6

THE WITNESS:  Yes.

---

Witness_ Andria Werynski - Vol. 1.txt:  23:3 - 23:6

Q.   Prior to 2008, you never had any
4  job function that involved review of
5  annual reports or quarterly or annual
6  periodic reports for sulindac, correct?

| Objection (23:3 to 26:3): -402 (as to time and issue) | Ruling:  Sustained. |
|---|---|

---

Witness_ Andria Werynski - Vol. 1.txt:  23:12 - 23:21

A.   I don't know when the time frame
13  was that I began to review annual
14  reports or periodic reports.
15  Q.   Okay.  And is that true for all
16  drugs, or you just don't remember for
17  sulindac?
18  A.   All drugs.
19  Q.   When would it have been?  Would it

**Bartlett v Mutual**

20  have been in relation to the change in
21  title, change in responsibility?

---

**Witness_ Andria Werynski - Vol. 1.txt:  23:24 - 25:25**

THE WITNESS:  I guess when I
25  became an assistant manager.
00024
1  BY MR. JENSEN:
2  Q.   Okay.  Which was August '06?
3  A.   Yes.
4  Q.   Let's use that as a time frame,
5  then.
6       Prior to August '06, is it correct
7  that you never had a job responsibility
8  to review any annual reports?
9  A.   Yes.
10  Q.   Why did you review the 2007
11  periodic reports for sulindac when you
12  last reviewed them?
13  A.   It's in my job function.
14  Q.   And did you review them prior to
15  them being filed?
16  A.   Yes.
17  Q.   And do you do that for all
18  periodic reports since about 2007 prior
19  to them being filed?
20  A.   Yes.
21  Q.   You review them for completeness
22  and accuracy before they are filed?
23  A.   Yes.
24  Q.   Who prepares them for you, in
25  relation to sulindac, since about 2007
00025
1  before you review them?
2  A.   A contract research company called
3  Prosar.
4  Q.   Did you ever review periodic
5  reports for sulindac prior to Prosar
6  being involved?
7  A.   No.
8  Q.   Is it your understanding that
9  Prosar does surveillance of the medical
10  literature for Mutual's ANDAs/generic
11  drugs?
12  A.   Yes.
13  Q.   What is your understanding of when
14  Prosar, on behalf of Mutual, started
15  doing surveillance of the medical
16  literature for Mutual's generic ANDA
17  drugs?
18  A.   When?
19  Q.   Yes, ma'am.
20  A.   2006.
21  Q.   Is it your understanding that,
22  prior to 2006, neither Mutual, nor no
23  one on Mutual's behalf, ever conducted
24  surveillance of the medical literature
25  regarding its generic Mutual drugs?

---

**Witness_ Andria Werynski - Vol. 1.txt:  Page 26, Line 3**

**Bartlett v Mutual**

---

THE WITNESS:  Yes.

---

Witness_ Andria Werynski - Vol. 1.txt:  26:16 - 27:1

Q.   Other than the fact that a Mutual
17  affiliated company first started
18  marketing a brand product, and you also
19  told me Mutual markets one brand
20  product, other than those facts, can
21  you, Ms. Werynski, cite any other fact
22  in support of the reason or reasons why
23  Mutual for the first time in 2006
24  started, through somebody else, having
25  medical literature surveillance done for
00027
1  its generic, also known as ANDA drugs?

---

> Objection (26:16 to 29:6):
> -402
> -403
> -407 (Prescription date 12/04)

> Ruling:  Sustained (through line 31:2).
> Mutual's failure to review the medical
> literature and to report adverse safety
> information to the FDA is no longer relevant
> to the case, now that Bartlett's claims for
> negligence and enhanced compensatory
> damages have been dismissed.

---

Witness_ Andria Werynski - Vol. 1.txt:  27:6 - 27:14

THE WITNESS:  No.
7  BY MR. JENSEN:
8  Q.   As stated in the affirmative, the
9  only reason you know that Mutual started
10  doing surveillance of the medical
11  literature in 2006 is because at about
12  that time Mutual, or its affiliated
13  companies, started selling brand name
14  drugs; is that correct?

---

Witness_ Andria Werynski - Vol. 1.txt:  27:18 - 28:1

THE WITNESS:  We implemented
19  the process in association with the
20  branded product.
21  BY MR. JENSEN:
22  Q.   And other than that fact, you
23  can't think of any other reason why
24  Mutual started doing this for its
25  generic drugs as well?
00028
1  A.  No.

---

Witness_ Andria Werynski - Vol. 1.txt:  28:5 - 28:15

Q.  No, you cannot.  Correct?
6  A.  No, I cannot.
7  Q.  Thank you.
8      And since Mutual began, through
9  somebody else, doing medical literature
10  surveillance for its generic, also known
11  as ANDA drugs, when a decision is made
12  that the medical literature warrants
13  reporting under the regulations, since
14  that time such medical literature has
15  been reported, correct?

---

Witness_ Andria Werynski - Vol. 1.txt:  28:18 - 29:3

THE WITNESS:  Yes.
19  BY MR. JENSEN:
20  Q.  In other words, before 2006,
21  Mutual, on behalf of its ANDA drugs,

Bartlett v Mutual

22 never looked for nor provided any
23 medical literature to the FDA for its
24 generic ANDA drugs, and after about
25 2006, they both looked for, through
00029
1 somebody else, and when it warranted,
2 gave medical literature to the FDA for
3 the first time, correct?

---

Witness_ Andria Werynski - Vol. 1.txt:  Page 29, Line 6

---

THE WITNESS:  Yes.

---

Witness_ Andria Werynski - Vol. 1.txt:  29:23 - 30:7

---

Q.   As a person who has a career in
24 regulatory affairs, Ms. Werynski, the
25 proposition of providing medical
00030
1 literature to the FDA provides them
2 information in which they can assess and
3 make determinations whether that
4 information warrants or does not warrant
5 potentially providing new information in
6 a package insert and/or to physicians
7 through other means?

---

Witness_ Andria Werynski - Vol. 1.txt:  Page 31, Line 2

---

THE WITNESS:  Yes.

---

Witness_ Andria Werynski - Vol. 1.txt:  32:16 - 32:21

---

Q.  And don't you think it's good that
17 they provided that ability by you giving
18 them medical literature?
19    Don't you think it's a good thing
20 that Mutual now chooses to do this, give
21 them medical literature for its drugs?

| Objection (32:16 to 34:3): | Ruling:  Sustained. |
|---|---|
| -Argumentative | |
| -407 | |
| -Calls for opinion from | |
| non-retained expert | |

---

Witness_ Andria Werynski - Vol. 1.txt:  32:25 - 33:8

---

THE WITNESS:  No.
00033
1 BY MR. JENSEN:
2 Q.  No, you don't think it's a good
3 thing?
4 A.  No.
5 Q.  So you think it's a bad thing that
6 Mutual has now chosen to start providing
7 medical literature to the FDA for its
8 generic drugs?

---

Witness_ Andria Werynski - Vol. 1.txt:  33:12 - 34:3

---

THE WITNESS:  I don't think
13 it's a bad thing.
14 BY MR. JENSEN:
15 Q.  Well, you just said that you don't
16 think it's a good thing.  So what is it?
17 A.  I don't think that it helps.
18 Q.  You don't think that it helps?

**Bartlett v Mutual**

19 A. No.
20 Q. And why is that the case?
21 A. Because the brand companies also
22 do literature searches.
23 Q. But you assume that the brand
24 companies provide medical literature to
25 the FDA, you don't have personal
00034
1 knowledge that they do? You never see
2 their filings, correct?
3 A. Correct.

---

Witness_ Andria Werynski - Vol. 1.txt: 34:7 - 34:15

Q. So, if the brand name companies
8 are hypothetically providing the medical
9 literature to the FDA and they are
10 assessing it, in that example, a second
11 copy would do nothing; but if they are
12 not, then you might be providing some
13 new information, right?
14 You don't know whether they are,
15 right?

| Objection (34:7 to 34:19): | Ruling: Sustained. |
| -Argumentative | |
| -Calls for opinion | |
| testimony | |

---

Witness_ Andria Werynski - Vol. 1.txt: 34:19 - 35:2

THE WITNESS: Yes.
20 BY MR. JENSEN:
21 Q. Hence, because a generic company
22 never knows whether a brand name company
23 is actually providing medical literature
24 to the FDA, don't you agree that it's a
25 good thing that Mutual is now for the
00035
1 first time giving medical literature to
2 the FDA for its generic drugs?

| Objection (34:21 to 37:1): | Ruling: Sustained. |
| -Argumentative | |
| -407 | |
| -Calls for opinion testimony | |

---

Witness_ Andria Werynski - Vol. 1.txt: 35:7 - 35:16

THE WITNESS: Yes.
8 BY MR. JENSEN:
9 Q. Don't you think, because you now
10 agree it's a good thing that Mutual for
11 the first time in 2006 has started
12 providing medical literature to the FDA
13 for its generic drugs, that it is a
14 better way of operating than it did in
15 the past for the reasons you just agreed
16 with?

---

Witness_ Andria Werynski - Vol. 1.txt: 35:22 - 36:4

THE WITNESS: Yes.
23 BY MR. JENSEN:
24 Q. How much of your time do you best
25 estimate, Ms. Werynski, is spent
00036
1 assessing medical literature and whether
2 or not it's properly reportable for
3 either NDA or ANDA drugs?
4 A. None.

**Bartlett v Mutual**

---

Witness_ Andria Werynski - Vol. 1.txt:  36:8 - 36:11

Q.   Does Prosar both find and make
9  recommendations to Mutual/URL on the
10  reportability of the medical literature
11  it finds?

---

Witness_ Andria Werynski - Vol. 1.txt:  Page 36, Line 14

THE WITNESS:  Yes.

---

Witness_ Andria Werynski - Vol. 1.txt:  36:19 - 36:22

To your knowledge, does Prosar
20  make not only recommendations, but
21  decisions as to which medical literature
22  is reportable for Mutual?

---

Witness_ Andria Werynski - Vol. 1.txt:  Page 37, Line 1

THE WITNESS:  Yes.

---

Witness_ Andria Werynski - Vol. 1.txt:  37:21 - 37:25

Q.   To your knowledge, has anyone at
22  Mutual ever countermanded, reversed,
23  vetoed a Prosar decision as to what
24  medical literature was reportable for a
25  generic drug?

Objection (37:21 to 38:5):
-407 (Prosar involved only
after Rx date of 12/04)
-Argumentative
-Foundation

Ruling:  Sustained (through line 43:13).

---

Witness_ Andria Werynski - Vol. 1.txt:  Page 38, Line 5

THE WITNESS:  No.

---

Witness_ Andria Werynski - Vol. 1.txt:  43:9 - 43:13

Have you ever been involved in
10  making a decision as to what any medical
11  publication should be or should not be
12  reported to the FDA?
13  A.  No.

---

Witness_ Andria Werynski - Vol. 1.txt:  44:25 - 45:6

Q.   Is it also correct to state that
00045
1  you don't know of any employee in any of
2  the Mutual entities who has ever made
3  medical literature reportability
4  decisions, rather, to your knowledge,
5  all such decisions have been made by
6  persons at Prosar?

Objection (44:25 to 45:11):
-407 (Prosar involved only
after Rx date of 12/04)

Ruling:  Sustained.

---

Witness_ Andria Werynski - Vol. 1.txt:  Page 45, Line 11

THE WITNESS:  Yes.

---

Witness_ Andria Werynski - Vol. 1.txt:  48:19 - 48:25

Q.  Excluding that instance of
20  cosuspect drugs, is it correct that
21  generic companies never see the filings

**Bartlett v Mutual**

22  of their brand name counterparts, so
23  they don't know whether the brand name
24  counterparts are providing medical
25  literature to the FDA or not?

---

Witness_ Andria Werynski - Vol. 1.txt:  Page 49, Line 5

---

THE WITNESS:  Yes.

---

Witness_ Andria Werynski - Vol. 1.txt:  51:10 - 51:19

---

Is it correct to state that you
11  have never heard that anyone, before you
12  got involved with sulindac, between 1991
13  and 2004, ever, A, filed a citizen's
14  petition, B, did a CBE labeling change,
15  or, C, made any advocacy attempts that
16  any risk information be strengthened or
17  enhanced on the sulindac label in that
18  13-year time period between 1991 and
19  2004?

| Objection (51:10 to 53:4): | Ruling:  Sustained.  Mutual's failure to |
|---|---|
| -Compound, vague | advocate a stronger warning is not relevant to |
| -Misleading (unclear which | whether its warning in place at the time of |
| question is answered) | Bartlett's prescription avoided an unreasonable |
| -402 (time) | risk of danger, or to any other issue in the case. |

---

Witness_ Andria Werynski - Vol. 1.txt:  51:24 - 52:7

---

THE WITNESS:  I don't know if
25  anyone made any labeling changes in 13
00052
1  years without looking at the
2  correspondence.
3  BY MR. JENSEN:
4  Q.  But you do know what you have
5  heard of, and you have never heard that
6  that occurred, correct, any of those
7  three things?

---

Witness_ Andria Werynski - Vol. 1.txt:  52:10 - 52:25

---

THE WITNESS:  Correct.
11  BY MR. JENSEN:
12  Q.  And let's talk more about what you
13  know from either reading it or hearing
14  about it.
15      To the best of your knowledge,
16  Mutual has never for any of its generic,
17  also known as ANDA drugs, done any of
18  those three things, A, file a citizen's
19  petition, B, did a changes being
20  effected label change or, C, made any
21  advocacy to the FDA for enhanced or
22  strengthened risk information at any
23  time, a time way before you began in
24  1991 through today in August -- or
25  September of 2009, correct?

---

Witness_ Andria Werynski - Vol. 1.txt:  Page 53, Line 4

---

THE WITNESS:  Yes.

---

Witness_ Andria Werynski - Vol. 1.txt:  55:6 - 55:10

---

to the extent anyone believed
7  or testified that you only need to keep

Bartlett v Mutual

8  periodic ADD reports for a year or two
9  after the expiration of the underlying
10 product, that would be incorrect, right?

Objection (55:6 to 55:23):
-402

Ruling:  Sustained.

Witness_ Andria Werynski - Vol. 1.txt:  55:14 - 55:23

THE WITNESS:  Are you talking
15  about periodic reports, adverse drug
16  reports?
17 BY MR. JENSEN:
18 Q.  Yes.
19 A.  Yes, that would be incorrect.
20 Q.  The regulations very clearly state
21  that such documentation needs to be kept
22  for ten years, correct?
23 A.  Yes.

Witness_ Andria Werynski - Vol. 1.txt:  57:2 - 57:8

Q.  What was the annual reporting
3  period for sulindac, from what month to
4  what month?
5 A.  I would have to see when it was
6  approved.
7 Q.  In April 1991.
8 A.  Then it's April 1st to March 31st.

Witness_ Andria Werynski - Vol. 1.txt:  57:13 - 57:19

Q.  I'm going to show you an article,
14  here it is, it's KB 2769.  And we are
15  going to start with the date of it.
16      And do you see the article is
17  dated February 13, 2003?  The lower
18  left.  I highlighted it.
19 A.  Yes.

Objection:
-402

Ruling:  Sustained.  Mutual's notice of the
Mockenhaupt study is no longer relevant,
since Bartlett's negligence and failure-to-
warn claims have been dismissed.

Witness_ Andria Werynski - Vol. 1.txt:  59:24 - 60:3

If,
25  hypothetically, it was decided this was
00060
1  a 15-day report, when would this report,
2  published on February 13th, 2003, have
3  been reported?

Objection (59:24 to 60:9):
-Improper hypothetical
-Improper assumption of
facts
-Calls for expert opinion

Ruling:  Sustained.

Witness_ Andria Werynski - Vol. 1.txt:  60:8 - 60:9

Q.  The one starting at 2769.
9 A.  April 2003.

Witness_ Andria Werynski - Vol. 1.txt:  61:20 - 61:25

The annual report needs to be
21  filed every year within 60 days of the
22  anniversary approval?
23 A.  60 days?
24 Q.  Yes, ma'am.
25 A.  Yes.

Objection:
-402

Ruling:  Overruled.

Witness_ Andria Werynski - Vol. 1.txt:  62:16 - 62:22

**Bartlett v Mutual**

Q.   So, again, roughly, if it's April
17  17, '91 was the approval date, we are
18  talking approximately June 17th, give or
19  take a couple days, that the periodic
20  annual reports would need to be filed,
21  correct?
22  A.   Yes.

| Objection: -402 | Ruling:  Overruled. |

---

Witness_ Andria Werynski - Vol. 1.txt:  65:20 - 65:23

Q.   How, if at all, were you involved
21  with the 2009 changes being effected
22  label change that Mutual for the first
23  time did for one of its NDA drugs?

| Objection (65:20 to 68:10): -402 (questions relate to NDA product) -403 -407 (Rx date 12/04) | Ruling:  Sustained. |

---

Witness_ Andria Werynski - Vol. 1.txt:  66:2 - 66:12

Q.   Let me add the risk of
3  thrombocytopenia to Qualaquin.
4  A.   Oh, I was involved in that.
5  Q.   How so?
6  A.   I prepared the submission.
7  Q.   Were you involved at all in
8  determining whether the medical
9  information warranted the unilateral CBE
10  label change that Mutual was submitting
11  to the FDA before the FDA had even
12  approved the label change?

---

Witness_ Andria Werynski - Vol. 1.txt:  66:16 - 66:24

THE WITNESS:  No.
17  BY MR. JENSEN:
18  Q.   And I did have an assumption in my
19  question.
20      Is it correct to state that the
21  2009 label change for Qualaquin was one
22  that Mutual unilaterally instituted
23  before the FDA had approved that label
24  change?

---

Witness_ Andria Werynski - Vol. 1.txt:  67:2 - 67:17

THE WITNESS:  What do you
3  mean by "unilaterally"?
4  BY MR. JENSEN:
5  Q.   Unilaterally means taking action
6  on your own without someone else's
7  authority or approval.
8  A.   So you are asking did we implement
9  the change prior to updating the
10  approval?
11  Q.   Yes.
12  A.   Yes.
13  Q.   And that's what a changes being
14  effected label change is, it allows, in
15  this exact circumstance, Mutual to make
16  a label change before they get the FDA's
17  approval, correct?

---

Witness_ Andria Werynski - Vol. 1.txt:  67:22 - 68:5

Bartlett v Mutual

THE WITNESS:  Yes.
23  BY MR. JENSEN:
24  Q.   Who were the persons involved in
25  determining that that action needed to
00068
1  be taken, i.e., that the medical facts
2  and science warranted the need to make
3  that label change before the FDA even
4  assessed whether it needed to be
5  changed?

---

Witness_ Andria Werynski - Vol. 1.txt:  68:9 - 68:10

THE WITNESS:  Upper
10  management.

---

Witness_ Andria Werynski - Vol. 1.txt:  72:13 - 72:17

Q.   Do you recall that the risk
14  information regarding thrombocytopenia
15  was enhanced and moved in the label to a
16  different location?
17  A.   Yes.

Objection:
-402 (does not relate to
Sulindac)
-407 (after 12/04)

Ruling:  Sustained.

---

Witness_ Andria Werynski - Vol. 1.txt:  73:17 - 73:22

Q.   Is that the first time in your
18  career in 2009 that you had ever been
19  involved with a unilateral label change,
20  again, defining that as the drug company
21  making a change to the label before the
22  FDA has approved that label change?

Objection:
-402
-407
-No answer designated

Ruling:  Sustained (through line 74:9).

---

Witness_ Andria Werynski - Vol. 1.txt:  74:3 - 74:16

Q.   Have you ever been involved in
4  such a label change with any of the
5  Mutual entities before that?
6  A.   When we do RLD updates for generic
7  drugs, that's via a changes being
8  effected supplement.
9  Q.   Understood.
10      Let me ask you this way:  Was the
11  2009 CBE label change that you were
12  involved in the first such label change
13  you had ever been involved in to
14  enhance, add to or strengthen risk
15  information in a label in your career at
16  any of the Mutual entities?

Objection (74:10 to 75:4):
-402
-407

Ruling:  Sustained.

---

Witness_ Andria Werynski - Vol. 1.txt:  74:21 - 75:4

THE WITNESS: Associated
22  outside of RLD updates, yes.
23  BY MR. JENSEN:
24  Q.   And the caveat you are making is,
25  there might be an RLD update that might
00075
1  enhance risk information, but it was not
2  one that Mutual unilaterally made a
3  decision to make those changes?
4  A.   Correct.

Bartlett v Mutual

---

| Witness_ Andria Werynski - Vol. 1.txt: 75:7 - 75:12 | Objection: | Ruling: Sustained. |
|---|---|---|
| Is it correct to state that you<br>8 have never been involved at Mutual with<br>9 any changes being effected label change<br>10 to enhance or increase or add to risk<br>11 information for any generic, also known<br>12 as ANDA drug, at any time? Correct? | -Plaintiff did not designate the<br>answer; Plaintiff misunderstood the<br>answer and designated a later<br>answer after confusing the witness.<br>RLD update is done for GENERIC<br>drugs. Question becomes<br>nonsensical when plaintiff says<br>"that's excluded from my question". | |

| Witness_ Andria Werynski - Vol. 1.txt: Page 76, Line 5 | Objection: | Ruling: Sustained. |
|---|---|---|
| THE WITNESS: Yes. | -Same as 75:7 to 75:12 | |

| Witness_ Andria Werynski - Vol. 1.txt: 77:24 - 78:14 | | Ruling: Sustained. |
|---|---|---|
| Q. Are you aware from any source that<br>25 the Honorable Joseph Laplante, the<br>00078<br>1 presiding judge in this case, has ruled<br>2 against Mutual's position that ANDA,<br>3 also known as generic drug holders,<br>4 cannot change their labels to add to or<br>5 strengthen risk information?<br>6 A. Yes.<br>7 Q. Are you aware that Karen<br>8 Bartlett's prescribing physician, who<br>9 prescribed her sulindac, has testified<br>10 that if there were warnings in place<br>11 about a higher risk of SJS and TEN from<br>12 sulindac than other NSAIDs, he would<br>13 never have prescribed her the sulindac<br>14 that he did? | Objection (77:24 to 78:19):<br>-402<br>-Argumentative | |

| Witness_ Andria Werynski - Vol. 1.txt: 78:19 - 79:16 | | Ruling: Sustained. |
|---|---|---|
| THE WITNESS: No.<br>20 BY MR. JENSEN:<br>21 Q. Can you flip back to the article,<br>22 please, that starts at page 2769.<br>23 Tell me when you are there.<br>24 A. Okay.<br>25 Q. Thank you.<br>00079<br>1 And then flip to 2771. Tell<br>2 me when you are there.<br>3 A. Okay.<br>4 Q. And under Table 1 it gives a<br>5 relationship between various NSAIDs and<br>6 their relative risk in relation to SJS<br>7 and TEN.<br>8 And if you follow down the left<br>9 column, under Drugs, under Ketoprofen,<br>10 which is also an NSAID they have no<br>11 confirmable risk of SJS and TEN because<br>12 the multivariates relative risk is not<br>13 statistically significant.<br>14 Do you see that,<br>15 Ms. Werynski?<br>16 A. I see what you are referring to, | Objection (79:1 to 80:9):<br>-402<br>-801<br>-802<br>-Improper publishing<br>-602<br>-Foundation, calls for<br>speculation<br>-Argumentative | |

Witness_ Andria Werynski - Vol. 1.txt: 79:19 - 80:9

**Bartlett v Mutual**

Asking you to assume that that
20 data means that this study was unable to
21 confirm a link or relationship between
22 this NSAID called Ketoprofen on the one
23 hand and getting SJS or TEN on the other
24 hand.
25    Asking you to assume that's
00080
1 correct for purposes of my question.
2    Is it correct to state, to the
3 best of your knowledge, the FDA was
4 never provided this information nor was
5 Karen Bartlett's physician provided this
6 information so he could potentially
7 prescribe Karen Bartlett a safer NSAID
8 than sulindac before he did prescribe
9 her sulindac in 2004?

---

Witness_ Andria Werynski - Vol. 1.txt:  81:19 - 82:3

| THE WITNESS:  Yes, that's how<br>20 I took it.<br>21        I don't know what the FDA<br>22 knew, and I don't know what Karen<br>23 Bartlett's physician knew.<br>24 BY MR. JENSEN:<br>25 Q.  But you do know what Mutual<br>00082<br>1 provided and, to the best of your<br>2 knowledge, Mutual never provided this<br>3 information to either of them, correct? | Objection (81:19 to 81:23):<br>-402<br>-801<br>-802<br>-Improper publishing<br>-602<br>-Foundation, calls for<br>speculation<br>-Argumentative | Ruling:  Sustained (through line 82:15). |

---

Witness_ Andria Werynski - Vol. 1.txt:  82:8 - 82:15

THE WITNESS:  To the best of
9 my knowledge, no, they never provided
10 this particular literature article.
11 BY MR. JENSEN:
12 Q.  And this information was in the
13 article we looked at before that came
14 out in February of 2003.  Correct?
15 A.  Yes.

---

Witness_ Andria Werynski - Vol. 1.txt:  83:7 - 83:17

| Q.  If I was to represent to you,<br>8 Ms. Werynski, that Ms. Bartlett has had<br>9 many, many eye surgeries, would that be<br>10 news to you?<br>11 A.  No.<br>12 Q.  You know that?<br>13 A.  I saw the Complaint, her medical<br>14 records.<br>15 Q.  When did you first see any of<br>16 Karen Bartlett's medical records?<br>17 A.  May 1st, 2009. | Objection:<br>-402<br>-Argumentative<br>-Characterizes evidence | Ruling:  Overruled. |

---

Witness_ Andria Werynski - Vol. 1.txt:  84:11 - 85:4

Q.  Tell me what your involvement was
12 with review of anything to do with Karen

Bartlett v Mutual

13 Bartlett's medical records, how she is
14 doing.
15 A.  I received them and I forwarded
16 them to Prosar.
17 Q.  Other than that, what other
18 involvement, if any, have you had in
19 reviewing any of Karen Bartlett's
20 medical records?
21 A.  Just the review of the 15-day
22 alert report that was submitted.
23 Q.  Other than those two things, what
24 other involvement, if any, have you had
25 with Karen Bartlett and/or the review of
00085
1 her medical records?
2 A.  Huh-uh.
3 Q.  That's it?
4 A.  Uh-huh.  Yes.

Objection:
-402

Ruling:  Sustained as to "and I forwarded them to Prosar."  Otherwise overruled.

---

Witness_ Andria Werynski - Vol. 1.txt:  87:7 - 87:10

So, I guess I should clarify that
8 I was not aware that she had eye
9 surgeries.  I was aware that she had eye
10 injury.

Objection:
-No question designated
-402

Ruling:  Overruled.

---

Witness_ Andria Werynski - Vol. 1.txt:  87:15 - 88:5

Q.  Go back to Exhibit 403, please,
16 and find your way to the MedWatch form.
17    Tell me when you have found it,
18 please.
19 A.  Uh-huh.  Got it.
20 Q.  And that is a report that is
21 submitted to the FDA in relation to an
22 adverse event, correct?
23 A.  Yes.
24 Q.  And this form is the one that was
25 submitted to the FDA in relation to
00088
1 Mutual's receipt of information
2 regarding Karen Bartlett and her adverse
3 event, correct?
4 A.  This one is the second report.
5 This is a follow-up report.

Objection:
-402
-403
-801
-802 (contains hearsay within document for which there is an exception)
-1002 & 1004 (medical records are the best evidence)

Ruling:  Overruled.  The witness may testify about Mutual's report to the FDA regarding Bartlett's injuries and the representations that Mutual made therein, which are party admissions (Rule 801(d)(2)) and thus are not hearsay.  This is not to say, however, that the entire report is admissible.  For example, the parts referring to this litigation and the parts referring to Prosar's literature searches are inadmissible under Rules 401-403, as explained in the court's previous limine rulings.  This court will decide issues regarding the admissibility of the report at trial.

---

Witness_ Andria Werynski - Vol. 1.txt:  89:5 - 90:6

Q.  Who created the information on
6 Page 9 of that first MedWatch report,
7 which is dated 4/29/08?
8 A.  Prosar.
9 Q.  Now, let's look -- hold that open,
10 please.
11    Now, let's look at the
12 supplemental report that's contained
13 within Exhibit 403.  And it's dated
14 5/8/2009, correct?
15 A.  Yes.
16 Q.  And, as you pointed out, this is a
17 second report regarding Karen Bartlett,
18 correct?

Bartlett v Mutual

19  A.  Yes.
20  Q.  And who created all the
21  information in this report?
22  A.  Prosar.
23  Q.  As you can see here, at the end of
24  the first paragraph, they say they
25  reassessed the case as serious and
00090
1  unexpected.  Correct?
2  A.  Yes.
3  Q.  And does that mean that in their
4  evaluation the one or more of the
5  adverse events being reported was not
6  set forth in the label?

Witness_ Andria Werynski - Vol. 1.txt:  90:10 - 90:16

THE WITNESS:  Yes.
11  BY MR. JENSEN:
12  Q.  And which adverse events were
13  those that were unexpected and,
14  therefore, in Prosar's interpretation
15  not in the sulindac label?
16  A.  I don't know.

| Objection (89:5 to 90:16): |
| -402 |
| -403 |
| -602 |
| -801 |
| -802 |

Ruling:  Sustained as to lines 89:5 through 89:8 and as to lines 89:20 through 90:6.  Otherwise overruled.

Witness_ Andria Werynski - Vol. 1.txt:  91:10 - 91:15

Q.  Did you have any knowledge of this
11  reassessment, which clearly this was a
12  serious unexpected event, in or around
13  May of 2009?
14  A.  Yes.
15  Q.  And what was that involvement?

Witness_ Andria Werynski - Vol. 1.txt:  91:18 - 91:23

THE WITNESS:  I received an
19  e-mail notification, I believe, that it
20  was assessed and that they would be
21  preparing a 15-day alert report, and I
22  reviewed the 15-day alert report for
23  completeness and accuracy.

| Objection (91:10 to 91:23): |
| -402 (report submitted more than three years after the event) |
| -403 |
| -801 |
| -802 |
| -602 |

Ruling:  Sustained as to "which clearly this was a serious unexpected event."  Otherwise overruled.

Witness_ Andria Werynski - Vol. 1.txt:  92:17 - 92:24

Q.  And the second report that was
18  submitted of the 15-day report, is it
19  five pages long?
20  A.  Yes.
21  Q.  And were any of the medical
22  records following those five pages
23  submitted to the FDA, to your knowledge?
24  A.  Yes, they all were.

| Objection: |
| -402 |
| -403 |
| -801 |
| -802 |
| -602 |

Ruling:  Overruled.

Witness_ Andria Werynski - Vol. 1.txt:  93:25 - 94:12

Q.  But you did review the
00094
1  supplemental report and all the medical
2  records attached to it when you
3  submitted it?
4  A.  Yes.

Bartlett v Mutual

5 Q. So you were aware from the very
6 last page submitted, which is the
7 discharge summary from Spaulding
8 Rehabilitation Hospital, that
9 Mrs. Bartlett was discharged from that
10 hospital on or about May 19, 2005,
11 correct?
12 A. Correct.

Objection:
-402
-801
-802
-804
-1003
-1004

Ruling: Overruled.

---

Witness_ Andria Werynski - Vol. 1.txt: 95:25 - 96:5

You knew from the entirety of
00096
1 these records that Mrs. Bartlett's
2 events started early February 2005, and
3 she was now getting discharged from
4 Spaulding Rehab some four months and 19
5 days later, correct?

Objection (95:25 to 96:9):
-402
-801
-802
-804
-1003
-1004

Ruling: Overruled.

Witness_ Andria Werynski - Vol. 1.txt: Page 96, Line 9

THE WITNESS: Yes.

---

Witness_ Andria Werynski - Vol. 1.txt: 97:17 - 97:20

You see from her discharge
18 medications that four are them are
19 prescribed in relation to her G-tube,
20 Numbers 1, 2, 4 and 5. Correct?

Objection (97:17 to 98:11):
-402
-801
-802
-804
-1003
-1004

Ruling: Sustained as to lines 97:25
through 98:11.

Witness_ Andria Werynski - Vol. 1.txt: 97:24 - 98:6

THE WITNESS: Yes.
25 BY MR. JENSEN:
00098
1 Q. Do you know that Ms. Bartlett
2 needed to continue to be fed through a
3 G-tube in her stomach for approximately
4 11 months after this discharge, which
5 was about four and a half months after
6 her SJS and TEN started?

---

Witness_ Andria Werynski - Vol. 1.txt: 98:11 - 98:19

THE WITNESS: No.
12 BY MR. JENSEN:
13 Q. Do you know that a number of Karen
14 Bartlett's ophthalmologists or eye
15 doctors have concluded, either through
16 visual acuity tests or otherwise, that
17 she has been legally blind in one eye
18 and often both eyes for most of the last
19 four years?

Objection (98:13 to 98:24):
-402
-403
-Argumentative
-Misstates facts
-Misleading
-801
-802

Ruling: Sustained.

---

Witness_ Andria Werynski - Vol. 1.txt: 98:24 - 99:5

THE WITNESS: No.
25 BY MR. JENSEN:
00099
1 Q. Has anyone from any of the Mutual
2 companies, URL, AR Holdings, URL Pharma,
3 any of these companies, ever called

**Bartlett v Mutual**

4  Karen Bartlett to apologize or even to
5  talk to her about how she is doing?

Objection (99:1 to 99:11):
-Argumentative
-402
-403

Ruling: Sustained.

Witness_ Andria Werynski - Vol. 1.txt:  99:10 - 99:11

THE WITNESS:  I'm not aware
11  of anyone, no.

Witness_ Andria Werynski - Vol. 1.txt:  100:8 - 100:14

Q.  On the supplemental MedWatch
9  report -- if you can flip there, and
10  tell me when you are there, please.
11  A.  Okay.
12  Q.  Do you see under the Box 2 it has
13  Disability checked?
14  A.  Yes.

Objection:
-402
-403
-801
-802
-1003
-1004

Ruling: Overruled.

Witness_ Andria Werynski - Vol. 1.txt:  101:1 - 101:2

Q.  The third paragraph under Box 5.
2  Tell me when you are there, please.

Objection (101:1
to 103:6):
-402
-403
-801
-802
-804
-1003
-1004

Witness_ Andria Werynski - Vol. 1.txt:  101:21 - 101:24

It reads, on 2/4/08 -- it should
22  read 2/4/05 -- the patient was diagnosed
23  with, I will abbreviate, SJS progressing
24  to TEN.  Correct?

Ruling: Overruled.

Witness_ Andria Werynski - Vol. 1.txt:  102:6 - 103:1

THE WITNESS:  I could say
7  it's a reasonable assumption that that's
8  a typographical error.
9  BY MR. JENSEN:
10  Q.  And I read it correctly, correct?
11  A.  That it should be 2005?
12  Q.  And the rest of the sentence, that
13  the patient was diagnosed with Stevens-
14  Johnson Syndrome progressing to, I will
15  abbreviate, TEN.  Correct?
16  A.  Yes.
17  Q.  And then it says, the patient was
18  hospitalized for approximately three
19  months for these events, two of which
20  she was in a drug-induced coma.
21  Correct?
22  A.  Yes.
23  Q.  And it says, the patient developed
24  unspecified scarring some time after the
25  events began, leading to an unspecified
00103
1  permanent disability.  Correct?

Witness_ Andria Werynski - Vol. 1.txt:  103:5 - 103:6

THE WITNESS:  That's what it
6  says there, yes.

Witness_ Andria Werynski - Vol. 1.txt:  104:9 - 104:13

**Bartlett v Mutual**



Q.  If her ophthalmologists at Harvard
10 have concluded that after nine eye
11 surgeries she will likely never be able
12 to read or work or drive again, do you
13 consider that a permanent disability?

Objection (104:9 to 104:23):
-402
-403
-701
-801
-802
-Argumentative
-Speculation

Ruling:  Sustained.

Witness_ Andria Werynski - Vol. 1.txt:  104:22 - 104:23

THE WITNESS:  I don't -- I
23 can't classify a significant disability.

Witness_ Andria Werynski - Vol. 1.txt:  106:11 - 106:16

This follow-up report that's being
12 reported to the FDA occurred about six
13 months after the lawsuit was filed,
14 correct?  The follow-up visit that was
15 being reported of Ms. Bartlett's
16 treating physician?

Objection (106:11 to 107:9):
-402
-403
-801
-802
-804
-1003
-1004

Ruling:  Overruled.

Witness_ Andria Werynski - Vol. 1.txt:  106:19 - 107:4

THE WITNESS:  Yes.  That's
20 correct.
21 BY MR. JENSEN:
22 Q.  And what is reported to the FDA is
23 that she had a follow-up visit in July
24 2008, and her medical history included
25 chronic obstructive pulmonary disease,
00107
1 it's abbreviated COPD, and it says that
2 she's legally blind in the right eye,
3 secondary to Stevens-Johnson Syndrome?
4 Correct?

Witness_ Andria Werynski - Vol. 1.txt:  107:8 - 107:9

THE WITNESS:  That's what her
9 medical records say, yes.

Witness_ Andria Werynski - Vol. 1.txt:  108:21 - 108:25

It's correct that Mutual reported
22 to the FDA in May of 2009 that
23 Ms. Bartlett was legally blind in the
24 right eye secondary to Stevens-Johnson
25 Syndrome?  Correct?

Objection (108:21 to 109:22):
-402
-403
-801
-802
-804
-1003
-1004

Ruling:  Overruled.

Witness_ Andria Werynski - Vol. 1.txt:  109:5 - 109:9

THE WITNESS:  Her medical
6 records were submitted to the FDA, yes.
7 BY MR. JENSEN:
8 Q.  But I didn't ask you about her
9 medical records.

Witness_ Andria Werynski - Vol. 1.txt:  109:12 - 109:15

Q.  It's correct to state that in May
13 2009, Mutual reported to FDA that
14 Ms. Bartlett was legally blind in her
15 right eye secondary to SJS?  Correct?

**Bartlett v Mutual**

---

**Witness_ Andria Werynski - Vol. 1.txt: 109:18 - 109:22**

THE WITNESS: No, I don't see
19 that.
20 BY MR. JENSEN:
21 Q. It's the end of Page 5 of 5.
22 A. Oh. Yes.

---

**Witness_ Andria Werynski - Vol. 1.txt: 109:23 - 110:4**

Q. Is blindness a disability, or do
24 you not know?
25 MR. COSGROVE: Objection.
00110
1 Form. Foundation. Argumentative.
2 Assumes facts. Calls for improper
3 expert opinion.
4 THE WITNESS: I don't know.

| Objection:<br>-402<br>-403<br>-701<br>-Speculation | Ruling: Sustained. |
|---|---|

---

**Bartlett v Mutual**

---

**Witness_ Andrea Werynski - Vol. 1.txt: 1:1 - 1:19**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**
**2**
**- - -**
**3**
**4 KAREN L. BARTLETT, : CASE NO. 08-cv-358-JL**
**Plaintiff, :**
**5 :**
**:**
**6 -v.- :**
**:**
**7 MUTUAL PHARMACEUTICAL :**
**COMPANY, INC. and UNITED :**
**8 RESEARCH LABORATORIES, INC., :**
**Defendants. :**
**9**
**- - -**
**10**
**Friday**
**11**
**November 13, 2009**
**12**
**- - -**
**13**
**Oral deposition of ANDREA WERYNSKI, held at**
**14**
**the Law Offices of Segal, McCambridge, Singer & Mahoney,**
**15**
**LTD, United Plaza, 30 South 17th Street, Suite 1700,**
**16**
**Philadelphia, Pennsylvania, commencing at 10:08 a.m. on**
**17**
**the above date, before Christine M. Aguado, a Professional**
**18**
**Court Reporter and Notary Public in the Commonwealth of**
**19**
**Pennsylvania.**

---

**Witness_ Andrea Werynski - Vol. 1.txt: 4:21 - 4:22**

**Q. Please state your name for the record.**
**22 A. Andrea Werynski.**

---

**Witness_ Andrea Werynski - Vol. 1.txt: 4:23 - 5:8**

**And we've met at your prior**
**24 deposition, correct?**
**25 A. Yes.**
**00005**
**1 Q. Did you read your prior deposition after you gave**
**2 that testimony that day?**
**3 A. Yes.**
**4 Q. Did you make any changes to your testimony?**
**5 A. No.**
**6 Q. Is it fair to assume that the reason that you did**
**7 not make any changes to your testimony is that you did not**
**8 find any errors in it?**

| Objection (4:23 to 4:25):<br>-402 | Ruling: Overruled. |
|---|---|

| Objection (5:1 to 5:8):<br>-Improper bolstering<br>-402 | Ruling: Overruled. |
|---|---|

---

**Witness_ Andrea Werynski - Vol. 1.txt: 5:10 - 5:15**

Bartlett v Mutual

THE WITNESS:  Yes.
11 BY MR. JENSEN:
12    Q.   And do you understand that one of the reasons
13 we're here today is that you've been designated as
14 corporate representative on behalf of one or more
15 corporations to provide testimony on one or more topics?

| Objection (5:12 to 5:18): | Ruling:  Overruled. |
|---|---|
| -402 | |
| -Vague | |

Witness_ Andrea Werynski - Vol. 1.txt:  Page 5, Line 18

THE WITNESS:  Yes.

---

Witness_ Andrea Werynski - Vol. 1.txt:  6:22 - 7:1

Q.   How many times, to your knowledge, either before
23 you arrived at Mutual, because you might have knowledge of
24 that, or since you arrived at Mutual has Mutual or AR
25 Holdings or URL or one of its other affiliated companies
00007
1 ever filed a citizen's petition for any reason?

| Objection (6:23 to 8:16): | Ruling:  Sustained. |
|---|---|
| -402 (events after 12/04), (NDA) | |
| -403 | |
| -407 | |
| -602 | |

Witness_ Andrea Werynski - Vol. 1.txt:  7:5 - 7:6

THE WITNESS:  I'm aware of them.  I have
6      no idea how many.

Witness_ Andrea Werynski - Vol. 1.txt:  7:9 - 7:10

So please now
10 tell me how many you have knowledge of.

Witness_ Andrea Werynski - Vol. 1.txt:  7:14 - 8:16

THE WITNESS:  Approximately three.
15 BY MR. JENSEN:
16    Q.   And please identify the three that you're aware
17 of.
18    A.   Colcrys, for a product Colcrys, for a product
19 Skelaxin -- Metaxalone, and I think that's it.
20    Q.   Okay.  And you said approximately three, but I
21 think you just said two drugs.  Was there three in
22 relation to these drugs that you have knowledge of?
23    A.   I don't know.  No, I really don't know.
24    Q.   And Skelaxin is the brand name and Metaxalone is
25 the chemical?
00008
1    A.   Yes.
2    Q.   Colcrys is the brand name?
3    A.   Yes.
4    Q.   What is the chemical?
5    A.   Colchicine.
6    Q.   Can you spell that?
7    A.   C-O-L-C-H-I-C-I-N-E.
8    Q.   And Mutual holds the NDA or ANDA for Colcrys?
9    A.   NDA.
10    Q.   And Mutual holds the NDA or ANDA for Skelaxin?
11    A.   Neither.
12    Q.   What does it hold?
13    A.   Nothing.
14    Q.   Did it ever hold one of them, to your knowledge,
15 for Skelaxin?
16    A.   No.

Bartlett v Mutual

---

Witness_ Andrea Werynski - Vol. 1.txt: 13:18 - 13:20

Q.   Did Mutual attempt to enhance safety information
19  in its Qualaquin Physicians' Desk Reference or package
20  insert label?

| Objection (13:18 to 14:18):<br>-402 (NDA products)<br>-403<br>-602 | Ruling:  Sustained. |

Witness_ Andrea Werynski - Vol. 1.txt: 13:25 - 14:9

THE WITNESS:  When?
00014
1  BY MR. JENSEN:
2    Q.  Since August 2005.
3    A.  Yes.
4    Q.  What did it do in that regard?
5    A.  I'm only aware of one specific instance, and it
6  was to update information pertaining to thrombocytopenia.
7    Q.  And what did Mutual do to update information
8  regarding thrombocytopenia in its NDA product Qualaquin
9  label?

---

Witness_ Andrea Werynski - Vol. 1.txt: 14:16 - 14:18

THE WITNESS:  I don't know the specific
17      details.  I know they increased the strength
18      warning for it.

Witness_ Andrea Werynski - Vol. 1.txt: 15:17 - 15:19

Q.   What was Prosar's role, if any, in the changes of
18  the Qualaquin label to add additional risk information
19  regarding thrombocytopenia?

| Objection (15:17 to 15:24):<br>-402 (time)<br>-403<br>-407 (Prosar engaged after Rx date 12/04)<br>-602 | Ruling:  Sustained. |

Witness_ Andrea Werynski - Vol. 1.txt: Page 15, Line 24

THE WITNESS:  I did not have a role.

---

Witness_ Andrea Werynski - Vol. 1.txt: 21:11 - 21:15

Q.   How often does Prosar survey the medical
12  literature for Mutual's ANDA drugs?
13      A.  They have their own standard operating procedures
14  that specifies how often they do that.  It's -- I believe
15  it's done weekly.

| Objection:<br>-402 (time)<br>-403<br>-407 (Prosar engaged after Rx date 12/04)<br>-602 | Ruling:  Sustained. |

Witness_ Andrea Werynski - Vol. 1.txt: 23:17 - 23:24

Q.   When did Prosar start doing medical literature
18  surveillance for Sulindac?
19      A.  I don't have a specific date, but I believe they
20  began surveying the literature for all of our products in
21  association with the Qualaquin NDA approval.
22      Q.  Better than associated, do you believe it started
23  happening at the same time the Qualaquin NDA was approved;
24  is that correct?

| Objection (23:17 to 24:23):<br>-402 (NDA products)<br>-403<br>-407 (Prosar and Qualaquin and literature survey after 12/04) | Ruling:  Sustained. |

Witness_ Andrea Werynski - Vol. 1.txt: 24:2 - 24:9

THE WITNESS:  Around the same time, yes.
3  BY MR. JENSEN:
4    Q.  And you estimated for me before that the
5  Qualaquin NDA was in August 2005; is that correct?
6    A.  Yes.

**Bartlett v Mutual**

7    Q.  If that estimation is accurate, is that when,
8  August 2005, you believe that Prosar starting doing
9  medical literature surveillance for Sulindac?

---

Witness_ Andrea Werynski - Vol. 1.txt:  24:13 - 24:18

THE WITNESS:  Yes.
14  BY MR. JENSEN:
15    Q.  And if that August 2005 estimation is correct, is
16  that also the first month and year that Prosar started
17  doing medical literature surveillance for all of Mutual's
18  approximate 100 ANDAs?

---

Witness_ Andrea Werynski - Vol. 1.txt:  24:22 - 24:23

THE WITNESS:  It's all an approximation,
23      but yes.

---

Witness_ Andrea Werynski - Vol. 1.txt:  30:10 - 30:16

| | Objection: | Ruling:  Sustained. |
|---|---|---|
| Tell me, when Prosar identifies a<br>11  15-day report, what happens?<br>12     A.  When they identify a 15-day report, they prepare<br>13  the Med Watch.  They send it to Mutual where it's reviewed<br>14  by either Dr. Davis or Dr. Wason and myself, and then when<br>15  we let Prosar know if we approve it, then Prosar submits<br>16  it. | -402<br>-403 (Prosar engaged<br>for literature reviews<br>after 12/04) | |

---

Witness_ Andrea Werynski - Vol. 1.txt:  31:11 - 31:16

| | Objection (31:11 to<br>31:21): | Ruling: Sustained. |
|---|---|---|
| Tell me, Prosar identifies 15-day<br>12  alert reports.  Prosar does the substance and analysis of<br>13  whether or not they should be reported yet to the FDA.<br>14  Mutual solely reviews the same for completeness and Mutual<br>15  does not review the same for reportability.  If and when<br>16  Mutual says it's complete, Prosar submits it to the FDA? | -402<br>-403<br>-407 (post-dates 12/04<br>Rx) | |

---

Witness_ Andrea Werynski - Vol. 1.txt:  Page 31, Line 21

THE WITNESS:  Yes.

---

Witness_ Andrea Werynski - Vol. 1.txt:  32:17 - 32:22

| | Objection: | Ruling:  Sustained. |
|---|---|---|
| Q.  Hence, what you agreed to as the relationship and<br>18  how it works for a 15-day alert of reports as between<br>19  Prosar and Mutual has been true since approximately the<br>20  fall of 2008 for all of Mutual's ANDAs and/or NDAs,<br>21  correct?<br>22     A.  Yes. | -402<br>-403<br>-407 (post-dates 12/04<br>Rx) | |

---

Witness_ Andrea Werynski - Vol. 1.txt:  33:3 - 33:5

| | Objection (33:3 to<br>33:23): | Ruling:  Sustained. |
|---|---|---|
| Q.  Between August 2005 and the fall of 2008, tell me<br>4  how it worked then in that time period for 15-day alert<br>5  reports. | -402<br>-403<br>-407 (post-dates 12/04<br>Rx) | |

---

Witness_ Andrea Werynski - Vol. 1.txt:  33:8 - 33:19

THE WITNESS:  It worked the same, except
9      when the Med Watch was sent to Mutual and it was
10      reviewed and considered accurate and complete,
11      Mutual submitted it.  They actually put it in the

Bartlett v Mutual

12      mail rather than Prosar putting it in the mail.
13 BY MR. JENSEN:
14      Q.  In that time period, approximately three years
15 between August 2005 and sometime in the fall of 2008, was
16 it still true that Mutual was not doing an analysis
17 regarding reportability?  It was only doing a review of
18 completeness.  Hence, Prosar was doing the analysis and
19 reportability.

---

Witness_ Andrea Werynski - Vol. 1.txt:  Page 33, Line 23

THE WITNESS:  Yes, that is correct.

---

Witness_ Andrea Werynski - Vol. 1.txt:  34:23 - 35:1

What are the requirements for an ANDA
24 filer of an annual report in terms of in stating the
25 report what information might affect the safety profile of
00035
1 the product or its label?

| Objection (34:23 to 35:21):<br>-402<br>-403 (no evidence of such a requirement) | Ruling:  Sustained. |

---

Witness_ Andrea Werynski - Vol. 1.txt:  35:7 - 35:12

THE WITNESS:  There is no such
8      stipulation in an annual report.
9 BY MR. JENSEN:
10      Q.  Is there any requirement in an annual report for
11 an ANDA holder to comment on information that may affect
12 the safety profile of the product?

---

Witness_ Andrea Werynski - Vol. 1.txt:  35:18 - 35:21

THE WITNESS:  Are you talking about an
19      annual report or a periodic report?
20          MR. JENSEN:  Annual report.
21          THE WITNESS:  Not that I'm aware of.

---

Witness_ Andrea Werynski - Vol. 1.txt:  37:2 - 37:6

Q.  Is the following a correct statement?  Prosar has
3 not been hired by Mutual or any of its related entities to
4 evaluate whether or not Mutual or its related entity
5 labels are in conformity or not with the requirements of
6 the code of federal regulations.

| Objection (37:2 to 37:13):<br>-402<br>-403<br>-407 (Prosar engaged after 12/04) | Ruling:  Sustained. |

---

Witness_ Andrea Werynski - Vol. 1.txt:  37:11 - 37:13

THE WITNESS:  Prosar was not hired to
12      evaluate Mutual's labeling for any of their
13      products.

---

Witness_ Andrea Werynski - Vol. 1.txt:  42:18 - 42:23

And 430, as you
19 can see, is a citizen's petition signed by Mr. Dennery on
20 March 6th, 2001.  Do you see that?
21      A.  Yes.
22      Q.  And it involves the product of Skelaxin, correct?
23      A.  Yes.

| Objection:<br>-402 (not product at issue; NDA product)<br>-403<br>-602 (see line 42:21) | Ruling:  Sustained. |

---

Witness_ Andrea Werynski - Vol. 1.txt:  43:9 - 43:12

Bartlett v Mutual

| | | |
|---|---|---|
| Q.  I understand that you were not with Mutual in<br>10  2001, is it correct that you've come to learn that Mutual<br>11  has filed a number of citizens' petitions regarding the<br>12  product Skelaxin?<br><br>Witness_ Andrea Werynski - Vol. 1.txt:  Page 43, Line 15<br><br>THE WITNESS:  Yes. | Objection (43:9 to<br>43:15):<br>-402 (not product at<br>issue; NDA product)<br>-403<br>-602 (see line 42:21) | Ruling:  Sustained. |

---

| | | |
|---|---|---|
| Witness_ Andrea Werynski - Vol. 1.txt:  44:9 - 44:12<br><br>Q.  Do you understand or do you not that Mutual's<br>10  citizens' petitions in part might affect the labeling of<br>11  Skelaxin that Mutual has requested that the FDA take<br>12  action regarding the labeling of Skelaxin, correct?<br><br>Witness_ Andrea Werynski - Vol. 1.txt:  44:21 - 44:25 | Objection (44:9 to 44:22):<br>-402 (not product at issue;<br>NDA product)<br>-403<br>-602 | Ruling:  Sustained. |

| | | |
|---|---|---|
| A.  I don't know what the citizen's petition is for.<br>22  I haven't read it.<br>23     Q.  Do you recognize Exhibit-431 to be Mutual's<br>24  petition for stay at action filed through Mutual's<br>25  attorneys in April 2004 regarding the product Skelaxin?<br><br>Witness_ Andrea Werynski - Vol. 1.txt:  45:4 - 45:11 | Objection (44:23 to<br>45:6):<br>-402 (not product at<br>issue; NDA product)<br>-403<br>-602 | Ruling:  Sustained. |

| | | |
|---|---|---|
| THE WITNESS:  I don't know.  It says on<br>5        behalf of Mutual, but I don't recognize it as<br>6        something I've seen.<br>7  BY MR. JENSEN:<br>8     Q.  Do you recognize Exhibit-432 to be Mutual's<br>9  supplemental submission regarding Skelaxin in February<br>10  2005 submitted through its other attorneys, Zuckerman<br>11  Spaeder?<br><br>Witness_ Andrea Werynski - Vol. 1.txt:  45:16 - 45:21 | Objection (45:8 to<br>45:25):<br>-402 (not product at<br>issue; NDA product)<br>-403<br>-602 | Ruling:  Sustained. |

| | | |
|---|---|---|
| THE WITNESS:  It says Mutual on it.<br>17  BY MR. JENSEN:<br>18     Q.  And does it also say, starting on the third line,<br>19  both petitions concern the significance of the labeling<br>20  that King has proposed regarding the possible food effects<br>21  of King's drug Skelaxin?<br><br>Witness_ Andrea Werynski - Vol. 1.txt:  45:24 - 46:4 | | |

| | | |
|---|---|---|
| THE WITNESS:  Yes, the document says<br>25        that.<br>00046<br>1  BY MR. JENSEN:<br>2     Q.  Do you recognize Exhibit-433 to be another<br>3  citizen's petition by Mutual this time in May 2009<br>4  regarding Skelaxin?<br><br>Witness_ Andrea Werynski - Vol. 1.txt:  46:21 - 46:25<br><br>THE WITNESS:  It says May 13th, 2009,<br>22        filed by Mutual.<br>23  BY MR. JENSEN:<br>24     Q.  Do you recognize that to be Robert Dennery's<br>25  signature on Page 8? | Objection (46:2 to 47:3):<br>-402 (not product at<br>issue; NDA product)<br>-403<br>-602<br>-407 (post-dates event) | Ruling:  Sustained (through line 48:24). |

Page 6

**Bartlett v Mutual**

---

Witness_ Andrea Werynski - Vol. 1.txt:  Page 47, Line 3

THE WITNESS:  Yes.

---

Witness_ Andrea Werynski - Vol. 1.txt:  47:13 - 47:16

Q.  Do you see that the first item, that through the
14 citizen's petition that Mutual this year has requested
15 that the FDA declare Skelaxin misbranded unless King
16 updates its labeling?

---

Witness_ Andrea Werynski - Vol. 1.txt:  47:21 - 47:25

THE WITNESS:  Yes, that's what it says.
22 BY MR. JENSEN:
23    Q.  Were you aware at any time in 2009 of Mutual's
24 intent or actual pursuit of this action through this
25 citizen's petition?

---

Witness_ Andrea Werynski - Vol. 1.txt:  48:5 - 48:10

THE WITNESS:  I was aware that Mutual
6       filed a citizen's petition stating or suggesting
7       that Skelaxin should be a delayed-release
8       product.
9 BY MR. JENSEN:
10    Q.  And that is the petition, Exhibit-433, correct?

---

Witness_ Andrea Werynski - Vol. 1.txt:  48:14 - 48:19

THE WITNESS:  Yes.
15 BY MR. JENSEN:
16    Q.  And what you referred to as the second item of
17 relief that Mutual seeks in this citizen's petition which
18 is that King be required to update the dosage form listing
19 to have it read delayed release, correct?

---

Witness_ Andrea Werynski - Vol. 1.txt:  48:24 - 49:4

THE WITNESS:  Yes.
25 BY MR. JENSEN:
00049
1    Q.  And do you understand these to be the same
2 efforts in part that Mutual was involved in Exhibit-430
3 back in 2001 and through two different law firms in 2004,
4 Exhibit-431, and in 2005, Exhibit-432?

| Objection (49:1 to 49:12): -402 -403 -602 | Ruling:  Sustained. |

---

Witness_ Andrea Werynski - Vol. 1.txt:  49:10 - 49:16

THE WITNESS:  I don't know other than
11       the product name in which these citizens'
12       petitions are related.
13 BY MR. JENSEN:
14    Q.  And Exhibit-431 shows us that the law firm named
15 Heller Ehrman represented Mutual at that time in April of
16 2004, correct?

| Objection (49:14 to 49:24): -402 -403 -602 | Ruling:  Sustained. |

---

Witness_ Andrea Werynski - Vol. 1.txt:  49:19 - 49:24

THE WITNESS:  Yes.
20 BY MR. JENSEN:
21    Q.  And Exhibit-432 shows us that a law firm called

**Bartlett v Mutual**

22 Zuckerman Spaeder represented Mutual at that time in
23 February 2005, correct?
24    A.  Yes.

---

Witness_ Andrea Werynski - Vol. 1.txt:  51:12 - 51:15

Q.  Is it correct that the fifth item of relief that
13 Mutual in May 2009 citizen's petition was to require a
14 different drug company; namely, King Pharmaceutical, to
15 perform a pharmacokinetic study?

Witness_ Andrea Werynski - Vol. 1.txt:  51:20 - 51:21

THE WITNESS:  The document says required
21       King to perform a pharmacokinetic study.

| Objection (51:12 t0 51:21): -402 -403 -407 -602 | Ruling:  Sustained. |
|---|---|

---

Witness_ Andrea Werynski - Vol. 1.txt:  52:24 - 52:25

Q.  When did Mutual file a citizen's petition for
25 Colcrys?

Witness_ Andrea Werynski - Vol. 1.txt:  53:3 - 53:8

THE WITNESS:  I don't know when Mutual
4       filed their citizen's petition for Colcrys.
5 BY MR. JENSEN:
6    Q.  Do you know what year or an approximation of what
7 year?
8    A.  Approximately 2008, 2009.

| Objection (52:24 to 53:8): -402 -403 -407 -602 | Ruling:  Sustained. |
|---|---|

---

Witness_ Andrea Werynski - Vol. 1.txt:  53:18 - 53:20

does that signature
19 on Page 5 also appear to be, in fact, Mr. Dennery's
20 signature?

Witness_ Andrea Werynski - Vol. 1.txt:  54:1 - 54:2

THE WITNESS:  Yes, that appears to be
2       his signature.

| Objection: -402 (NDA product and not product at issue; time) -403 | Ruling:  Sustained. |
|---|---|

---

Witness_ Andrea Werynski - Vol. 1.txt:  54:4 - 54:9

Q.  Have you ever heard of a Dr. Daniel Azernof?
5    A.  No.
6    Q.  To your knowledge, how many times has Mutual
7 hired a doctor like Dr. Azernof, not in relation to
8 litigation, but actually in relation to Mutual's efforts
9 to get a label changed like the Skelaxin label?

Witness_ Andrea Werynski - Vol. 1.txt:  54:14 - 54:15

THE WITNESS:  I don't know how often
15       they hire doctors.

| Objection (54:4 to 54:15): -402 -403 -602 -Foundation | Ruling:  Sustained. |
|---|---|

---

Witness_ Andrea Werynski - Vol. 1.txt:  55:4 - 55:8

Q.  How many times has Mutual, to your knowledge,
5 ever hired a medical expert or consultant to aid Mutual in
6 its efforts to change a label regarding safety, in whole
7 or in part, on one of its drugs or a drug that is not a
8 Mutual drug, but that Mutual is interested in pursuing?

**Bartlett v Mutual**

---

| | Objection (55:4 to 55:25): | Ruling: Sustained. |
|---|---|---|
| | -402 | |
| | -403 | |
| | -407 | |
| | -Vague | |

**Witness_ Andrea Werynski - Vol. 1.txt: 55:14 - 55:20**

THE WITNESS: I'm only aware of one
15       time.
16 BY MR. JENSEN:
17     Q.  What time is that?
18     A.  This year, 2009.
19     Q.  What was the drug and what was Mutual trying to
20 accomplish by hiring them?

---

**Witness_ Andrea Werynski - Vol. 1.txt: Page 55, Line 25**

THE WITNESS: It was Qualaquin.

---

**Witness_ Andrea Werynski - Vol. 1.txt: 57:17 - 58:11**

Q.  The first page of 403, whose signature is that on
18 the bottom?
19     A.  Beatrice Rivera.
20     Q.  And do you recognize some or all of the
21 handwriting on it and do you know who is the author of any
22 of it?
23     A.  I recognize some of it, yes.
24     Q.  Is it yours?
25     A.  Yes.
00058
1     Q.  Now, identify the date entries that are your
2 writing.
3     A.  May 1st, 2009.
4     Q.  So above your note on 2/11/08, it says case is
5 listed as expected and serious.  No investigation
6 required, correct?
7     A.  That is what it says, yes.
8     Q.  Do you know who wrote that?
9     A.  Yes.
10    Q.  Who?
11    A.  Beatrice Rivera.

| Objection: | Ruling: Overruled. |
|---|---|
| -402 | |
| -403 | |
| -407 | |
| -Vague, ambiguous with regard to what question relates to best evidence | |

---

**Witness_ Andrea Werynski - Vol. 1.txt: 59:21 - 59:25**

Q.  Is what Pages 2 and 3 on Exhibit-403 are in part
22 is a list of terms that the person who reviewed Karen
23 Bartlett's complaint found to be in the label, and, in
24 other terms, in association with her case, the reviewer
25 had found not to be in the Sulindac label?

---

| Objection (59:21 to 61:8): | Ruling: Sustained.  References to Prosar's work and conclusions are unfairly prejudicial (Rule 403). |
|---|---|
| -402 | |
| -403 | |
| -801 | |
| -802 | |
| -1002 | |

**Witness_ Andrea Werynski - Vol. 1.txt: 60:3 - 60:18**

THE WITNESS:  These are all terms pulled
4       from the medical records and their assessment of
5       them, yes.
6 BY MR. JENSEN:
7     Q.  Is it correct that your understanding is the
8 reviewer pulled these terms from Karen Bartlett's medical
9 records and if the reviewer found those terms in the
10 Sulindac label, then they identified it as expected.
11 We'll stop there.
12    A.  I don't know how they assess expectedness and
13 unexpectedness, but the general concept is if it's in the
14 label, it's expected.
15    Q.  Okay.  Conversely, is it your understanding that

Bartlett v Mutual

16 if the reviewer did not find the term on the Sulindac
17 label, they characterize it on these two pages as an
18 unexpected event?

---

Witness_ Andrea Werynski - Vol. 1.txt:  60:21 - 61:2

THE WITNESS:  That is my general
22        understanding of the process, yes.
23 BY MR. JENSEN:
24    Q.  And will you please count and agree with me that
25 based upon this review that was done by Prosar, that
00061
1 reviewer found 14 different conditions in Karen Bartlett's
2 medical records which were not in the Sulindac label?

---

Witness_ Andrea Werynski - Vol. 1.txt:  61:5 - 61:8

THE WITNESS:  Well, if you look at the
6        original one these weren't in there.  These were
7        all associated or because of the original adverse
8        event.

---

Witness_ Andrea Werynski - Vol. 1.txt:  61:11 - 61:22

So
12 you're saying that you think these all flow from TEN or
13 SJS?
14    A.  Yes.
15    Q.  That is not your medical opinion?  That's your
16 understanding of what you think happened?
17    A.  That's my understanding of how the case
18 progressed because originally, the AE terms were SJS and
19 TEN.
20    Q.  Right.  And this information, as you noted, was
21 based upon new information received which was specifically
22 the medical records, correct?

| Objection (61:11 to 61:25):<br>-402<br>-403<br>-602<br>-801<br>-802<br>-1002 | Ruling:  Overruled. |
| --- | --- |

---

Witness_ Andrea Werynski - Vol. 1.txt:  61:25 - 62:7

THE WITNESS:  Yes, that's correct.
00062
1 BY MR. JENSEN:
2    Q.  Now, do you agree with me that based upon this
3 new information, i.e., Karen Bartlett's medical records,
4 that the reviewer at Prosar identified 14 conditions in
5 Karen Bartlett's medical records that they listed as
6 unexpected.  To your knowledge, that means that they were
7 not in the Sulindac label, correct?

| Objection (62:2 to 63:7):<br>-402<br>-403<br>-407<br>-801<br>-802<br>-602<br>-702 (Prosar not medical expert)<br>-Rule 26a(2) (Prosar not disclosed)<br>-1002 | Ruling:  Sustained. |
| --- | --- |

---

Witness_ Andrea Werynski - Vol. 1.txt:  62:12 - 63:1

THE WITNESS:  There are 14 terms that
13        are listed as unexpected.
14 BY MR. JENSEN:
15    Q.  And the 14 terms listed as unexpected that are,
16 therefore, based upon Prosar's review, not on the Sulindac
17 label, are:  One, scarring; two, corneal defects; three,
18 vancomycin resistant enterococcal infection; four, acute
19 respiratory distress syndrome; five, DVT or deep vein
20 thrombosis; six, an acronym, SIADH; seven, lobar
21 pneumonia; eight, staphylococcal infection; nine, chronic
22 obstructive pulmonary disease; ten, blindness in the right

Bartlett v Mutual

23  eye or blindness unilateral; eleven, esophageal
24  restriction; twelve, unilateral complete paralysis in the
25  vocal cords; thirteen, dehydration; fourteen, urinary
00063
1  tract infection.

---

Witness_ Andrea Werynski - Vol. 1.txt: 63:6 - 63:11

THE WITNESS:  That is what the document
7        says, yes.
8 BY MR. JENSEN:
9        Q.   Do you know who at Prosar conducted this
10 review to find those 14 items in Karen Bartlett's medical
11 records which are not on the Sulindac label?

Witness_ Andrea Werynski - Vol. 1.txt: 63:17 - 63:24

THE WITNESS:  I don't know who at Prosar
18        performed the assessment.
19 BY MR. JENSEN:
20     Q.  Did you ever have any conversations at all with
21 anybody regarding the follow up of Karen Bartlett's
22 analysis?
23     A.  I e-mailed them medical records and they notified
24 us that it was ungraded to serious unexpected.

| Objection (63:9 to 63:24): | Ruling:  Sustained. |
|---|---|
| -402 | |
| -407 | |
| -602 | |

---

Witness_ Andrea Werynski - Vol. 1.txt: 64:4 - 64:15

Q.   Does 434 appear to you to be a copy of the
5 Sulindac label as of February 2002?
6     A.  Yes.
7     Q.  And that's Mutual's Sulindac label, correct?
8     A.  Yes.
9     Q.  Back at Exhibit-403 -- if you would flip to the
10 Med Watch report, the follow up one.  It's five-pages
11 long.  Tell me when you're there, please.
12     A.  (Witness complies.)
13     Q.  And have you seen this five-page follow-up report
14 regarding Ms. Bartlett's medical records from before?
15     A.  Yes.

Witness_ Andrea Werynski - Vol. 1.txt: 64:18 - 64:24

But what I'm going to do with you now,
19 Ms. Werynski, is identify some additional things that are
20 identified here in Mutual/Prosar's follow-up report and
21 ask you whether they're in the label that are in addition
22 to the 14 things that Prosar concluded that were not in
23 the label.  Do you understand what I'm asking you to do?
24     A.  No.

| Objection (64:9 to 64:24): | Ruling:  Sustained as to the references to Prosar's work and its conclusions (Rule 403).  Otherwise overruled. |
|---|---|
| -402 | |
| -403 | |
| -407 | |
| -602 | |
| -Foundation | |

---

Witness_ Andrea Werynski - Vol. 1.txt: 67:14 - 67:17

Q.   Please confirm for me that there is no other
15 statement in the label that identifies that as a result of
16 taking Sulindac, there might be a coma or a drug-induced
17 coma.

Witness_ Andrea Werynski - Vol. 1.txt: 67:20 - 68:1

THE WITNESS:  No.  I don't know see anywhere
21        where it says drug-induced coma.

| Objection (67:14 to 68:11): | Ruling:  Overruled. |
|---|---|
| -Improper publishing | |
| -Argumentative | |
| -402 | |
| -407 | |
| -602 | |
| -801 | |
| -802 | |
| -1002 | |

**Bartlett v Mutual**

22  BY MR. JENSEN:
23     Q.  And do you also agree that there is nothing in
24  the label that informs someone that they might have a coma
25  as a result of taking Sulindac on the Mutual Sulindac
00068
1  label?

---

Witness_ Andrea Werynski - Vol. 1.txt: 68:6 - 68:11

THE WITNESS:  I don't see coma in the
7       insert, no.
8  BY MR. JENSEN:
9     Q.  When you say insert, you're referring to the
10  label, correct?
11     A.  Yes.

---

Witness_ Andrea Werynski - Vol. 1.txt: 70:23 - 71:7

What I'm going to do,
24  Ms. Werynski, is for each of these matters I've identified
25  -- I'll identify them again for clarity of the question.
00071
1  I'll ask you to tell us whether or not that medical
2  condition which is in Mutual's own follow-up report to the
3  FDA, which is not an unexpected event in its listing on
4  Pages 2 and 3, whether or not they're in the Sulindac
5  label.
6         Do you understand what I'm going to ask?
7     A.  Yes.

Objection (70:23 to 73:7):
-Argumentative
-Foundation
-402
-403
-602
-702
-801
-802
-1002

Ruling:  Sustained as to "which is not an unexpected event in its listing on Pages 2 and 3."  Otherwise overruled.

---

Witness_ Andrea Werynski - Vol. 1.txt: 71:13 - 71:16

Starting with ventilator, which is
14  characterized as vent dependence.  Is there anything in
15  the Sulindac label that advises that someone might go on a
16  ventilator if they take Mutual's Sulindac product?

---

Witness_ Andrea Werynski - Vol. 1.txt: 71:23 - 72:2

THE WITNESS:  I do not see vent
24       dependence in the insert.
25  BY MR. JENSEN:
00072
1     Q.  Or maybe it's under ventilator or breathing tube,
2  correct?

---

Witness_ Andrea Werynski - Vol. 1.txt: Page 72, Line 6

THE WITNESS:  No, I do not see that.

---

Witness_ Andrea Werynski - Vol. 1.txt: 72:13 - 72:16

Q. Do you see anything in the Sulindac label
14  which advises that someone might need to get trached or go
15  on a tracheostomy as Mutual found Karen Bartlett needing
16  to do after taking Mutual's Sulindac product?

---

Witness_ Andrea Werynski - Vol. 1.txt: 72:18 - 73:2

THE WITNESS:  I do not see the term
19       tracheostomy in the Sulindac insert.
20  BY MR. JENSEN:

Bartlett v Mutual

21  Q.      And again, the insert refers to the Sulindac
22  label, correct?
23  A.  Yes.
24  Q.  Do you see anything in Mutual's insert or
25  Sulindac label that advises that someone might need one or
00073
1  multiple bronchoscopies if they take Sulindac, Mutual's
2  product?

---

Witness_ Andrea Werynski - Vol. 1.txt:  73:6 - 73:7

---

THE WITNESS:  I don't see bronchoscopy
7        in the label.

---

Witness_ Andrea Werynski - Vol. 1.txt:  74:15 - 74:18

---

| both her medical records and what was<br>16  lifted from them in Mutual's report to the FDA, you<br>17  reported that Ms. Bartlett had five bronchoscopies,<br>18  correct? | Objection (74:15 to 75:4):<br>-Argumentative<br>-Foundation<br>-402<br>-403<br>-602<br>-702<br>-801<br>-802<br>-1002 | Ruling:  Overruled. |

---

Witness_ Andrea Werynski - Vol. 1.txt:  74:21 - 75:4

---

THE WITNESS:  Yes.
22  BY MR. JENSEN:
23    Q.   Next is the recordation and the report to the FDA
24  was that Ms. Bartlett needed Morphine and Versed, a pain
25  medication, a conscious sedation medication.  Is there
00075
1  anything in the Mutual Sulindac label that says they might
2  need one or both of those medications to treat conditions,
3  illnesses, or diseases that might result from the Sulindac
4  product that was being taken?

---

Witness_ Andrea Werynski - Vol. 1.txt:  75:12 - 75:19

---

| Q.  It's not in there, correct?<br>13    A.  No.<br>14    Q.  And is there any information in the Sulindac<br>15  label that alerts someone that they might need Methadone<br>16  for pain, Ativan for agitation based upon the conditions,<br>17  illnesses, or diseases that they might get from taking<br>18  Sulindac product as was reported to the FDA that<br>19  Ms. Bartlett had? | Objection (75:12 to 76:17):<br>-Argumentative<br>-Foundation<br>-402<br>-403<br>-602<br>-702<br>-801<br>-802<br>-1002 | Ruling:  Overruled. |

---

Witness_ Andrea Werynski - Vol. 1.txt:  76:3 - 76:14

---

THE WITNESS: No.  Methadone and Ativan
4        is not in the insert.
5  BY MR. JENSEN:
6    Q.  And do you see where Mutual reported to the FDA
7  that Ms. Bartlett needed packed white blood cells,
8  Albumin, and Crystalloid?
9    A.  Yes.
10    Q.  Are any of those three blood products or any
11  blood product identified in the Sulindac label that
12  someone might need blood transfusions of all of these
13  three or any type based upon conditions or diseases they
14  might get if they take the Sulindac product?

---

Witness_ Andrea Werynski - Vol. 1.txt:  76:16 - 76:17

Bartlett v Mutual

THE WITNESS: I don't see those three
17    blood products in the product insert.

---

Witness_ Andrea Werynski - Vol. 1.txt: 76:23 - 77:1

Q.  Do you see where Mutual reported to the FDA that
24 Ms. Bartlett needed intermittent presser support and that
25 she had hypoalbuminemia and anemia?
00077
1    A.  Yes, I see that.

| Objection: | Ruling:  Overruled. |
|---|---|
| -Argumentative | |
| -Foundation | |
| -402 | |
| -403 | |
| -602 | |
| -702 | |
| -801 | |
| -802 | |
| -1002 | |

---

Witness_ Andrea Werynski - Vol. 1.txt: 77:16 - 77:19

Q.  Do you agree that there's nothing in the label
17 that advises someone that takes Sulindac product that they
18 might be on presser support or they might get
19 hypoalbuminemia as a result of the taking Sulindac?

| Objection (77:16 to 90:12): | Ruling:  Overruled. |
|---|---|
| -Argumentative | |
| -Foundation | |
| -402 | |
| -403 | |
| -602 | |
| -702 | |
| -801 | |
| -802 | |
| -1002 | |

---

Witness_ Andrea Werynski - Vol. 1.txt: 78:1 - 78:5

THE WITNESS: I don't see
2    hypoalbuminemia in the insert.
3 BY MR. JENSEN:
4    Q.   And do you also agree that you don't see anything
5 about presser support in the label?

---

Witness_ Andrea Werynski - Vol. 1.txt: 78:8 - 78:14

THE WITNESS: I don't see that in there.
9 BY MR. JENSEN:
10    Q.  On Page 3, do you see where Mutual reported to
11 the FDA that Ms. Bartlett had oral airway sloughing and
12 described oral airway sloughing as having thick, bloody
13 secretions?
14    A.  Yes, I see that.

---

Witness_ Andrea Werynski - Vol. 1.txt: 78:18 - 78:21

Q.  Do you agree that there's nothing in Mutual's
19 Sulindac label which alerts a reader that a person taking
20 Sulindac might get oral airway sloughing with or without
21 thick, bloody secretions?

---

Witness_ Andrea Werynski - Vol. 1.txt: 79:1 - 79:6

THE WITNESS: I do not see the term oral
2    airway sloughing or thick, bloody secretions in
3    the insert.
4 BY MR. JENSEN:
5    Q.  Do you see where Mutual advises the FDA that
6 Ms. Bartlett needed a chest tube?

---

Witness_ Andrea Werynski - Vol. 1.txt: 79:9 - 79:15

THE WITNESS: Yes.
10 BY MR. JENSEN:
11    Q.  Do you agree that there is nothing in Mutual's
12 Sulindac label which alerts the reader that someone taking
13 Mutual's Sulindac product might need a chest tube for the
14 diseases and conditions that result from taking Mutual's
15 Sulindac product?

**Bartlett v Mutual**

---

Witness_ Andrea Werynski - Vol. 1.txt:  79:22 - 80:8

THE WITNESS:  I do not see chest tube in
23      the insert.
24 BY MR. JENSEN:
25    Q.  Do you see where Mutual advised the FDA that
00080
1 Karen Bartlett had what is called a passy-muir valve?
2    A.  Yes.
3    Q.  Do you agree that there is nothing in the
4 Sulindac label which alerts its reader to the fact that
5 someone might need a valve, any type of valve, to be
6 implanted in their throat or otherwise to treat any
7 conditions or diseases that will result from taking
8 Sulindac?

---

Witness_ Andrea Werynski - Vol. 1.txt:  80:15 - 80:25

THE WITNESS:  No, that term is not in
16      the insert.
17 BY MR. JENSEN:
18    Q.  Next paragraph was where Mutual informed the FDA
19 in part that Karen Bartlett had to be on total parenteral
20 nutrition, which is also known as tube feeding, correct?
21    A.  Yes.
22    Q.  Do you agree that nothing in Mutual's Sulindac
23 label which alerts its readers that someone might have to
24 be tube fed for the diseases or conditions as a result of
25 taking Mutual's Sulindac product?

---

Witness_ Andrea Werynski - Vol. 1.txt:  81:10 - 81:23

THE WITNESS:  TPN?  I do not see that in
11      the label.
12 BY MR. JENSEN:
13    Q.  Or a tube feed, correct?
14    A.  Correct.
15    Q.  Do you see the next paragraph where Mutual
16 advised the FDA that Karen Bartlett needed a Foley
17 catheter?
18    A.  Yes.
19    Q.  Do you agree that there is nothing in Sulindac's
20 label that advises someone that they might need to have a
21 catheter inserted in their genital area where Foley
22 catheters are inserted to treat any diseases or conditions
23 that result from Sulindac?

---

Witness_ Andrea Werynski - Vol. 1.txt:  82:5 - 82:15

THE WITNESS:  No, I not see that.
6 BY MR. JENSEN:
7    Q.  Do you agree that in two paragraphs down that
8 Mutual advised the FDA that Karen Bartlett needed
9 a Fragmin, a blood thinner to treat a DVT?
10    A.  Yes.
11    Q.  Do you agree that there is nothing in the Mutual
12 Sulindac label which advises or alerts its reader that
13 someone might need either Fragmin, one blood thinner, or
14 Coumadin, another blood thinner, to treat conditions or
15 diseases which can result from taking Sulindac's product?

---

Witness_ Andrea Werynski - Vol. 1.txt:  82:22 - 83:7

**Bartlett v Mutual**


**THE WITNESS:  I do not see Fragmin or**
23          **Coumadin in the insert.**
24 **BY MR. JENSEN:**
25    **Q.  Do you agree that on the next page Mutual advised**
00083
1  **the FDA that Karen Bartlett had a 60 percent open on**
2  **admission with sloughing referring to her skin?**
3     **A.  Yes.**
4     **Q.  Do you see anywhere in the Sulindac label that**
5  **alerts the reader that someone might have 60 percent of**
6  **their skin fall off if they take Mutual Sulindac's**
7  **product?**

---

Witness_  Andrea Werynski - Vol. 1.txt:  83:16 - 84:4

**THE WITNESS:  I don't see 60 percent**
17          **open on admission with Sulfane in the insert**
18          **label, but I do see hypersensitivity and severe**
19          **skin reactions in the insert.**
20 **BY MR. JENSEN:**
21    **Q.  Do you see in that same paragraph where they**
22 **identify three different treatments that were used on**
23 **Karen's skin, mainly Aquacel, Acticoat, and Mepetel?**
24    **A.  Yes.**
25    **Q.  And do you agree that there's nothing in Mutual's**
00084
1  **Sulindac label that tells or alerts its readers that they**
2  **might need three different types of skin dressings to**
3  **treat their skin when it's infected or falling off or**
4  **sloughing as a result of taking Mutual's Sulindac product?**

---

Witness_  Andrea Werynski - Vol. 1.txt:  84:12 - 84:14

**THE WITNESS:  I don't see reference to**
13          **Aquacel, Acticoat, or Mepetel in the Sulindac**
14          **insert.**

---

Witness_  Andrea Werynski - Vol. 1.txt:  84:24 - 85:3

**Q.  Sure.  Do you also know that Karen Bartlett was**
25 **treated with pig skin which sometimes doctors refer to it**
00085
1  **as pig skin, like Dr. Schultz who put it on her?**
2  **Sometimes they refer to it as a zenograph.**
3     **A.  No.**

---

Witness_  Andrea Werynski - Vol. 1.txt:  85:10 - 85:14

**Q.  Do you agree that there's nothing in Mutual's**
11 **Sulindac label which alerts its reader that they might**
12 **need to have pig skin applied or medically zenographed,**
13 **which is the same thing as pig skin, on their body as a**
14 **result of taking Mutual's Sulindac product?**

---

Witness_  Andrea Werynski - Vol. 1.txt:  85:21 - 86:13

**THE WITNESS:  No, I do not see pig skin**
22          **in the insert.**
23 **BY MR. JENSEN:**
24    **Q.  Or a zenograph, correct?**
25    **A.  Or a zenograph, no.**

Bartlett v Mutual

00086
1    Q.  The next paragraph pertains to GYN, and it says
2  her vulva was erythematous and desquamated.  Her labia was
3  erythematous, but well-demarcated without adhesions.  Do
4  you see that?
5    A.  I do see that, yes.
6    Q.  And that's what Mutual reported to the FDA from
7  Karen's medical records, correct?
8    A.  Yes.
9    Q.  Do you agree that there's nothing in the Mutual
10  Sulindac label which alerts its readers that they might
11  have vaginal sequelae or vaginal complications, including
12  erythematous vulva as a result of taking Mutual's Sulindac
13  product?

---

Witness_ Andrea Werynski - Vol. 1.txt:  86:20 - 86:23

THE WITNESS:  Skin reaction, severe skin
21        reaction is in the insert, but vulva with
22        erythematous and desquamated labia with
23        erythematous is not in the insert.

---

Witness_ Andrea Werynski - Vol. 1.txt:  87:3 - 87:7

Q.  I'm representing to you, Ms. Werynski, that the
4  pages handed to you was Dr. Colleen Ryan's medical records
5  from the Harvard/Mass General Burn Unit.  Can you read me
6  that portion I highlighted there from Dr. Colleen Ryan's
7  medical records, please?

---

Witness_ Andrea Werynski - Vol. 1.txt:  87:10 - 87:16

THE WITNESS:  She has vaginal adhesion.
11  BY MR. JENSEN:
12    Q.  Do you agree with me that there is nothing in
13  Mutual Sulindac label which alerts its readers that
14  someone might get vaginal adhesion as Dr. Ryan documented
15  that Ms. Bartlett had from taking Mutual's Sulindac
16  product?

---

Witness_ Andrea Werynski - Vol. 1.txt:  87:25 - 88:12

THE WITNESS:  I don't see vaginal
00088
1        adhesions in the product insert.
2  BY MR. JENSEN:
3    Q.  Okay.  And the product insert is the same thing
4  as the label that we're talking about, right?
5    A.  Yes.
6    Q.  Do you see on that same page, the last paragraph,
7  where Mutual reported to the FDA that Karen had dysphagia?
8    A.  I see that, yes.
9    Q.  Do you agree that there's nothing on Mutual's
10  Sulindac label which alerts its readers that someone might
11  have dysphagia or a a painful swallowing as a result from
12  taking Sulindac?

---

Witness_ Andrea Werynski - Vol. 1.txt:  88:19 - 89:2

THE WITNESS:  No, I don't see dysphagia.
20  BY MR. JENSEN:
21    Q.  Do you see on the next line where Mutual reported

Bartlett v Mutual

22  to the FDA that Karen had a gastrostomy tube placed?
23      A.   Yes, I see that.
24      Q.   Do you agree that there's nothing in the Sulindac
25  label where Mutual alerts its readers that someone might
00089
1   need a g-tube or a gastrostomy tube placed if they take
2   Sulindac?

---

Witness_ Andrea Werynski - Vol. 1.txt: 89:9 - 89:14

THE WITNESS:  I don't see a gastrostomy
10         tube in the insert.
11  BY MR. JENSEN:
12      Q.   Do you also agree that Mutual reported to the FDA
13  that Karen had a g-tube for eleven months, from May 2005
14  to April 2006?

---

Witness_ Andrea Werynski - Vol. 1.txt: 89:19 - 89:24

THE WITNESS:  Yes, I see that.
20  BY MR. JENSEN:
21      Q.   Do you agree that there's no g-tube mentioned in
22  the label or there's no mention that someone might need a
23  g-tube for an extended period of time, let alone eleven
24  months?

---

Witness_ Andrea Werynski - Vol. 1.txt:  90:7 - 90:12

THE WITNESS:  No, I don't see g-tube
8          in the insert.
9   BY MR. JENSEN:
10      Q.   Or for any extended period of time or for any
11  time at all, right?
12      A.   Right.

---

| Witness_ Andrea Werynski - Vol. 1.txt:  90:15 - 90:18  Q.   Do you see the next sentence where Mutual 16 reported to the FDA that Karen underwent dilatation 17 surgery for her esophagus, which is to enlarge her 18 esophagus due to an esophageal stricture?  Witness_ Andrea Werynski - Vol. 1.txt:  Page 90, Line 21  THE WITNESS:  Yes, I see that. | Objection (90:15 to 90:21): -Argumentative -Foundation -402 -403 -602 -702 -801 -802 -1002 | Ruling:  Sustained as to "which is to enlarge her esophagus due to an esophageal stricture." Otherwise overruled. |
|---|---|---|
| Witness_ Andrea Werynski - Vol. 1.txt:  91:18 - 91:20  Q.   Do you agree that there's nothing in the Sulindac 19 label which advises its reader that they might 20 need an esophageal dilatation or enlargement surgery?  Witness_ Andrea Werynski - Vol. 1.txt:  92:6 - 92:18  THE WITNESS:  No, I don't see dilatation 7          of the cervical esophagus. 8  BY MR. JENSEN: 9      Q.   Or anything in relation to a dilatation surgery, 10 correct? 11      A.   Correct. 12      Q.   Do you see at the very bottom there that Mutual 13 reports to the FDA that Karen needed a donor cornea placed | Objection (91:18 to 93:18): -Argumentative -Foundation -402 -403 -602 -702 -801 -802 -1002 | Ruling:  Overruled. |

**Bartlett v Mutual**

14  in her left eye?
15    A.   Yes.
16    Q.   Do you agree that there's nothing in the Mutual
17  label regarding the potential need for a donor cornea in
18  any eye if you take Mutual's Sulindac product?

---

Witness_ Andrea Werynski - Vol. 1.txt:  93:1 - 93:6

THE WITNESS:  Donor cornea, I don't see
2        it in the insert.
3  BY MR. JENSEN:
4    Q.   Do you agree with me that there's nothing in the
5  Sulindac label that relates to blindness or potential
6  blindness if you take Sulindac?

---

Witness_ Andrea Werynski - Vol. 1.txt:  93:16 - 93:18

THE WITNESS:  I don't see blindness, but
17        I see disturbance of the retina in the vascular
18        region.

---

Witness_ Andrea Werynski - Vol. 1.txt:  94:10 - 94:14

Q.   Based upon your review of the label, other than
11  disturbances, blurred vision, or visual disturbance, do
12  you agree that there's nothing in the label that alerts
13  the reader that they might be blind as result of taking
14  Sulindac?

---

Witness_ Andrea Werynski - Vol. 1.txt:  94:22 - 95:8

THE WITNESS:  I don't see the term
23        blindness in the insert.
24  BY MR. JENSEN:
25    Q.   Representing to you that Ms. Karen Bartlett had
00095
1  eleven eye surgeries, ten in her left eye, including four
2  karetoprosthesis surgeries in her left eye, and she's had
3  transplanted corneas, including plastic apparatuses in her
4  left eye four times.
5        Do you agree that there's nothing in the
6  Sulindac label that alerts its reader that someone might
7  need multiple eye surgeries to treat the blindness or
8  possible blindness as a result of taking Sulindac?

---

Witness_ Andrea Werynski - Vol. 1.txt:  95:18 - 95:19

THE WITNESS:  I don't see multiple eye
19        surgeries in the insert.

---

Witness_ Andrea Werynski - Vol. 1.txt:  96:7 - 96:9

Q.  Do you agree that there's nothing in the Sulindac
8  label which alerts its readers that SJS or TEN might lead
9  to blindness?

---

Witness_ Andrea Werynski - Vol. 1.txt:  Page 96, Line 17

THE WITNESS:  No, I don't see that.

---

Witness_ Andrea Werynski - Vol. 1.txt:  97:19 - 97:25

Bartlett v Mutual

Q.  Is it true that for every condition and treatment
20  that we've gone through today where you testified that
21  such condition, disease, or treatment is not in the
22  label?  It's also true that there's nothing in the label
23  that says that if someone gets SJS or TEN, those
24  conditions might lead to any of the matters you identified
25  as not being in the label, correct?

| Objection (97:19 to 98:10):<br>-Vague<br>-Ambiguous<br>-Improper impeachment<br>-402<br>-403 | Ruling:  Overruled. |
|---|---|

Witness_ Andrea Werynski - Vol. 1.txt:  98:7 - 98:10

THE WITNESS:  I'll agree that the terms
8          and treatments that we discussed today, and I
9          said they were not in the insert, and I agree
10         that they're not in the insert.

Witness_ Andrea Werynski - Vol. 1.txt:  99:16 - 99:19

Q.  And also, all the terms that we discussed today
17  that you testified were are not in the label are not
18  identified in the label as potentially resulting from SJS
19  or TEN, correct?

| Objection (99:16 to 100:1):<br>-Vague<br>-Ambiguous<br>-Improper impeachment<br>-402<br>-403 | Ruling:  Overruled. |
|---|---|

Witness_ Andrea Werynski - Vol. 1.txt:  Page 100, Line 1

THE WITNESS:  Yes, that's correct.

Witness_ Andrea Werynski - Vol. 1.txt:  101:24 - 102:3

Q.  And we've gone through a number of matters which
25  were both conditions or diseases and a number of matters
00102
1  which were treatments for conditions or diseases, which
2  you testified are not in the Sulindac label, all within
3  these five pages of Mutual's Med Watch report, correct?

| Objection (101:24 to 104:3):<br>-Vague<br>-Ambiguous<br>-Improper impeachment<br>-402<br>-403 | Ruling:  Overruled. |
|---|---|

Witness_ Andrea Werynski - Vol. 1.txt:  Page 102, Line 6

THE WITNESS:  Yes.

Witness_ Andrea Werynski - Vol. 1.txt:  102:10 - 102:22

Do you agree that those matters include:
11  One, prolonged hospitalization; two, coma or drug-induced
12  coma; three, ventilator dependence; four, tracheostomy;
13  five, bronchoscopies; six and seven, Morhphine and Versed;
14  eight and nine, Methadone and Ativan; ten, eleven, and
15  twelve, packed red blood cells, Albumin, and Crystalloid;
16  thirteen, presser support; fourteen, hypoalbuminemia;
17  fifteen, airway sloughing, with or without thick, bloody
18  secretions; sixteen, a chest tube; seventeen, a Passy-Muir
19  valve insertion; eighteen, TPN or tube feeds; nineteen, a
20  Foley catheter insertion; and twenty -- let's stop there
21  -- with a blood thinner called Fragmin, or twenty-one, a
22  blood thinner called Coumadin.

Witness_ Andrea Werynski - Vol. 1.txt:  102:25 - 103:6

THE WITNESS:  Is there a question?
00103
1  BY MR. JENSEN:
2    Q.  Yes.  Those are all matters that we identified as
3  not being in the Sulindac label that Mutual reported to

Bartlett v Mutual

4  the FDA that Karen had or treatment she needed as a result
5  of the conditions or diseases she had, and we counted 21
6  so far, correct?

Witness_ Andrea Werynski - Vol. 1.txt:  103:9 - 103:22

THE WITNESS:  You've identified 21 terms
10        that I agree I did not see in the insert.
11 BY MR. JENSEN:
12    Q.  Now, 22 would be 60 percent sloughing of the
13 skin.  Twenty-three, 24, and 25 were the treatments of
14 Aquacel, Acticoat, and Mepetel.  Twenty-six would be the
15 vaginal injury of the vulva being erythematous or
16 desquamated.  Twenty-seven would be dysphagia or
17 difficulty swallowing or painful swallowing.
18        Twenty-eight would be a g-tube or a
19 gastrostomy tube, whether it is placed at all or placed
20 for 11 months.  Twenty-nine would be the need for an
21 esophageal dilatation or an enlargement surgery.  Thirty
22 would be the need to have a donor cornea, correct?

Witness_ Andrea Werynski - Vol. 1.txt:  Page 104, Line 3

THE WITNESS:  Yes, I agree.

Witness_ Andrea Werynski - Vol. 1.txt:  112:2 - 112:8

Q.  Now, 435, 436, and 437 are a citizen's petition,
3 a supplement to a citizen's petition, and another
4 supplement to a citizen's petition by Mutual, correct?
5    A.  Yes.
6    Q.  Please confirm that all three of those exhibits
7 are signed by Robert Dennery in person whose signature
8 that you referred to earlier.

| Objection (112:2 to 112:15): | Ruling:  Sustained. |
|---|---|
| -402 (as to issue, NDA products, and timing- see 112:17) -403 -Vague -602 | |

Witness_ Andrea Werynski - Vol. 1.txt:  112:14 - 112:15

THE WITNESS:  Yes.  As far as I can
15        tell, they're signed by Robert Dennery.

Witness_ Andrea Werynski - Vol. 1.txt:  125:1 - 125:12

Q.  Have you ever seen the log book entries that
2 pertain to the four no longer existing adverse events, the
3 two on 438 and 439?  Did you ever see any of those log
4 book entries?
5    A.  Yes.
6    Q.  When was the last time you did?
7    A.  Probably July 11th and November 9th.
8    Q.  Did you create 438 and 439?
9    A.  Yes.
10    Q.  And the reason you say probably is because you
11 believe those are the dates that you created them?
12    A.  Yes.

Witness_ Andrea Werynski - Vol. 1.txt:  144:4 - 144:11

Q.  So is it your testimony that Exhibit-438 is all
5 of the adverse events in the 150 milligram ANDA or
6 Sulindac?
7    A.  Yes.
8    Q.  And that's also your testimony regarding 439 for

**Bartlett v Mutual**

9  the dates referenced there through July 11th, 2008,
10  correct?
11     A.  Yes.

## ROBERT DETTERY – AUGUST 29, 2009

**Pg: 27 Ln: 15 - 18**

**Annotation:**
27:15  Q.  Generic labels for drugs are often
  16  found in the Physicians' Desk Reference,
  17  too; isn't that true?
  18  A.  No.

| **RULING:** | **OBJECTION:** | Rule 401. |
| Overruled. | | Rule 403. |
| | | Foundation. |

**Pg: 147 Ln: 18 - 20**

**Annotation:**
147:18       THE WITNESS:  Before 2006, we
  19  were still considering ourselves a
  20  generic company.

| **RULING:** | **OBJECTION:** | Non-responsive. |
| Overruled. | | |

**Pg: 148 Ln: 1 - 2**

**Annotation:**
148: 1  Q.  I asked you about conduct and you
  2  talked about a generic company.

| **RULING:** | **OBJECTION:** | Improper inclusion of statement of counsel which cannot possibly be considered evidence or relevant. |
| Overruled. | | |

**Pg: 148 Ln: 13 - 16**

**Annotation:**
148:13        THE WITNESS:  Before 2006, as
   14   a generic company, we did what was
   15   expected of us by FDA and did not
   16   perform literature surveillance.

| **RULING:** | **OBJECTION:** | Rule 401. |
|---|---|---|
| Sustained. | | Rule 403. |
| | | Subject of Plaintiff's Motion in Limine No. 7. |

**Pg: 149 Ln: 8 - 11**

**Annotation:**
149: 8        THE WITNESS:  FDA policy, I
    9   don't know if you would call it
   10   prohibited, but I believe it was
   11   actively discouraging that.

| **RULING:** | **OBJECTION:** | Non-responsive. |
|---|---|---|
| Sustained. | | Speculation. |

**Pg: 149 Ln: 14**

**Annotation:**
149:14   Q.  Nothing prohibited it, correct?

| **RULING:** | **OBJECTION:** | No answer. |
|---|---|---|
| Sustained. | | |

**Pg: 217 Ln: 22**

**Annotation:**

217:22 Q.  I understand.

| RULING: | OBJECTION: | Improper inclusion of statement of Counsel which cannot possibly be evidence or relevant. |
|---|---|---|
| Overruled. | | |

**Pg: 221 Ln: 5 - 9**

**Annotation:**

221: 5 Q.  Did Mutual receive the approximate
   6 RDL at the same time when it acquired
   7 the NDA?
   8 A.  We didn't -- that NDA we developed
   9 ourselves.  We didn't acquire that NDA.

| RULING: | OBJECTION: | Rule 401.<br>Rule 403. |
|---|---|---|
| Overruled. | | |

**Pg: 223 Ln: 4 - 11**

**Annotation:**

223: 4 Q.  Do you have any information as to
   5 whether the FDA is actively considering
   6 it or when it is estimating or when you
   7 are estimating they might decide?
   8 A.  They acknowledged receipt of it,
   9 but other than that, we have no
  10 information of what their timing is to
  11 be.

| RULING: | OBJECTION: | Rule 401.<br>Rule 403. |
|---|---|---|
| Sustained. | | |

20

**Pg: 224 Ln: 2 - 11**

**Annotation:**
224: 2   Q.   Then describe for us, please, what
       3   enhanced or additional risk information
       4   regarding this disorder that Mutual has
       5   now got approved through its action?
       6   A.  Well, nothing is approved yet,
       7   but what --
       8   Q.   Well, it's approved because 30
       9   days have passed and it's effective.
       10   A.  It's effective, but not
       11   technically approved.

| **RULING:** | **OBJECTION:** | Rule 401. |
| --- | --- | --- |
| Sustained. | | Rule 403. |

**Pg: 229 Ln: 5 - 7**

**Annotation:**
229: 5        THE WITNESS:  Yes.  We can
       6   only do it for NDAs, and we haven't done
       7   it for any of our other NDA products.

| **RULING:** | **OBJECTION:** | Rule 401. |
| --- | --- | --- |
| Sustained. | | Rule 403. |

## ROBERT DETTERY – SEPTEMBER 1, 2009 (VOL. 2)

### Pg: 273 Ln: 20 - Pg: 274 Ln: 8

**Annotation:**
273:20  Q.  Understanding what you just told
   21   me, that you are not an expert in the
   22   benefit/risk ratio of a product, do you
   23   have an understanding that, in fact,
   24   benefit/risk ratios can change, either,
   25   for example, when a new indication has
274: 1   been discovered, which I think is fair
   2   to describe as a new benefit, or when
   3   new risk information is learned, or
   4   increased incidents risk information is
   5   learned that can be described as a new
   6   information regarding a risk, hence,
   7   changing in any of those examples the
   8   risk/benefit profile?

| RULING:  Sustained. | OBJECTION:       No Answer. |
|---|---|

### Pg: 275 Ln: 13 - 18

**Annotation:**
275:13  Q.  I'm not asking you about any other
   14   person than you, Mr. Dettery.
   15       Isn't it true that Mr. Dettery
   16   knows that the benefit/risk profile of a
   17   drug can change over the lifetime of the
   18   drug?

| RULING:  Sustained. | OBJECTION:       No Answer. |
|---|---|

22

**Pg: 328 Ln: 16 - 18**

**Annotation:**
328:16        THE WITNESS:  The reason that
   17   Mutual did that for Qualaquin was
   18   because we were the branded product.

| **RULING:** | **OBJECTION:**        Non-responsive. |
|---|---|
| Sustained. | |

**Pg: 328 Ln: 25 - Pg: 329 Ln: 3**

**Annotation:**
328:25   branded.  I said, was it for post-
329: 1   marketing drug safety reasons?
   2   A.  As a branded product, that's why
   3   we do it, yes.

| **RULING:** | **OBJECTION:**        Incomplete question.<br>                      Non-responsive. |
|---|---|
| Sustained. | |

**Pg: 335 Ln: 8 - 11**

**Annotation:**
335: 8        THE WITNESS:  Yes.  Again,
   9   it's what you highlighted.  I don't know
   10   what is in the rest of the document.  I
   11   haven't seen this document before.

| **RULING:** | **OBJECTION:**        Non-responsive. |
|---|---|
| Overruled. | |

**Pg: 347 Ln: 16 - 18**

**Annotation:**
347:16          THE WITNESS:  Well, this is
   17   the first time I have seen this
   18   document, but that is what it appears

| **RULING:** | **OBJECTION:**          Non-responsive before "...that is..." |
|---|---|
| Overruled. | |

**Pg: 363 Ln: 3 - 7**

**Annotation:**
363: 3          THE WITNESS:  Well, since I
   4   haven't seen this since -- let me
   5   rephrase.
   6          Since I have not seen this
   7   before last Friday, I don't know if this

| **RULING:** | **OBJECTION:**          Non-responsive before "...I don't know". |
|---|---|
| Overruled. | |

**Pg: 366 Ln: 1 - 2**

**Annotation:**
366: 1          THE WITNESS:  I haven't seen
   2   this document before.  The sentence says

| **RULING:** | **OBJECTION:**          Non-responsive before "The sentnence..." |
|---|---|
| Overruled. | |

24

**Pg: 368 Ln: 20 - 23**

**Annotation:**
368:20      THE WITNESS:  I see the
  21  sentence that you have highlighted.  I
  22  haven't seen the entire article.  But
  23  what you stated is what the highlighted

| **RULING:**<br><br>Overruled. | **OBJECTION:**        Non responsive before, "what you stated". |
|---|---|

**Pg: 390 Ln: 24 - Pg: 391 Ln: 2**

**Annotation:**
390:24      THE WITNESS:  Well, in
  25  reading this document for the first
391: 1  time, I see sulindac is included in
  2  about two dozen products, correct.

| **RULING:**<br><br>Overruled. | **OBJECTION:**      Non-responsive beginning with, "included". |
|---|---|

**Pg: 394 Ln: 5 - 7**

**Annotation:**
394: 5      THE WITNESS:  Well, based on
  6  my examining this particular table for
  7  the first time, it shows -- it appears

| **RULING:**<br><br>Overruled. | **OBJECTION:**      Non-responsive before "it appears". |
|---|---|

**Pg: 397 Ln: 18**

**Annotation:**
397:18   A.   That is FDA's assumption, correct.

| RULING: | OBJECTION: | Non-responsive other than "correct". Speculation. |
|---|---|---|
| Sustained (Rules 401, 402, 602) | | |

# CLAUS DOHLMAN – SEPTEMBER 10, 2009

**Pg: 6 Ln: 21**

**Annotation:**
  6:21   Q.   And I occasionally ask real long questions.

| RULING: | OBJECTION: | Improper inclusion of statement of counsel which cannot possibly be evidence or testimony. |
|---|---|---|
| Overruled. | | |

**Pg: 25 Ln: 24 - Pg: 26 Ln: 5**

**Annotation:**
  25:24      Obviously, Stevens-Johnson syndrome doesn't
    25        cause legal blindness every time someone
  26: 1       has SJS.  Correct?
    2   A.  Does not cause?
    3   Q.  Does not cause it every time someone has
    4        SJS.
    5   A.  Oh, no.  No, no.

| RULING: | OBJECTION: | Rule 401. Rule 403. |
|---|---|---|
| Sustained. Improper opinion from non-retained expert (Fed. R. Civ. P. 26) | | |

27

**Pg: 27 Ln: 11 - Pg: 28 Ln: 4**

**Annotation:**

27:11  Q.  Okay.  Medically speaking, Doctor Dohlman,
    12     briefly, what is a mechanism of action?
    13  A.  Well, that is something that I really
    14     cannot comment on.  I have no expertise
    15     here in the biology of Stevens-Johnson or
    16     epidemiology or statistical correlation
    17     with medications and so on.
    18  Q.  Okay.
    19  A.  All that I know is vague medical hearsay.
    20     And some people, and I am sure this will
    21     come up later, but some people swear by
    22     medications and, and that can trigger
    23     Stevens-Johnson.  Other people are more apt
    24     to blame occasional diseases such as flu or
    25     herpes or something like that that's a
28: 1     trigger mechanism.  But here it's I have
    2    no, no expertise in this.
    3       MR. JENSEN:  Okay.  Nonresponsive.
    4  Q.  You very clearly answered my question.  You

| RULING: | OBJECTION: | Rule 401. |
|---|---|---|
| Sustained. | | Rule 403. |
| Improper opinion from non-retained | | |
| expert (Fed. R. Civ. P. 26). | | |

28

**Pg: 42 Ln: 18 - Pg: 44 Ln: 5**

**Annotation:**

42:18  words, tears still functioning.
 19 Q. Okay.
 20 A. And it might be even have been Mrs.
 21  Bartlett.  I don't know.
 22   But that is roughly what -- I
 23  think Ms. Bartlett was a little more
 24  inflamed, but that was the type of
 25  operation we did with Mrs. Bartlett.
43: 1  Because she had still a wet eye, she was
 2  very vulnerable and prone to breakdown and
 3  so on, but the eye was wet.
 4 Q. Right.
 5 A. So we did not have to go to a much more
 6  stymying and ugly and cosmetically
 7  unacceptable Type 2.
 8 Q. Right.  You raised, you raised a question
 9  of whether this might be Ms. Bartlett.
 10   Is it correct that a couple pages
 11  later you have a list of the ages of the 16
 12  people that you did this publication about?
 13 A. Okay.
 14 Q. Yes.  And Ms. Bartlett is now 50 because
 15  she was born in 1959.  And this publication
 16  was in -- she had -- 2007.  When your paper
 17  was accepted it was 2007, and she would
 18  have been 48.
 19 A. I-4.
 20 Q. Yes.  And that is 46.  But I also noticed
 21  that the time period on the very first
 22  page, January 2000 through December 2005,
 23  and your first surgery on Ms. Bartlett was
 24  in 2006.  Correct?
 25 A. Oh, I see.  Yes, that is correct.
44: 1 Q. So fair to say that Ms. Bartlett --
 2 A. May not be here.
 3 Q. -- for better or worse, would not have been
 4  one of these 16 patients of yours.
 5  Correct?

| RULING: | OBJECTION: | Incomplete answer. |
|---|---|---|
| Overruled. | | Rule 401. |
| | | Rule 403. |

**Pg: 49 Ln: 19 - Pg: 50 Ln: 4**

**Annotation:**

49:19  Q.  In terms of medical stratification of
    20      preoperative diagnoses and assessing from
    21      that what the likely outcomes are going to
    22      be after one or more K-Pro's, do you and
    23      your colleagues at Harvard refer to SJS TEN
    24      cases as hopeless cases?
    25          MR. COSGROVE: Objection.  Form.
50: 1      Foundation.  Calls for expert testimony.
    2      Beyond the scope of the Doctor's treatment.
    3  A.  No.  I wouldn't -- I would not call any
    4      case that has light perception hopeless.

| RULING: | OBJECTION: | Rule 401. |
|---|---|---|
| Sustained. | | Rule 403. |
| Improper opinion from non-retained | | |
| expert (Fed. R. Civ. P. 26). | | |

**Pg: 65 Ln: 5 - 19**

**Annotation:**

65: 5  Q.  Thank you.  And so is he again suggesting
    6      that she might need to have both eyes sewn
    7      shut?
    8          MR. COSGROVE: Objection to form.
    9      Foundation.
    10  Q.  Is that what that means?
    11          MR. COSGROVE: Same objection.
    12  A.  I don't think that he intends to suggest
    13      that both eyes are, will be or should be
    14      completely fully shut.  Usually,
    15      tarsorrhaphy is one third out here.
    16  Q.  Okay.
    17  A.  That's a standard procedure.  And in the
    18      worst cases maybe half, but there is always
    19      an opening.

| RULING: | OBJECTION: | Speculation Rule 401. |
|---|---|---|
| Sustained | | Rule 403. |
| (Rules 601 and | | |
| 602) | | |

30

**Pg: 96 Ln: 19 - 22**

**Annotation:**

96:19  Q.  Can you show us where the ring is of the
   20      Boston K-Pro in this diagram you are
   21      pointing to?
   22  A.  The ring cannot be seen here.

| **RULING:** | **OBJECTION:** | Irrelevant. |
|---|---|---|
| Sustained. | | |

**Pg: 97 Ln: 7 - 11**

**Annotation:**

97: 7        MR. COSGROVE: Keith, just so I
   8     understand for the record, is this Karen's
   9     eye?
  10        MR. JENSEN: Not to the best of my
  11     knowledge.

| **RULING:** | **OBJECTION:** | Improper inclusion of statement of counsel which cannot possibly be evidence or testimony.<br>Rule 401.<br>Rule 403. |
|---|---|---|
| Sustained. | | |

**Pg: 102 Ln: 10 - 13**

**Annotation:**

102:10  Q.  Okay.  And why do you say it worked well
  11     for a while, sir?
  12  A.  Then Doctor Chodosh will have to continue
  13     to answer that.

| **RULING:** | **OBJECTION:** | Rule 401.<br>Rule 403. |
|---|---|---|
| Sustained. | | |

31

**Pg: 116 Ln: 7**

**Annotation:**
116: 7  A.  September 19th.  I can't see here.  Can we

| | |
|---|---|
| **RULING:**<br><br>Overruled. | **OBJECTION:**          Irrelevant. |

**Pg: 120 Ln: 1 - 11**

**Annotation:**
120: 1  Q.  Karen has had glaucoma as well, correct?
    2          MR. COSGROVE: Objection to form.
    3  A.  No.  She was fortunate enough, in contrast
    4      to most other people with Stevens-Johnson,
    5      she did not have any real glaucoma.  So
    6      that was essentially the only aspect that
    7      had been, that has gone quite well.
    8  Q.  Okay.
    9  A.  That could have been an isolated measure of
  10      pressure, a little on the high side, but
  11      nothing serious.

| | |
|---|---|
| **RULING:**<br><br>Overruled. | **OBJECTION:**          Rule 401.<br>                        Rule 403. |

**Pg: 126 Ln: 22 - Pg: 127 Ln: 1**

**Annotation:**
126:22        Let's look at 212.  212, sir, is a
  23      month after that, in May 2008.  Do we see
  24      -- how is her eye doing at this point, her
  25      left eye?
127: 1  A.  It seems to be doing fine from here.

| | |
|---|---|
| **RULING:**<br><br>Sustained. | **OBJECTION:**          Rule 401.<br>                        Rule 403. |

**Pg: 158 Ln: 18 - Pg: 159 Ln: 9**

**Annotation:**
158:18  Q.  Thank you.  Is it correct that in our
    19      off-the-record conversation the gentleman
    20      here, who is running our video machine and
    21      doing a wonderful job, asked you whether or
    22      not SJS can cause kidney failure?
    23        Did he ask you that?
    24        MR. COSGROVE: Objection to form.
    25      Foundation.
159: 1  A.  Yes, it can, right.
    2   Q.  And what was your --
    3   A.  But --
    4   Q.  And what was your answer?
    5   A.  That is -- that is correct.
    6       MR. COSGROVE: Same objection.
    7   A.  That it can.  But I am not familiar with
    8     all the numerous systemic complications,
    9     including lungs and so on.

| **RULING:** | **OBJECTION:** | Rule 401. |
|---|---|---|
| Sustained. | | Rule 403. |
| Improper opinion from non-retained | | Foundation. |
| expert (Fed. R. Civ. P. 26). | | |

**Pg: 160 Ln: 22**

**Annotation:**
160:22  A.  Which I took out of our funds here.

| **RULING:** | **OBJECTION:** | Irrelevant. |
|---|---|---|
| Sustained. | | Non-responsive. |

**Pg: 162 Ln: 1 - 10**

**Annotation:**
162: 1  Q.  Okay.  Why is that your understanding?  Is
      2      that from your experience of treating SJS
      3      and TEN patients?
      4          MR. COSGROVE: Objection.  Form.
      5      Foundation.  Calls for expert testimony.
      6  A.   Yes.  I have seen a large number of these
      7      patients and I have read the histories and
      8      the evaluation of their referring
      9      physicians and so on.  That has given me
      10     certain Gestalt.

| RULING: | OBJECTION: | |
|---|---|---|
| Sustained. Improper opinion from non-retained expert (Fed. R. Civ. P. 26) | Rule 401. Rule 403. Foundation. Incomplete answer. Rule 26(a)(2)(A) | |

34

**Pg: 164 Ln: 20 - Pg: 165 Ln: 14**

**Annotation:**
164:20  Q.  While all of the reasons may not be
    21       included in this binder, are all of the
    22       opinions that you formulated during your
    23       care and treatment of Ms. Bartlett
    24       contained within this binder?
    25  A.  Yes.  I don't have any other, other written
165: 1       opinions, no.
     2  Q.  Okay.  Am I understanding your testimony
     3       correctly that you have no written opinions
     4       outside this binder --
     5  A.  Correct.
     6  Q.  -- outside the course and scope of your
     7       treatment of Ms. Bartlett?
     8  A.  Correct.
     9  Q.  All right.  Fair to say that all the
    10       various studies that were marked that were
    11       published both before and after your
    12       treatment of Ms. Bartlett are not included
    13       in this binder.  Right?
    14  A.  Correct.

| **RULING:**<br>Sustained. | **OBJECTION:**   Rule 401.<br>Rule 403. |
|---|---|

**Pg: 166 Ln: 3 - 8**

**Annotation:**
166: 3  Q.  Well, what I am getting at here, sir, and
     4       Doctor, and what I would like to confirm is
     5       that you have no opinions beyond Ms.
     6       Bartlett.  Correct?
     7  A.  Beyond what, what is there, you mean?  I
     8       have it up here.

| **RULING:**<br>Overruled. | **OBJECTION:**   Rule 401.<br>Rule 403. |
|---|---|

**Pg: 166 Ln: 11 - 15**

**Annotation:**

166:11  Q.  In other words, with respect to this case
    12     and your involvement in this case as a
    13     treating physician of Ms. Bartlett, your
    14     opinions do not extend beyond Ms. Bartlett.
    15     Correct?

| RULING:<br><br>Overruled. | OBJECTION: | No answer.<br>Rule 401.<br>Rule 403. |
|---|---|---|

**Pg: 167 Ln: 14 - 21**

**Annotation:**

167:14  A.  I will quote you.  But it's as when you
    15     treat the patient you go by your own
    16     long-term experience, and then you come to
    17     a conclusion that is the best chance to be
    18     of help is to do so and so.  And we will
    19     jot down just what we will do, so and so,
    20     not the reason why we have -- why I have
    21     decided to do it.

| RULING:<br><br>Sustained. | OBJECTION: | No Question.<br>Rule 401.<br>Rule 403. |
|---|---|---|

**Pg: 168 Ln: 9 - 25**

**Annotation:**

168: 9  Q.  Do you remember when you said that you were
    10      not an expert on SJS and that you would
    11      have very little to add to this?
    12          Do you recall that comment, sir?
    13  A.  Well, I should -- I should say I am -- I am
    14      not an expert on the treatment of S -- of
    15      Stevens-Johnson syndrome in general and the
    16      etiology of Stevens-Johnson.  This is not
    17      my field.
    18          My field is ophthalmology and the
    19      ophthalmic consequences of Stevens-Johnson
    20      and the ophthalmic treatment.
    21  Q.  Sure, the sequelae of Stevens-Johnson,
    22      correct?
    23  A.  Correct.
    24  Q.  Okay.  And you are not, you are not an
    25      infectious disease specialist, right?

| RULING:<br><br>Overruled. | OBJECTION: | Irrelevant.<br>Rule 403. |
|---|---|---|

**Pg: 169 Ln: 1 - Pg: 170 Ln: 19**

**Annotation:**

169: 1  A.  No.
    2  Q.  Now, during the course and scope of your
    3      treatment of Ms. Bartlett, did you have
    4      occasion to review any materials such as
    5      package inserts or labeling generated by
    6      Mutual Pharmaceuticals or United Research
    7      Laboratories?
    8  A.  I don't understand.  How?
    9  Q.  Did you ever have occasion to review the
    10      package labeling for any type of drug or
    11      medication that Ms. Bartlett had taken
    12      prior to her experience, experiencing her
    13      condition in connection with your
    14      treatment?

15   A.   No.  I have not -- I have not searched in
16        her past what she has been treated with
17        before she came to me, no.
18   Q.   Did -- did you ever at any point in
19        connection with your treatment of Ms.
20        Bartlett undertake a review of the world
21        scientific literature for the various
22        causes of Stevens-Johnson syndrome?
23   A.   No.  I read, I read from time to time the
24        various hypotheses.  But I have restricted
25        my work and expertise to the treating eye
170: 1       symptoms.  And I cannot comment on etiology
2        and, and so on.
3    Q.   Okay.  Well, but was the etiology important
4        to you at all?
5    A.   Well, it is -- it is important in the sense
6        that, that they have to be found with
7        reasonable certainty.  And but we cannot do
8        everything here in life and I will have to
9        restrict myself to ophthalmology.  And when
10        it comes to the etiology, it is a matter
11        of, of pharmacology, of infectious disease,
12        of dermatology and epidemiology and so on.
13   Q.   And pharmacology and infectious disease and
14        toxicology, those are not issues on which
15        you are, you would consider yourself an
16        expert.  Right?
17   A.   Absolutely not, that is right.
18   Q.   Do you intend to testify in any capacity as
19        an expert in this case?

| RULING:          | OBJECTION:          | Cumulative.                                         |
|------------------|---------------------|-----------------------------------------------------|
| Sustained.       |                     | Rule 401.                                            |
|                  |                     | Rule 403.                                            |
|                  |                     | Offers legal conclusion as to what and expert       |
|                  |                     | is.                                                  |

**Pg: 171 Ln: 1 - 13**

**Annotation:**
171: 1   A.   Well, I would rather not.  I would rather,
    2         I would rather stay out of it.  But I -- I
    3         don't know the implications of that.  But I
    4         -- I don't -- can I be subpoenaed?
    5   Q.   Other than your chart, reviewing your
    6         chart, did you have -- what else did you do
    7         to prepare for your deposition today, if
    8         anything?
    9   A.   I, I, I have said essentially what I know
    10        about the treatment of Ms. Bartlett's eye,
    11        eyes, and the outcomes there.
    12               And anything else, I am not
    13        prepared to offer any opinion on.

| **RULING:** | **OBJECTION:** | Rule 401. |
|---|---|---|
| Overruled. | | Rule 403. |

**Pg: 172 Ln: 9 - 12**

**Annotation:**
172: 9              You would agree that Doctor
    10        Chodosh's opinions and his observations are
    11        best asked of him, right?
    12   A.   Yes.

| **RULING:** | **OBJECTION:** | Rule 401. |
|---|---|---|
| Sustained. | | Rule 403. |

**Pg: 180 Ln: 20 - 23**

**Annotation:**
180:20  Q.  Okay.  And do you know who, who the M.D.
   21     who signed that, do you recognize that
   22     signature?
   23  A.  No.

| **RULING:** | **OBJECTION:** | Irrelevant. |
|---|---|---|
| Sustained. | | Rule 403. |

**Pg: 182 Ln: 4 - 5**

**Annotation:**
182: 4  A.  This is not my opinion.  I don't have any
   5     opinion.

| **RULING:** | **OBJECTION:** | Rule 401. |
|---|---|---|
| Sustained. | | Rule 403. |

**Pg: 183 Ln: 6 - 17**

**Annotation:**
183: 6  A.  No, not contrary but not, not for it
   7     either.  We simply don't have any opinion
   8     on the -- I certainly don't have any
   9     opinion on etiology.
   10     This is notoriously difficult to
   11   find and --
   12     COURT REPORTER:  What?
   13     THE WITNESS:  Notoriously
   14   difficult to identify.  And I have not been
   15   involved with her original hospitalization
   16   at MGH and so I cannot comment one way or
   17   the other.

| **RULING:** | **OBJECTION:** | Non-responsive after "no". |
|---|---|---|
| Sustained. | | |

**Pg: 184 Ln: 4 - 17**

**Annotation:**

184: 4          Would you defer to Doctor Schulz,
    5    who is Karen's attending burn physician at
    6    MGH, on the question of whether or not
    7    Sulindac was responsible and caused Karen's
    8    SJS and TEN?
    9       MR. COSGROVE: Objection. Form.
   10    Foundation. Argumentative. Misleading.
   11    Misstates facts.
   12      COURT REPORTER: Can you say that
   13    objection over, please.
   14      MR. COSGROVE: Objection. Form.
   15    Foundation. Argumentative. Misleading.
   16    Misstates facts.
   17   A. I cannot comment on this.

| **RULING:** | **OBJECTION:** | Rule 401. |
| Sustained. | | Rule 403. |
| | | Foundation. |

## NAM KIM DEPOSITION – SEPTEMBER 30, 2009

**Pg: 47 Ln: 18 - Pg: 48 Ln: 13**

**Annotation:**

47:18  Q.  Tell us about the relationship between -- strike
19  that.  If I was to say:  Doctor, if a person is
20  sedated, they don't need pain medication because they
21  can't feel anything, what's your response to that?
22  A.  Sedation is not the same as treatment of pain.
23  Q.  Okay.  Do people -- does the -- do you believe
24  that when you were treating Karen Bartlett, she was
25  feeling pain even when sedated?
48: 1  MR. GEOPPINGER:  Objection; form,
2  foundation.
3  THE WITNESS:  I can't say.  I don't
4  know.  The pain medications address the
5  pain.  The sedation addresses anxiety, or
6  we call them anxiolytics as well, they
7  address the anxiety.  It can cause a
8  disassociation from the pain, but treatment
9  with sedation does not necessarily or --
10  treat pain and I think that's something
11  that a lot of people become confused with.
12  But you have to treat pain and you have to
13  treat anxiety.

| RULING:          | OBJECTION:     | Rule 401.     |
|------------------|----------------|---------------|
| Overruled.       |                | Rule 403.     |
|                  |                | Speculation.  |

**Pg: 55 Ln: 2 - 8**

**Annotation:**

55: 2  Q.  So on this chart, Exhibit 141, the only blood
3  transfusions are the packed red blood cells and the
4  fresh frozen plasma, correct?
5  MR. GEOPPINGER:  Objection to form.
6  THE WITNESS:  The fresh frozen plasma
7  is not a blood transfusion.  It's a blood
8  product.

| RULING:          | OBJECTION:     | Rule 401.     |
|------------------|----------------|---------------|
| Overruled.       |                | Rule 403.     |

69

**Pg: 80 Ln: 3 - 6**

**Annotation:**
80: 3    Q.  Would you have usually in the course of your
    4    care and treatment of Karen Bartlett had been reading
    5    the notes of Dr. Schultz and Dr. Ryan and Dr. Sheridan?
    6    A.  Sometimes.

| **RULING:** | **OBJECTION:** | Rule 401. |
| --- | --- | --- |
| Overruled. | | Rule 403. |

**Pg: 80 Ln: 24 - Pg: 81 Ln: 3**

**Annotation:**
80:24    Q.  Do you remember a Dr. Ken Shepherd at Mass
    25    General who did a RICU consult for Karen Bartlett about
81: 1    four days after this note, and I'll show it to you in a
    2    second?
    3    A.  No, I don't remember.

| **RULING:** | **OBJECTION:** | Rule 401. |
| --- | --- | --- |
| Sustained (assumes facts not in evidence) | | Rule 403. |

**Pg: 82 Ln: 4 - 19**

**Annotation:**

82: 4    Q.  And I use the word "recommended."  Would it be
    5   more accurate to state that you made decisions about
    6   what medications Karen should get and the dosages she
    7   should get and how often she should get them?
    8    A.  Well, for narcotic drips often we write the
    9  order for a drip and give a range, and then what
  10  happens is the people at the bedside, the nurses, will
  11  make the assessment and titrate it to effect.
  12   Q.  And what does titrate mean, please?
  13    A.  Meaning -- well, it is -- titrate is, well, if
  14  she looks like she's in pain, then you would increase
  15  the drip.  If it looks like she's overly narcotized,
  16  meaning that she's not responsive, then they would turn
  17  it down.  So for these decisions, titrating a drip up
  18  and down, as long as it's not beyond a normal range,
  19  the nurses would -- would do themselves.

| RULING:<br><br>Overruled. | OBJECTION:     Rule 401.<br>                    Rule 403. |
|---|---|

**Pg: 87 Ln: 24 - Pg: 88 Ln: 1**

**Annotation:**

87:24    Q.  Thank you.  On two days later on March 16, '05,
  25   can you please tell us in lay terms what's going on
88: 1   with your patient then on hospital day 41.

| RULING:<br><br>Overruled. | OBJECTION:     Rule 401.<br>                    Rule 403.<br>                    No Answer. |
|---|---|

**Pg: 92 Ln: 12 - 20**

**Annotation:**

```
92:12          THE WITNESS:  Well, it actually, if
   13       -- in the latter part of these notes, it
   14       appears that I'm now saying:
   15       Hospitalization day and not ICU day and I
   16       don't mention any critical care time.  So I
   17       would say typically these -- that was
   18       probably shorter amounts of times and she
   19       must have fallen off the critically ill
   20       list sometime during the latter part of her
```

| **RULING:** | **OBJECTION:** | No Question. |
|---|---|---|
| Overruled. | | Incomplete Answer. |
| | | Rule 401. |
| | | Rule 403. |

**Pg: 94 Ln: 7 - 15**

**Annotation:**

```
94: 7      Q.  Okay.  Do you think you would have highly likely
    8    read what appeared above your page -- strike that.  Do
    9    you think it's highly likely you would have read the
   10    entry that appears above your writing on that page of
   11    the infectious disease note?
   12          MR. GEOPPINGER:  Objection; form.
   13      Q.  (By Mr. Jensen)  Before you made your entry?
   14          MR. GEOPPINGER:  Objection; form.
   15          THE WITNESS:  50/50.
```

| **RULING:** | **OBJECTION:** | Rule 401. |
|---|---|---|
| Overruled. | | Rule 403. |

**Pg: 94 Ln: 23 - 24**

**Annotation:**

```
94:23          THE WITNESS:  Yes but he makes no --
   24       he makes no new recommendations.
```

| **RULING:** | **OBJECTION:** | Non-responsive. |
|---|---|---|
| Overruled. | | Rule 401. |
| | | Rule 403. |

**Pg: 96 Ln: 3 - 4**

**Annotation:**
96: 3      it -- there was no recommendations that
    4        would affect us to change our management.

| **RULING:** | **OBJECTION:** | No question. |
| Overruled. | | Incomplete answer. |
| | | Rule 401. |
| | | Rule 403. |

**Pg: 96 Ln: 15 - 17**

**Annotation:**
96:15    Q.  Do you remember what was going on at the time in
  16    relation to that note, Doctor?
  17    A.  No, I don't.

| **RULING:** | **OBJECTION:** | Rule 401. |
| Overruled. | | Rule 403. |

**Pg: 105 Ln: 14 - 16**

**Annotation:**
105:14    Q.  Okay.  And do you believe at that time that
  15    would have been a direct or indirect consequence of
  16    Karen's TEN?

| **RULING:** | **OBJECTION:** | No Answer. |
| Overruled. | | Rule 401. |
| | | Rule 403. |

**Pg: 106 Ln: 9 - 10**

**Annotation:**
106: 9    very poor nutrition.  There's -- you can't pinpoint it
  10    to one single cause.

| **RULING:** | **OBJECTION:** | No Question. |
| Overruled. | | Incomplete answer. |
| | | Rule 401. |
| | | Rule 403. |

**Pg: 123 Ln: 19 - 25**

**Annotation:**
123:19    Q.  Do you recall what month and year you were last
   20    at Mass General, please, Dr. Kim?
   21    A.  I thought it was May.
   22    Q.  Of 2005 or '6?
   23    A.  2005 or '6.  You have my CV.
   24    Q.  Here it is.
   25    A.  May 2005.

| **RULING:**<br><br>Overruled. | **OBJECTION:**      Rule 401.<br>                          Rule 403. |
| --- | --- |

**Pg: 126 Ln: 2 - 15**

**Annotation:**
126: 2    Q.  Do you agree as of 2005 that if, hypothetically,
   3    anyone was getting TENS from Chinatown food or from
   4    food in Boston in general, it would have been, if
   5    known, a public health epidemic?
   6         MR. GEOPPINGER:  Objection; form,
   7        foundation, requests improper expert
   8        testimony.
   9         THE WITNESS:  No because TENS is rare
   10        anyways.  A lot of people get medications
   11        and a vast majority won't have reactions.
   12        So it can be true, even if in the remote
   13        possibility that Chinese food is involved,
   14        that it may be a very rare individual that
   15        is impacted just like in the medication.

| **RULING:**<br><br>Overruled. | **OBJECTION:**      Rule 401.<br>                          Rule 403. |
| --- | --- |

**Pg: 132 Ln: 23 - Pg: 134 Ln: 25**

**Annotation:**

132:23    Q.  And correct me if I'm wrong, but did I
   24    understand you to testify earlier that the information
   25    in the history of present illness regarding the biopsy
133: 1    and the statements regarding NSAIDs and Chinese food,
    2    to your understanding, came from Ms. Morton's review of
    3    records from New England Medical Center?
    4    A.  Yes.  Not necessarily from the records at New
    5    England Medical Center.  What happens is every time a
    6    patient is transferred from one facility to another
    7    facility, someone creates an admission history and
    8    physical, and that admission history and physical will
    9    include a history of present illness.  And that --
   10    likely this is very similar to what her admission
   11    history and physical said.
   12    Q.  And you're speaking of the admission history and
   13    physical --
   14    A.  From Mass General Hospital.
   15    Q.  -- created at Mass General.  You have to say yes
   16    or no.
   17    A.  Sorry.  Yes.
   18    Q.  And the information in the admission history and
   19    physical would come from the previous hospital from
   20    where she was transferred, correct?
   21    A.  It would most, you know, most likely be created
   22    by someone at the accepting facility, in this case Mass
   23    General Hospital, and would be derived from the records
   24    sent with the patient as well as from a verbal sign-out
   25    from the -- a practitioner that was taking care of her
134: 1    before.
    2    Q.  Okay.  Is it a fair statement, you can't tell
    3    me, assuming this information in the history of present
    4    illness included in her discharge summary from 4/14/05,
    5    assuming that came from the admission and physical done
    6    at Mass General based upon the information from New
    7    England Medical Center, fair statement you can't tell
    8    me specifically who it was who provided that
    9    information from New England Medical Center?
   10    A.  No, not unless -- unless you have records that
   11    specifically say:  Information was obtained from so and
   12    so, and they had an actual copy of the transfer summary
   13    from the other facility.
   14    Q.  It wasn't you who provided the information on
   15    admission to Mass General?

16    A.  I don't think I was involved with her on her
17   admission.  I think I was involved shortly thereafter
18   but not on her admission.
19    Q.   Doctor, if you would take a look at Exhibit, I
20   believe it's 136, which is a compilation of your notes
21   from your treatment of Ms. Bartlett --
22    A.  Okay.
23    Q.   -- during her first admission at Mass General,
24   correct?
25    A.  Mm-hmm.

| RULING: | OBJECTION: | Rule 401. |
|---|---|---|
| Overruled. | | Rule 403. |

**Pg: 134 Ln: 25 - Pg: 145 Ln: 5**

**Annotation:**
134:25    A.  Mm-hmm.
135: 1     Q.   We've gone through those in quite some detail
    2    today, and correct me if I'm wrong, but is it a fair
    3    statement to say that nowhere in this exhibit did you
    4    make any notation regarding NSAIDs being a triggering
    5    or a hypothetical cause of Ms. Bartlett's TENS?
    6     A.  I don't think I have put it there, you know,
    7    without reviewing everything, but it wouldn't -- it
    8    wouldn't be something that I would note because it's
    9    not an event and it's not a new allergy.  It's not
    10    anything new that's happened since her admission.  So
    11    it's very likely I may not have mentioned anything.
    12    Q.   Okay.  As we sit here today, you can't point me
    13   to anything that I missed --
    14    A.  No.
    15    Q.   -- because I believe I've read it.
    16    A.  I can't --
    17    Q.   Obviously it's your handwriting and --
    18    A.  I can't pinpoint anything at this, you know,
    19   maybe if I took a microscope, maybe I could find
    20   something.  But from my review, I would say that no.
    21    Q.   Thank you.  Doctor, is it a fair statement to
    22   say that your primary concern with respect to
    23   Ms. Bartlett is providing treatment for her TENS,
    24   correct?
    25    A.  Yes.
136: 1     Q.   Your primary concern during her hospitalization

2   and during the course and scope of your treatment is
3   not to determine the etiology of her TENS, correct?
4     A.  It is not to determine the etiology.  It is --
5   except for the fact that we have to stop exposure to
6   it.  But no.  If we believe we've stopped exposure to
7   it, it's not something that I would spend a lot of time
8   investigating.
9     Q.  Is it a fair statement to say that in the
10   interest of stopping exposure to potential reasons for
11   TENS, you're overly cautious in that respect?
12     A.  You mean like prescribing the other drugs in the
13   same classification or with similar chemical
14   structures?
15     Q.  What I mean is that in the interest of making
16   sure that you don't expose the patient to any potential
17   or hypothetical or possible reason why they had
18   initially contracted the TENS, that you're going to be
19   -- would it be fair to say that you're overly cautious
20   in that regard?
21     A.  Well, we don't like to be overly but we like to
22   be reasonably cautious --
23     Q.  All right.  Fair.
24     A.  -- okay, because you can rule out all sorts of
25   drug classes if you say that everything potentially
137: 1   could be causing it.  So we would like to be reasonably
2   cautious and make sure that the most likely culprits
3   are at least she's not exposed to again.
4     Q.  Right.  And when you say, "the most likely
5   culprits," is it a fair statement that your
6   determination, if you made one, that the most likely
7   culprit in this case would be the use of an NSAID was
8   based upon her history and physical, correct?
9     A.  It would be based on her history.  Her physical
10   would give you no clue.
11     Q.  Okay.  And her history was what?
12     A.  Her history was that she came in from New
13   England Medical Center with biopsy-proven TENS after
14   exposure to sulindac and eating Chinese food.
15     Q.  And when -- another way of saying exposure to
16   sulindac is that she had taken sulindac in temporal
17   proximity to the diagnosis of TEN, correct?
18     A.  Yes.
19     Q.  Other than that temporal proximity, did you do
20   any type of experiment or any other type of process by
21   which to attempt to determine that --
22     A.  No.

23    Q.   -- sulindac had something to do with the TEN?

24    A.   No.

25    Q.   Doctor, Mr. Jensen mentioned during his

138: 1    questioning that you and he had had a conversation

2    substantively regarding this case and Ms. Bartlett's

3    treatment prior your deposition today, correct?

4    A.   Mm-hmm.

5    Q.   When did that occur?

6    A.   Oh, I can't remember.  Like maybe a couple weeks

7    ago, three weeks ago, something two to three weeks ago.

8    Q.   Was it in person or on the phone?

9    A.   On the phone.

10    Q.   What did you discuss?

11    A.   This -- this -- we reviewed some of -- some of

12    the other notes.  We reviewed the discharge summary.

13    Q.   Did Mr. Jensen provide you documents in advance

14    of your telephone conversation?

15    A.   Yes.  I had PDFs of many of these documents.

16    Q.   Can you tell me today as you sit here which

17    documents you had PDFs of?

18    A.   I had PDFs of my notes.  I had PDFs of some of

19    Dr. Sheridan's notes, some of Dr. Colleen Ryan's notes.

20    I have the PDFs of the discharge summaries, both of

21    them.  I think -- I think that's fairly it.

22        There's some PDFs I didn't even open but most of

23    it is because I had no access to any of these notes

24    because I'm not at that facility anymore.

25    Q.   Did you have any PDFs of medical literature?

139: 1    A.   I have a PDF of just the gross summarization of

2    some of them.

3    Q.   Is that a PDF that was provided to you by Mr.

4    Jensen?

5    A.   Yes.

6    Q.   Did you review that prior to coming to your

7    deposition today?

8    A.   Just briefly, yeah.

9    Q.   And did you review the records, the medical

10    records, that he provided you before coming to your

11    deposition?

12    A.   Not today but I did before our -- some of --

13    some of them before the conversation with him and some

14    during our conversation.

15    Q.   Fair to say that you -- any information you

16    provided -- excuse me, strike all that.  It's fair to

17    say that any information Mr. Jensen provided to you,

18    you have reviewed within, say, the last month?

78

19    A.  Yes.

20    Q.  Are you relying upon that information for your

21  deposition testimony here today?

22    A.  Yes.  For the medical records I am because I

23  don't have access to them.

24    Q.  I think you mentioned you reviewed medical

25  records that were made by physicians other than

140: 1    yourself, correct?

2    A.  Some of them but not as in depth as to my own.

3    Q.  Did you review any medical records that were

4  made by -- well, strike that.  Did you review any

5  medical records at all that were made regarding Karen

6  Bartlett that were made after the last time you treated

7  her?

8    A.  I saw the discharge summary that was signed by

9  Dr. Schultz.

10    Q.  And do you recall -- are you speaking of the

11  second discharge summary from Massachusetts General?

12    A.  Yes.

13    Q.  Okay.  Did you review any medical records that

14  were made after that?

15    A.  No.  At least I don't think so.

16    Q.  Now, during the course of your discussion with

17  Mr. Jensen, did you discuss the fact that this

18  litigation exists?

19    A.  Yes.

20    Q.  Obviously you wouldn't have been talking with

21  him otherwise, correct?

22    A.  Right.

23    Q.  You didn't know Mr. Jensen personally --

24    A.  Nope.

25    Q.  -- before this litigation?

141: 1    A.  I did not know him.

2    Q.  During the course of your discussion, you

3  discussed Ms. Bartlett's treatment, correct?

4    A.  Yes.

5    Q.  Anything else that you discussed?

6    A.  Well, we discussed blood products because he

7  didn't have a clear understanding of what exactly were

8  blood products and why they were used.

9          MR. JENSEN:  That does not call for

10      speculation.  That's stipulated.

11        THE WITNESS:  We discussed Chinese

12      food but that's pretty much about it.

13    Q.  (By Mr. Geoppinger)  Did you discuss the nature

14  of the claims in this case?

15   A.  My understanding is that -- we actually didn't,
16  but my understanding of this was that, essentially, the
17  drug company is being sued for -- as the cause of the
18  -- Ms. Bartlett's TENS.
19   Q.  Where did you gain that understanding?
20   A.  From the whole fact that this is going on
21  because when I got the -- when I was contacted, it was
22  like, well, the first thing we think is, well, we're
23  being sued.  And so essentially I was told that the
24  providers are not being sued.  It's the drug company
25  that is being sued.

142: 1   Q.  Right.  Did -- in the course of your discussion,
2  was there any discussion that the drug company was
3  being sued because the product was superpotent or there
4  was something wrong with the manufacture of the product
5  or was there any specifics in the discussion --
6   A.  No.
7   Q.  -- about why in fact this lawsuit had been filed
8  in that respect?
9   A.  Actually, no.
10   Q.  Okay.  All right.  Earlier in your deposition
11  today, you made some reference to a mechanism of action
12  for TENS.  Do you recall that testimony?
13   A.  Not exactly but was it something about the
14  adhesion?
15   Q.  Well, let me ask you this:  In 2005 during the
16  course and scope of your treatment of Karen Bartlett,
17  did you have any information about the mechanism of
18  action by which any compound could --
19   A.  I don't think --
20   Q.  -- lead to TEN?
21   A.  I don't think it's well understood.  We believe
22  that it's -- it is partially immunological but it's
23  not -- my understanding, it's not clearly understood
24  exactly why medications may cause TENS.  In fact, it's
25  also not understood exactly why some stay

143: 1  Stevens-Johnson's, which means that it's 30 percent or
2  less and why some progress to greater than 30 percent
3  and it's considered TENS.  So it is rare enough that is
4  not particularly well understood which is why some of
5  these -- these treatments are not done because
6  they're -- they're not known to cause benefit.
7   Q.  So fair statement, though, with respect to my
8  question, at the time you treated Karen Bartlett, fair
9  that you -- you're not going to testify you had an
10  understanding of the mechanism by which sulindac or any

11    medication for that matter --
12    A.  No.
13    Q.  -- could lead to TEN?
14    A.  We had a basic understanding of TENS that you
15    would learn in residency and medical school.
16    Q.  Doctor, you also -- I believe you also testified
17    today that TENS is a rare condition, correct?
18    A.  Yes.
19    Q.  At the time you were treating Karen Bartlett,
20    did you believe that TENS was a rare condition?
21    A.  Yes.
22    Q.  Are you familiar with the word "idiosyncratic"?
23    A.  Yes.
24    Q.  On the assumption that TENS could result from a
25    reaction to any medication, in 2005 would it have been
144: 1    your analysis that TENS from any medication would be an
2    idiosyncratic reaction to that medication?
3         MR. JENSEN:  Assumes facts not in
4         evidence.
5         THE WITNESS:  It's possible.  The
6         problem with idiosyncratic is that as we
7         know more, we learn that a lot of
8         idiosyncratic stuff is not idiosyncratic.
9         So idiosyncratic just means we don't know
10        typically in medicine.  So...
11    Q.  (By Mr. Geoppinger)  I think you answered my
12    question but I'm going to ask it again just to see if I
13    can get a clear record.  In 2005 would you have
14    considered a reaction of TENS to any medication to be
15    an idiosyncratic reaction to that?
16        MR. JENSEN:  Assumes facts not in
17        evidence that all medications cause TENS.
18        THE WITNESS:  It's -- once again,
19        it's like for us idiosyncratic means that
20        we just don't know enough.  I mean, there
21        can be a genetic basis.  We don't know.  So
22        it's a rare reaction that's uncommon that
23        some people may or may not be susceptible
24        to.  I guess I just can't answer that
25        question.
145: 1    Q.  (By Mr. Geoppinger)  Sure.  Okay.  Well, let me
2    see if I can rephrase it.  Would you agree or disagree,
3    if you like, but would you agree that a person who
4    develops TENS from allegedly any medication -- strike
5    all that.  Is there an identifiable class of people who

| RULING: | OBJECTION: | Rule 401. |
|---------|------------|-----------|
| Sustained as to | lines 141:6 | Rule 403. |
| through 141:10 | and lines 141:13 | |
| through 142:9. | Otherwise overruled. | |

**Pg: 146 Ln: 11 - Pg: 148 Ln: 1**

**Annotation:**

146:11    Q.  The medical records that you received -- you did
   12   receive medical records from Mr. Jensen?
   13   A.  Yeah.  I received initially some of my stuff.  I
   14   received the, I believe, the ID consult of one of the
   15   ID docs.  I received the discharge summary of
   16   Dr. Schultz and then I had to ask for my own because
   17   they -- someone asked me about my own and I'm going:
   18   Well, I don't have it.  So...
   19   Q.  Fair to say you didn't receive the entirety of
   20   the Massachusetts General --
   21   A.  I didn't receive --
   22   Q.  -- medical record from her hospitalization in
   23   2005?
   24   A.  I didn't receive the entirety of it.
   25   Q.  Who selected the portions to give you?
147: 1    A.  He or one of his assistants or one of his
    2  colleagues did.
    3   Q.  He meaning Mr. Jensen?
    4   A.  Yes.
    5   Q.  You didn't specifically request only portions of
    6  the medical record?
    7   A.  No but I did request -- I did request at least
    8  some of my records so that I knew what I had said.
    9   Q.  Sure.  But with respect to other physicians, you
   10  didn't identify --
   11   A.  No.
   12   Q.  -- particular physicians who you wanted and who
   13  you didn't?
   14   A.  No, I didn't.
   15   Q.  You referenced a summary of medical literature
   16  that you received in advance of your deposition; is
   17  that correct?
   18   A.  Yeah.  It was just a list of papers.
   19   Q.  How many pages was that document?
   20   A.  Like one and a quarter, one and a half.
   21   Q.  Do you know who created that document?
   22   A.  I believe Mr. Jensen may have but I'm not
   23  absolutely sure.
   24   Q.  Did you read any of the papers referenced on
   25  that document before you came here today?
148: 1    A.  No.

| RULING: | OBJECTION: | Rule 401. |
|---|---|---|
| Overruled. | | Rule 403. |

# ANDRIA WERYNSKI DEPOSITION – SEPTEMBER 1, 2009

**Pg: 75 Ln: 13**

**Annotation:**
75:13  A.  Outside of the RLD update.

| **RULING:** | **OBJECTION:** No question. |
|---|---|
| Overruled. | |

# ANDRIA WERYNSKI DEPOSITION – (VOL.2) – NOVEMBER 13, 2009

### Pg: 66 Ln: 10 - 12

**Annotation:**

66:10          THE WITNESS:  Hospitalization is not an
    11          adverse event.  So it wouldn't be expected to be
    12          on the label.

| **RULING:** | **OBJECTION:**          **Non-responsive (the question didn't ask for an opinion as to what should be in the label or why).  Undesignated opinion.  Rule 26(a)(2)(A).** |
|---|---|
| Sustained. |  |

### Pg: 67 Ln: 8 - 12

**Annotation:**

67: 8          THE WITNESS:  I can't look at the label
    9          and know if there is a term that should mean
   10          coma.  I can look at the label to see if it says
   11          coma, but there are many other terms that could
   12          be associated with that.

| **RULING:** | **OBJECTION:**          **Non-repsonsive.** |
|---|---|
| Overruled. |  |

**Pg: 71 Ln: 7 - 8**

**Annotation:**
71: 7    A.  Yes.  But again, I'm not qualified to understand
    8   if those terms are represented in this label.

| RULING:<br><br>Overruled. | OBJECTION:        No question. |
|---|---|

**Pg: 71 Ln: 11 - 12**

**Annotation:**
71:11    Q.  I'm not asking for your medical opinion.  I'm
    12   asking you whether they are in the label or not.

| RULING:<br><br>Overruled. | OBJECTION:        No answer and incomplete question. |
|---|---|

**Pg: 73 Ln: 9 - 11**

**Annotation:**
73: 9    Q.  Okay.  And Mutual recorded there that based upon
    10   their evaluation or Prosar's evaluation that Ms. Bartlett
    11   needed five bronchoscopies, correct?

| RULING:<br><br>Sustained. | OBJECTION:        Calls for speculation. |
|---|---|

**Pg: 73 Ln: 15 - 17**

**Annotation:**
73:15            THE WITNESS:  These are just copies of
    16            her medical records.  So I don't know why you
    17            would say Prosar inferred that.

| RULING:<br><br>Sustained. | OBJECTION:        Non-responsive. |
|---|---|

**Pg: 75 Ln: 9 - 10**

**Annotation:**
75: 9          THE WITNESS:  It's not the type of
    10       information that would be in a label.

| **RULING:** | **OBJECTION:**    **Undesignated opinion.  Rule 26(a)(2)(A).  And, no question designated.** |
|---|---|
| Sustained. | |

**Pg: 77 Ln: 11**

**Annotation:**
77:11          THE WITNESS:  Anemia is in the insert.

| **RULING:** | **OBJECTION:**        **Irrelevant.** |
|---|---|
| Overruled. | |

**Pg: 77 Ln: 13 - 15**

**Annotation:**
77:13     Q.  Thank you.  Where did you find that?
    14     A.   On Page 2 under hematologic aplastic anemia,
    15   hemolytic anemia.

| **RULING:** | **OBJECTION:**        **Irrelevant.** |
|---|---|
| Overruled. | |

**Annotation:**

91: 8           THE WITNESS:  Well, this says that she
    9        underwent dilatation of the esophagus due to
   10        stricture formation related to SJS, and SJS
   11        is in the insert.

| RULING:<br><br>Overruled. | OBJECTION:      Non responsive (question asked about label answer spoke of medical records). |
|---|---|

**Pg: 91 Ln: 14 - 17**

**Annotation:**

91:14     Q.  Are you going to answer the question or do you
   15   want me to repeat it?
   16     A.  Do I see that she underwent dilatation of her
   17   esophagus due to stricture formation in the insert?

| RULING:<br><br>Overruled. | OBJECTION:      Irrelevant.  Non-responsive.  A question answering a question is not evidence. |
|---|---|

**Pg: 98 Ln: 21 - 24**

**Annotation:**

98:21           THE WITNESS:  I mean, SJS and TEN is in
   22        the insert and it's meant for a physician.  So I
   23        don't know why you would list the treatments or
   24        the conditions that can result in the insert.

| RULING:<br><br>Sustained. | OBJECTION:      Non-responsive and irrelevant answer.  Undesignated opinion as she is stating by negative inference that treatments or conditions need not be in the insert.  That is an expert opinion.  Rule 26(a)(2)(A) & (B). |
|---|---|

**Pg: 99 Ln: 11 - 14**

**Annotation:**

99:11           THE WITNESS:  The label states
  12         fatalities may occur in these patients with SJS.
  13         I'll agree that the terms that we discussed today
  14         aren't in there, but there are terms in there.

| **RULING:** | **OBJECTION:**    Non responsive.  The question specifically asked about "where the label lists SJS and TEN" which is one paragraph, her answer addressed a different portion of the label. |
|---|---|
| Overruled. | |

**Pg: 100 Ln: 23 - 24**

**Annotation:**

100:23          THE WITNESS:  Are you asking me if
  24         prolonged hospitalization is in the insert?

| **RULING:** | **OBJECTION:**    Irrelevant a question responding to a question is not evidence. |
|---|---|
| Overruled. | |

**Pg: 101 Ln: 16 - 17**

**Annotation:**

101:16          THE WITNESS:  I don't know what the
  17         questioning is.

| **RULING:** | **OBJECTION:**    Irrelevant.  An exchange about what is being asked is probative of nothing and a "waste of time" under 403. |
|---|---|
| Overruled. | |

**Pg: 105 Ln: 2 - 3**

**Annotation:**

105: 2             THE WITNESS:  No, I don't understand
    3       what you mean.

| RULING:<br><br>Overruled. | OBJECTION:    **Irrelevant.  An exchange about what is being asked is probative of nothing and a "waste of time" under 403.** |
|---|---|

**Annotation:**

105:15           THE WITNESS:  Yes, but then again, I'm
   16      not qualified to do that.

| RULING:<br><br>Overruled. | OBJECTION:    **Non responsive after "Yes".** |
|---|---|

**Pg: 106 Ln: 1 - 2**

**Annotation:**

106: 1       foundation, confusion.
    2        THE WITNESS:  Yes.

| RULING:<br><br>Overruled. | OBJECTION:    **Cumulative and a "waste of time" under 403.** |
|---|---|

**Pg: 106 Ln: 19 - 25**

**Annotation:**

106:19          THE WITNESS:  And again, I'll say that
   20          I'm not qualified to interpret the medical terms
   21          in the insert and understand if another term
   22          is covered in the insert.  It says peptic ulcer
   23          and gastrointestinal bleeding have been reported.
   24          So I don't know.  I'm not qualified to make that
   25          assessment.

| RULING: | OBJECTION: |
|---|---|
| Overruled. | **Non responsive.** |

**Pg: 107 Ln: 8**

**Annotation:**

107: 8          THE WITNESS:  Gastritis, peptic ulcer.

| RULING: | OBJECTION:          **Undesignated expert opinion.** |
|---|---|
| Sustained. | **Rule 26(a)(2)(A) & (B).** |

**Pg: 107 Ln: 10 - 15**

**Annotation:**

107:10     Q.  Is it fair to say you don't know what you just
  11   read covers acid reflex disease or not?
  12     A.  That's correct.
  13     Q.  Dr. Sandronoori also concluded that Karen has
  14   ARDS or acute respiratory distress syndrome as a result of
  15   her SJS.  We have already discussed that, correct?

| RULING: | OBJECTION:          **Irrelevant.** |
|---|---|
| Sustained. | |

**Pg: 107 Ln: 18 - 19**

**Annotation:**
107:18         THE WITNESS:  Well, I don't remember
  19       discussing that.

| **RULING:** | **OBJECTION:**    **Cumulative and a "waste of time" under 403.** |
|---|---|
| Overruled. | |

**Pg: 107 Ln: 21 - 23**

**Annotation:**
107:21    Q.  We discussed it right there on Page 2 of 403.  So
  22  my question is:  Do you see ARDS listed on Page 2 of 403
  23  as unexpected event or unlabeled event?

| **RULING:** | **OBJECTION:**    **Objection.  Answer saying "Yes, we did discuss that is omitted".  If included it is cumulative and a "waste of time" under 403.** |
|---|---|
| Overruled. | |

**Pg: 108 Ln: 14 - 17**

**Annotation:**
108:14         THE WITNESS:  That's what I don't
  15       understand, if all these things were determined
  16       caused by SJS and SJS is in the label, then I
  17       don't understand what you're asking.

| **RULING:** | **OBJECTION:**    **Irrelevant, cumulative and a "waste of time" under 403.** |
|---|---|
| Overruled. | |

**Pg: 109 Ln: 6 - 7**

**Annotation:**
109: 6         THE WITNESS:  I mean, you said that it's
    7        caused by SJS.  SJS is in the label.

| **RULING:** | **OBJECTION:**    **Non responsive.** |
|---|---|
| Overruled. | |

**Pg: 109 Ln: 24 - 25**

**Annotation:**
109:24        THE WITNESS:  I don't have anything else
   25        to add.

| **RULING:** | **OBJECTION:**    **Irrelevant and prejudicial.  It is not evidence that the witness chose not to answer a question a second time.** |
|---|---|
| Overruled. | |

**Pg: 110 Ln: 20 - 23**

**Annotation:**
110:20        THE WITNESS:  It might be represented
   21        within the label by a term that I don't
   22        understand.  There's respiratory terms in here.
   23        I don't know if that means the same thing as what

| **RULING:** | **OBJECTION:**    **What "might be" is not more likely than not, hence, irrelevant.** |
|---|---|
| Overruled. | |

**Pg: 111 Ln: 14 - 15**

**Annotation:**
111:14             THE WITNESS:  I don't recall what number
  15       we're on.

| RULING:<br><br>Overruled. | **OBJECTION:**      **Irrelevant.** |
|---|---|

**Pg: 111 Ln: 17 - 23**

**Annotation:**
111:17    Q.   It would be the next one.  Fair enough?  It would
  18  be the next one to where we stopped, fair?
  19    A.  Yes.
  20    Q.   And is it also fair that you're not sure whether
  21  aspiration bronchiolitis is covered by something in the
  22  label or not?
  23    A.  Yes.

| RULING:<br><br>Overruled. | **OBJECTION:**    **Irrelevant, cumulative, "waste of time" under Rule 403.** |
|---|---|

161