UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Karen L. Bartlett

     v.                            Civil No. 08-cv-00358-JL

Mutual Pharmaceutical
Company, Inc.

## **SUMMARY ORDER**

Attached are the court's rulings on the parties' objections to the deposition testimony of witness Dr. Joel Stein, who has been deemed unavailable to testify at trial under Rule 32(a)(4) of the Federal Rules of Civil Procedure (see doc. 275).

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  August 24, 2010

cc:    Bryan Ballew, Esq.
       Keith M. Jensen, Esq.
       Patrick J. O'Neal, Esq.
       Eric Roberson, Esq.
       Christine M. Craig, Esq.
       Timothy P. Beaupre, Esq.
       Jeffrey D. Geoppinger, Esq.
       Joseph P. Thomas, Esq.
       Paul J. Cosgrove, Esq.
       Linda E. Maichl, Esq.
       Stephen J. Judge, Esq.
       Pierre A. Chabot, Esq.

**Bartlett v Mutual**

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  1:1 - 1:19

```
1        UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF NEW HAMPSHIRE
3
4 KAREN L. BARTLETT and        Case No.: 08-CV-358-JL
GREGORY S. BARTLETT,
5
6            Plaintiffs,
7 vs.
8 MUTUAL PHARMACEUTICAL
COMPANY, INC. and UNITED
9 RESEARCH LABORATORIES, INC.
10           Defendants.
11 -------------------------------------------------x
12      VIDEOTAPE DEPOSITION of JOEL STEIN, M.D.,
13 taken by Plaintiffs held at Weill Cornell Medical
14 Center/New York-Presbyterian Hospital, Division of
15 Rehabilitation, 525 East 68th Street, New York, New
16 York 10065, on Thursday, August 6, 2009, commencing
17 at 2:31 p.m., before Julia Moksin, a Shorthand
18 (Stenotype) Reporter and Notary Public within and for
19 the State of New York.
```

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  10:13 - 10:15

```
13    Q   Please state your name for the
14 record.
15    A   Joel Stein.
```

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  10:21 - 11:10

```
21    Q   I always like to start depositions,
22 Dr. Stein, by kind of giving the jury an idea of
23 where you fit into the picture of Karen
24 Bartlett's treatment.
25        And it's my understanding, Doctor,
00011
1 that Karen had over a hundred days in about five
2 hospitals starting at Caritas and then Tufts and
3 then about 70 days in Mass General, then about
4 five days in Northeast Rehab, then back to Mass
5 General for about 11 days, and then finally to
6 where you were involved in her care and
7 treatment at Spaulding Rehabilitation Center for
8 about three weeks.
9        Does that sound about right to you,
10 sir?
```

| Objection (10:21 to 11:15):<br>-403<br>-602<br>-611(c)<br>-Argumentative<br>-Calls for speculation<br>-Foundation<br>-Misleading | Ruling:  Overruled. |
| --- | --- |

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  11:13 - 11:15

Bartlett v Mutual

13    A    It's Spaulding Rehabilitation
14 Hospital, not center.  Aside from that, it
15 sounds accurate.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  11:24 - 12:20

24        Doctor, is it your understanding
25  that of Karen's over hundred-plus days of
00012
1 hospitalizations you were involved in her last
2 hospitalization; and she was discharged home
3 from Spaulding Rehabilitation, and you were her
4 attending doctor there for a portion of her time
5 at Spaulding?
6    A    Yes, that's correct.
7    Q    And is it correct that you were
8 Karen Bartlett's attending physician at
9 Spaulding Rehabilitation for approximately the
10 last two of her three weeks there, sir?
11    A    That's approximately correct.
12    Q    Is that true because for
13 approximately the first week of her
14 hospitalization at Spaulding you were not in the
15 hospital at that time?
16    A    That's correct.
17    Q    So when you got back on duty, you
18 immediately became her attending physician; is
19 that fair?
20    A    That's correct.

| Objection: | Ruling:  Overruled. |
| --- | --- |
| -403 | |
| -602 | |
| -611(c) | |
| -Argumentative | |
| -Calls for speculation | |
| -No foundation | |
| -Misleading | |

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  13:7 - 13:12

7    Q    Sure.  Let me go over some of your
8 qualifications that makes you a highly qualified
9 physician to be Karen Bartlett's attending
10 physician, and let me start out with where
11 you're licensed.  You're licensed in both the
12 states of New York and Massachusetts, correct?

| Objection: | Ruling:  Sustained as to lines 13:7 |
| --- | --- |
| -611 (c) | through 13:10.  Otherwise overruled. |
| -Argumentative | |
| -No foundation | |

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  13:15 - 15:3

15    A    I am licensed in both New York and
16 Massachusetts.
17    Q    And you are triple board-certified,
18 is that right, Dr. Stein?
19    A    I am board-certified in internal
20 medicine and in physical medicine and
21 rehabilitation.  I was at one time certified in
22 electrodiagnostic medicine; however, that
23 certification, I believe, has lapsed.
24    Q    And you didn't make any attempt to
25 keep that third board-certification?
00014

| Objection: | Ruling:  Overruled. |
| --- | --- |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

**Bartlett v Mutual**

```
1      A    That is correct, I chose not to
2  pursue recertification because my practice
3  changed.
4      Q    So as we speak you're double
5  board-certified in internal medicine and
6  physical medicine and rehabilitation?
7      A    That is correct.
8      Q    And in the past you've been an
9  instructor in medicine at Harvard Medical
10  School, correct?
11     A    Correct.
12     Q    You've been an assistant professor
13  for a time in the Department of Physical
14  Medicine and Rehabilitation at Harvard Medical
15  School?
16     A    Correct.
17     Q    Then you were an associate
18  professor at Harvard Medical School?
19     A    That's correct.
20     Q    Then you became the interim chair
21  of the department of physical medicine and
22  rehabilitation at Harvard Medical School?
23     A    That's correct.
24     Q    And since then you have moved on
25  and you became the professor and chief of a
00015
1  division of rehabilitation medicine at Weill
2  Cornell Medical College of Cornell's University,
3  correct?
```

---

Witness_ Joel Stein, M.D. - Vol. 1.txt: 15:6 - 15:11

```
6      A    That's correct.
7      Q    Back while you practiced at
8  Spaulding for approximately eight years, like
9  1996 or 2004, you were the director of the burn
10  rehabilitation program at the Spaulding Rehab
11  Hospital in Boston; is that right?
```

| Objection: | Ruling: Overruled. |
| --- | --- |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

---

Witness_ Joel Stein, M.D. - Vol. 1.txt: 15:14 - 17:3

```
14     A    That's correct.
15     Q    Please tell us, Dr. Stein, what is
16  the relationship between Spaulding
17  Rehabilitation Hospital and Massachusetts
18  General Hospital?
19     A    Both hospitals are part of the
20  partners health care system.  They are
21  affiliated institutions as such.
22     Q    Are they juxtaposed, can you walk
23  out of one into the other, are they across the
24  street?
25     A    They are several blocks from one
00016
1  another, approximately a ten minute walk.
2      Q    What is the relationship,
```

**Bartlett v Mutual**

3  Dr. Stein, between Spaulding Rehab Hospital and
4  Harvard Medical School?
5      A    Spaulding Rehab Hospital is a
6  Harvard Medical School affiliate.
7      Q    Got it.  When you were the director
8  of the burn rehab program at Spaulding, to give
9  the jury an idea, how many burn units are in the
10  greater Boston area that might have patients,
11  treat them, and potentially refer them to
12  Spaulding for burn rehabilitation?
13      A    I'm aware of two acute burn
14  rehabilitation -- excuse me, two acute burn
15  centers in the Boston area, one at Mass General
16  Hospital and the other at Brigham And Women's
17  Hospital.
18      Q    In addition to your teaching, you
19  have obtained a lot of fellowship and grant
20  support work for studies you have done, correct?
21      A    I have been involved in research,
22  yes.
23      Q    And in addition to your research,
24  according to your CV, you published some 38
25  original articles, correct?
00017
1      A    That sounds approximately correct.
2  I haven't counted them today, but that's
3  approximately correct.

| Objection (16:7 to 16:12): | Ruling:  Overruled. |
|---|---|
| -402 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

| Objection (16:18 to 16:25): | Ruling:  Overruled. |
|---|---|
| -402 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  17:9 - 17:21

And what are your
10  primary medical areas of interest, Dr. Stein?
11      A    My primary area of interest is
12  stroke rehabilitation and other neurologic
13  rehabilitation.
14      Q    If you could turn, Dr. Stein, to
15  Exhibit 22.  Let me start with that.  And that
16  is a Mass General one-page record, and it's a
17  nursing note speaking of a conversation that
18  occurred between a nurse and Karen Bartlett's
19  husband, Greg, about Sulindac and -- the bottle
20  of it and that 60 tabs were prescribed and 40
21  taken.  Do you see that, sir?

| Objection (17:14 to 17:21): | Ruling:  Sustained. |
|---|---|
| -403 | |
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  17:24 - 20:3

24      A    I'm reviewing it.  Let's see.
25  (Perusing document.)  Yes.
00018
1      Q    Do you know whether or not you
2  would have had access to that page after Karen
3  Bartlett was transferred to Spaulding
4  Rehabilitation Hospital?
5      A    It's unlikely.
6      Q    Exhibit 23 is a typed-up physical
7  therapy service record.

| Objection: | Ruling:  Sustained as to lines 17:24 |
|---|---|
| -402 | through 19:7.  Otherwise overruled. |
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

**Bartlett v Mutual**

8       Would you have had access to that
9  document at Spaulding?
10      A    I don't believe so.
11      Q    Exhibit 24 is a typed-up infectious
12  disease consult, dated March 4, 2005.
13        Would you have had access to that
14  while you were at Spaulding treating Karen
15  Bartlett?
16      A    It's uncertain.  Some of these
17  typed consultations are placed in the electronic
18  medical record which I did have access to, but I
19  have no way of knowing from this printout
20  whether this one was, in fact, in that record or
21  not.
22          This is a signed copy that was
23  printed, obviously, and placed in the medical
24  record.  It's unlikely that I would have had
25  access to the signed copy, but it's possible I
00019
1  had access to an unsigned copy.
2      Q    Got ya.  And the unsigned copies
3  would be electronically signed in and that's
4  what you would have had access to via computer?
5      A    Perhaps.  I don't know if this was,
6  in fact, in the electronic medical record.  I
7  can't tell.
8      Q    Thank you.  Please give us an idea
9  of the types of documents that would have been
10  in the electronic medical record at Mass General
11  that you likely would have had access to when
12  you were reviewing Karen's history.
13      A    I would have had access to the
14  discharge summary, to selected consultations
15  that were placed in the electronic medical
16  record; although, I couldn't tell you which
17  specific ones without having access to that
18  record.
19          And I would have had access to
20  laboratory results, to x-ray studies, to
21  operative reports.  Those are the major types of
22  data I would have had access to.
23      Q    And is it -- is it my presumption
24  correct that in the care and in the course and
25  scope of your treatment of Karen Bartlett you
00020
1  would have accessed electronically what you
2  deemed relevant to your care and treatment from
3  Mass General's records?

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  Page 20, Line 6

6      A    Yes.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  20:9 - 21:4

9      Q    And why do you do that?

**Bartlett v Mutual**

```
10      A   I access records as needed to help
11 me in the care of the patient so I understand
12 their medical condition and the treatments that
13 they might require.
14      Q   Have you had a chance to review
15 some or all of the Spaulding Rehab records that
16 pertained to your participation in Karen
17 Bartlett's care and treatment before we began
18 that deposition today, sir?
19      A   I have had a chance to review some
20 of those records which were provided to me by
21 you.  It does not appear to be a complete record
22 of the chart, but I do believe it contains all
23 of my own notes.
24      Q   And but for getting the records
25 from me because you're now at Weill Cornell, you
00021
1 wouldn't have had access to them unless you
2 called your former facility, Spaulding, and got
3 them yourself, correct?
4      A   That is correct.
```

| Objection (20:24 to 21:4): | Ruling:  Overruled,. |
| --- | --- |
| -402 | |
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

Witness_ Joel Stein, M.D. - Vol. 1.txt:  21:7 - 21:19

```
7       Exhibit 26, Dr. Stein, is a second
8 infectious disease consult.  It is dated March
9 24, 2005, again, it's the signed version.
10         Can you take a few moments to look
11 at that and tell us whether or not you would
12 have likely had access to the electronic
13 unsigned version of that, please?
14      A   It's possible, but I have no way of
15 knowing for certain.
16      Q   From a review of your notes and
17 discharge summary, Dr. Stein, is it correct to
18 state that you had knowledge of the reported
19 history of Sulindac and said use?
```

Witness_ Joel Stein, M.D. - Vol. 1.txt:  21:22 - 22:5

```
22      Q   It is.  Your discharge summary is
23 Exhibit 34, sir.
24      A   (Perusing document.)  As best I can
25 determine from my note, my knowledge was that
00022
1 she had been treated with a nonsteroidal
2 anti-inflammatory drug, but I'm not -- I did not
3 record what specific medication that was here.
4 I couldn't say whether I was aware of it or not,
5 but I didn't record it.
```

Witness_ Joel Stein, M.D. - Vol. 1.txt:  22:11 - 22:15

Bartlett v Mutual

| | Objection: | Ruling: Overruled. |
| 11    So is it correct to state, | -403 | |
| 12 Dr. Stein, that you had knowledge that she took | -602 | |
| 13 NSAIDs, you know Sulindac's an NSAID, but you | -611 (c) | |
| 14 didn't make any specific reference to which | -Compound | |
| 15 NSAID she took? | -Argumentative | |
| | -No foundation | |

Witness_ Joel Stein, M.D. - Vol. 1.txt: 22:18 - 25:6

| | Objection (22:19 to 25:6): | Ruling: Sustained as to lines 23:17 |
| 18    A    That is correct. | -402 | through 25:6. Otherwise overruled. |
| 19    Q    Okay. Exhibit 26, page 476, the | -602 | |
| 20 bottom. It is the last page, Dr. Stein, the | -611 (c) | |
| 21 impression of this infectious disease fellow | -Argumentative | |
| 22 states "this is a 45-year-old woman with TEN, | -No foundation | |
| 23 likely secondary to NSAIDs who currently has a | | |
| 24 multifocal pneumonia with associated effusions." | | |
| 25    Do you see that? | | |

00023
1    A    Yes.
2    Q    Was that your understanding when
3 you were the attending physician by the end of
4 your treatment of Karen Bartlett?
5    A    Regarding the cause of her -- I'm
6 not sure I understand your question. It's a bit
7 broad. Regarding her pneumonia, regarding her
8 TEN, regarding the nonsteroidal etiology?
9    Q    Regarding her TEN and etiology.
10    A    It was my understanding that
11 nonsteroidal use was entertained as one of the
12 possible causes of her TEN. It was not entirely
13 clear at the time. To -- to me that had been,
14 you know, whether that was, in fact, the cause,
15 but I was aware of that.
16    Q    Thank you, Doctor.
17    And because Exhibit 27, the ID
18 attending note is in cursive, you would not have
19 had that, right, or have had access to that,
20 right?
21    A    Presumably not.
22    Q    Exhibit 28 is the discharge
23 summary, and it is -- on the last page you will
24 see it is dictated by a Sally Morton, NP.
25    Do you know what NP stands for, Dr.
00024
1 Stein?
2    A    Nurse practitioner.
3    Q    Would you have -- let me ask you,
4 if you hypothetically had access to two
5 infectious disease consults, the very ones that
6 we just very quickly went over and a nurse
7 practitioner's indication of a discharge
8 summary, where would you have placed your focus
9 in terms of getting a picture about this
10 patient?
11    A    I think that's a very difficult
12 question to answer. I think it depends with
13 regard to what particular aspect of her care.
14 If, for example, the question was what
15 infections does she have or what treatment would
16 be appropriate, certainly I would generally

Bartlett v Mutual

17 defer to the infectious disease consultant.
18        There are other aspects of the
19 history that might or might -- or the course
20 that might or might not be more accurately
21 reflected in the nurse practitioner's note.
22     Q    Got it.
23     A    I wouldn't say one trumps the other
24 inherently.
25     Q    Would it be fair to say you would
00025
1 look at all the data, but if you were looking at
2 questions regarding infectious disease, I'm
3 asking you would you put more credence in the
4 infectious disease doctor's statements about
5 that than a nurse practitioner's?
6     A    Generally, yes.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  25:8 - 25:15

---

8        Would you have likely seen Exhibits
9 29 and 30, which are the history and physical
10 and discharge summary respectively from
11 Northeast Rehab Hospital?
12     A    Most likely not.  Occasionally
13 these records are duplicated, xeroxed and sent
14 with the patient's chart, but I would say that's
15 infrequent and unlikely to have been the case.

| Objection: | Ruling:  Sustained. |
|---|---|
| -402 | |
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |
| -Calls for speculation | |

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  25:17 - 28:11

---

17        What, if any, affiliation does
18 Northeast Rehab Hospital have with MGH or
19 Harvard Medical School?
20     A    None that I'm aware of.
21     Q    In retrospect in reviewing your
22 records, do you know why Ms. Bartlett went from
23 Mass General for approximately, give or take, 70
24 days to Northeast Rehab for about five days and
25 then back to MGH and then to Spaulding Rehab,
00026
1 specifically, why Northeast Rehab and then
2 Spaulding Rehab; do you know what the answer is
3 to that?
4     A    I could speculate, but I don't know
5 for certain.  My understanding is the patient
6 resided in New Hampshire.  Northeast Rehab is
7 located in New Hampshire, and it's quite
8 possible she preferred to be closer to home.
9 But that's speculation.
10        In terms of coming to Spaulding
11 afterwards, she obviously had a deterioration in
12 her medical status while at Northeast Rehab.  I
13 assume that she chose not to return there, or
14 her physicians advised her to stay closer and
15 come to our program instead.
16     Q    Got it.  Thank you, Doctor.

| Objection (25:21 to 26:15): | Ruling:  Sustained. |
|---|---|
| -602 | |
| -Argumentative | |
| -No foundation | |
| -Calls for speculation | |

**Bartlett v Mutual**

| | |
|---|---|
| 17      Let's go to Exhibit 31. Let me<br>18 know when you are there, please.<br>19     A    All set.<br>20     Q    Is that April 27th history and<br>21 physical the first formal document that's<br>22 created when Karen Bartlett would have arrived<br>23 as a new inpatient at Spaulding Rehab?<br>24     A    It's the first physician<br>25 documentation I would expect. | Objection (26:16 to 28:11):<br>-602<br>-611(c)<br>-Argumentative<br>-No foundation |

Ruling: Overruled.

00027
1     Q    And that tells us and it reported
2 that Ms. Bartlett, Karen, had been at Mass
3 General from February 4, '05 and that she had a
4 toxic epidermal necrolysis at greater than 40
5 percent of her total body surface area, correct?
6     A    I'm looking where it says that in
7 the notes, if you give me a moment. (Perusing
8 document.)
9      Admitted on 2/4/05 with right toxic
10 epidermal necrolysis, the greater than 40
11 percent total body surface area.
12     Q    And two sentences later it says she
13 spent 65 days in the hospital. Did you
14 understand that to be a reference to how long
15 she was at Mass General?
16     A    Yes.
17     Q    And then it tells us a couple of
18 lines later she was able to be discharged to
19 Northeast Rehab on April 14, 2005, right?
20     A    Correct.
21     Q    And you understood that to be that
22 she went from MGH for about 65 days to Northeast
23 Rehab, correct?
24     A    That's correct.
25     Q    And then the next sentence tells us
00028
1 she was subsequently -- that means after
2 Northeast Rehab -- back at Mass General,
3 correct?
4     A    That's correct.
5     Q    And then she is admitted to Mass
6 General on 4/18, so four or five days at
7 Northeast Rehab, and now it's April 27th, so she
8 is in Northeast Rehab for about -- or she's back
9 at Mass General for about 11 days before she
10 arrives at Spaulding; does that sound right to
11 you?

---

Witness_ Joel Stein, M.D. - Vol. 1.txt: 28:14 - 28:25

| | |
|---|---|
| 14     A    It looks more like nine days to me.<br>15     Q    Okay. Thank you.<br>16      And the doctor who signed this and<br>17 wrote this up was a colleague of yours named<br>18 Dr. Lie-Nemeth, correct?<br>19     A    Yes. | Objection (28:16 to 28:18):<br>-602<br>-611(c)<br>-Argumentative<br>-No foundation |

Ruling: Overruled.

| | |
|---|---|
| 20     Q    Dr. Lie-Nemeth reports that her<br>21 hospital course, referring to Mass General, was<br>22 significant because she was intubated, she had a | Objection (28:20 to 28:25):<br>-602<br>-611(c)<br>-Argumentative<br>-No foundation<br>-Improper publishing |

Ruling: Overruled.

Bartlett v Mutual

23 tracheostomy, and she had a vancomycin resistant
24 bacteremia, in addition to other things,
25 correct?

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  29:3 - 29:19

| | |
|---|---|
| 3      A    I'm reviewing -- I'm sorry.  What<br>4  page are you on?<br>5      Q    Same page.  I'm on like the fifth<br>6  line, under HPI.<br>7      A    Intubation, trach placement, VRE,<br>8  yes.  Okay.  That's accurate.<br>9      And SVT stands for supraventricular<br>10  tachycardia, Doctor?<br>11      A    Yes.<br>12      Q    Is that fancy for an abnormally<br>13  increased heart rate?<br>14      A    It's more precise, but it<br>15  essentially -- yeah, an example of an abnormally<br>16  increased heart rate.  It's one type.<br>17      Q    And ARDS is acute respiratory<br>18  distress syndrome?<br>19      A    That's correct, adult. | Objection:<br>-602<br>-611(c)<br>-Argumentative<br>-No foundation<br><br>Ruling:  Overruled. |

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  30:1 - 32:21

| | |
|---|---|
| 1      Q    And that she also had a deep vein<br>2  thrombi of the right common femoral vein.<br>3      A    Deep venous thrombosis, correct.<br>4      Q    And she also had MSSA, patient<br>5  developed hyperemia.  Can you tell us what that<br>6  is, please?<br>7      A    She had a methicillin sensitive<br>8  staph aureus.  That's what MSSA stands for,<br>9  bacteremia.  And she had anemia.  Her hyperemia<br>10  is a different issue.  That's on another line.<br>11      Q    And the very last sentence of that<br>12  paragraph it says -- it tells us what her sodium<br>13  level was, and it says that level was secondary<br>14  to her being dehydrated; is that right?<br>15      A    That is correct.<br>16      Q    Okay.  Now that we have that,<br>17  please paint the picture, if you will, medically<br>18  speaking, of what Karen's status was upon<br>19  presentation to Spaulding.<br>20      A    She was obviously had had a serious<br>21  illness with a very complex and lengthy hospital<br>22  course related to her toxic epidermal necrolysis<br>23  and related complications as detailed in the<br>24  note.<br>25          At the time of her arrival, she<br>00031<br>1  continued to have difficulty with swallowing.<br>2  She had a nasogastric feeding tube in place to<br>3  assist with that.  She had a tracheostomy tube<br>4  for her respiratory difficulties.  She was | Objection (30:1 to 30:15):<br>-602<br>-611(c)<br>-Argumentative<br>-No foundation<br><br>Ruling:  Overruled,. |

Bartlett v Mutual

5  experiencing generalized anxiety.  She had some
6  corneal damage from the TEN, which was being
7  managed with topical medications and followed by
8  an ophthalmologist, and she was deconditioned
9  and in need of physical rehabilitation services.
10      Q    Tell us to the extent you can,
11  Doctor, with the benefit of the notes that
12  you've gone back and reviewed at my request --
13  and thank you for doing so -- why Karen needed
14  to go back to Mass General a second time after
15  she had a brief hospitalization at Northeast
16  Rehab?
17      A    It sounds like there were multiple
18  factors.  I wasn't involved in her care or the
19  decision to bring her back to Mass General, but
20  as documented in this note, it sounds as though
21  there were concerns about her wounds and that
22  was why she was referred for evaluation at Mass
23  General.
24          The dehydration with the sodium of
25  155 is a fairly serious medical condition and
00032
1  required, as noted here, a substantial volume of
2  intravenous fluids, which I assume was the
3  primary reason for her rehospitalization at Mass
4  General.
5      Q    What insight, if any, do you have
6  on what caused that significant dehydration?
7      A    I'd be speculating, most likely she
8  had inadequate amounts of fluid that she was
9  receiving through her nasogastric tube combined
10  with perhaps higher losses of fluid through
11  breathing through her trach and perhaps through
12  perspiration or wounds or other sources.  But
13  it's a combination of either not enough water in
14  or too much out or somewhat of both.
15      Q    Is one of the very important things
16  that you began to manage after you later got
17  back to the hospital and became Karen's
18  attending physician, is her nutrition either
19  through a nasogastric tube or later on a
20  gastrostomy tube inserted into her abdomen?
21      A    That is correct.

| Objection (31:10 to 31:16): | Ruling:  Overruled. |
|---|---|
| -602 | |
| -Argumentative | |
| -No foundation | |
| -Vague | |
| -Calls for speculation | |

| Objection (32:15 to 32:21): | Ruling:  Overruled. |
|---|---|
| -602 | |
| -611(c) | |
| -Argumentative | |
| -No foundation | |

Witness_ Joel Stein, M.D. - Vol. 1.txt:  32:23 - 35:9

23          Is it not uncommon for patients to
24  become dehydrated despite being on a feeding
25  tube through their nose or a feeding tube
00033
1  through their stomach?
2      A    It does occur.
3      Q    Why does it occur, Doctor?  In
4  other words, one would logically think if
5  someone has a feeding tube through their nose or
6  feeding through their stomach, it's being
7  monitored, the perhaps assumption would be that
8  you wouldn't get dehydrated.  Why does it occur?
9      A    The management of patient's fluid

| Objection (32:23 to 33:8): | Ruling:  Sustained (through line 33:25). |
|---|---|
| -402 | |
| -602 | |
| -Argumentative | |
| -No foundation | |
| -701 | |
| -702 | |
| -Improper opinion by NRE | |

Bartlett v Mutual

10  and nutrition is not always given sufficient
11  priority by medical staff, or maybe they lack
12  knowledge of that.
13          In addition to that, estimates of
14  what people need are often inaccurate.  You
15  know, rule of thumbs formulas that are used may
16  not, in fact, reflect any individual patient's
17  needs.  And if monitoring is not performed
18  frequently, then because the person is unable to
19  take fluid by mouth it's very easy for them to
20  end up with abnormal electrolytes.
21          For an individual who is able to
22  drink by mouth and has access to water, you
23  would normally feel thirst and would replenish
24  your fluids automatically without requiring any
25  medical intervention.
00034
1      Q    Thank you, Doctor.  I'll go to page
2  3 of Dr. Lie-Nemeth's history and physical, and
3  under functional history, she reports that Karen
4  requires contact guard assistance for transfers.
5  What does that mean?
6      A    It means she needed someone
7  standing next to her with a hand placed on her
8  body for guidance for moving from the bed to the
9  wheelchair or the wheelchair to standing or
10  other activities, changes in position or
11  location.
12     Q    Does that mean that Dr. Lie-Nemeth
13  believes she is not able to walk alone without
14  assistance?
15     A    It means that she would not be safe
16  at that point in time to get out of bed and walk
17  by herself.
18     Q    Okay.  So in her next sentence
19  where she says she can walk for 220 feet, do you
20  interpret that to mean is that she can walk that
21  far with assistance?
22     A    It's unclear from this note.  It
23  may be that the patient requires the contact
24  guard assistance for the change in position, but
25  once she is upright and walking, she may not
00035
1  require that much assistance.  It is somewhat
2  ambiguous.
3      Q    And 220 feet -- I guess 300 feet is
4  a football field, so 220 feet is something like
5  being able to make it from the end zone to the
6  other side's 30 yard line.  With that as a
7  reference guide, do you interpret that sentence
8  to mean that she is unable to walk more than
9  that approximately 70 yards?

| Objection (34:1 to 34:5): | Ruling:  Overruled. |
|---|---|
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

| Objection (34:12 to 35:9): | Ruling:  Sustained (through line 35:24). |
|---|---|
| -602 | |
| -Argumentative | |
| -No foundation | |
| -Calls for speculation | |

Witness_ Joel Stein, M.D. - Vol. 1.txt:  35:12 - 35:24

12     A    It's difficult to say.  Oftentimes
13  we will comment on how far a patient can walk.
14  We don't generally walk them to exhaustion or
15  until they fail.  So I would interpret this as

Bartlett v Mutual

16 she can walk at least 220 feet, but it is
17 possible that she could walk further.
18        I'll mention that that's a
19 fairly -- for someone being admitted to a
20 rehabilitation hospital, that's a pretty good
21 distance.  It is not the size of a football
22 field inside the hospital, so there are limits
23 to how far a patient can physically walk on the
24 unit.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  36:10 - 36:12

Before I go on with this
11 page, please flip to Exhibit 33, bottom right,
12 1548.  Tell me when you are there, please.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  36:20 - 38:1

20     A   I see it.  I have it.
21     Q    Okay.  And hopefully the next page
22 of that shows that that is signed by a Dr. Jacob
23 Holzer.  Does your copy show that?
24     A   Yes.
25     Q    And Dr. Jacob Holzer is a
00037
1 psychiatrist that you worked with, let me try,
2 for years at Spaulding Rehabilitation?
3        A   I don't recall exactly how long he
4 worked there.  I believe it was perhaps two or
5 three years.  I don't recall.
6     Q    Okay.  And did you participate in
7 the care and treatment of many patients with
8 Dr. Holzer in his two or three years there?
9     A   Yes.
10     Q    Did you find him to be a competent,
11 qualified psychiatrist who aided you in taking
12 care of your patients?
13     A   Yes.
14     Q    Dr. Holzer reports in his first
15 paragraph about two-thirds of the way down, in
16 the middle it says "was followed by the burn
17 psychiatry service."  Do you see that?
18     A   Yes.
19     Q    And in the last sentence,
20 Dr. Holzer reports "psychiatry is requested to
21 consult as a follow-up to MGH course."  Do you
22 see that, sir?
23     A   Yes.
24     Q    Now, let's go back to
25 Dr. Lie-Nemeth, and she reports under review of
00038
1 symptoms --

| Objection (36:25 to 38:1): | Ruling:  Overruled. |
| --- | --- |
| -402 | |
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |
| -Calls for speculation | |
| -Improper publishing | |

---

Witness_  Joel Stein, M.D. - Vol. 1.txt:  38:8 - 40:13

Bartlett v Mutual

8    Q    She reports "positive for anxiety."
9 Go down under psych:  She reports "mood is
10 anxious."  And flip to the next page, please,
11 under psych No. 4, second or third sentence, she
12 reports "psychiatry at Mass General has
13 recommended discontinuation of Seroquel."  Do
14 you see that?
15    A    Yes.
16    Q    When you reviewed these records,
17 would it have been your understanding and is it
18 now that Karen Bartlett was seen at the
19 suggestion of the doctors at Mass General that
20 she see psychiatrists there, so Dr. Lie-Nemeth's
21 recommendation that she see a psychiatrist at
22 Spaulding would have been at least a second
23 facility who saw a need for Karen Bartlett to
24 get psychiatric evaluation or treatment,
25 correct?
00039
1    A    She ordered a psychiatry consult.
2 It seems to have been aware of the MGH
3 recommendation to continue psychiatric care, and
4 I think in her own assessment, although I can't
5 speak for her, and only per her written record
6 but seemed to feel it was appropriate.
7    Q    Okay.  And in that same paragraph
8 4, Dr. Lie-Nemeth not only suggests or
9 recommends psychiatry, but that she follow-up
10 with psychology, as well, correct?
11    A    That's correct.
12    Q    And the psychologist that was --
13 then evaluated Ms. Bartlett pursuant to
14 Dr. Lie-Nemeth's recommendation was Dr. Richard
15 Goldberg?
16    A    That's correct.
17    Q    For how many years, if at all, did
18 you work with Dr. Richard Goldberg?
19    A    Approximately 16 years.
20    Q    Did you find him in those
21 approximately 16 years to be a qualified,
22 capable psychologist who aided you in the care
23 and treatment of your patients?
24    A    Yes.
25    Q    Back to Dr. Holzer's comment
00040
1 followed by burn psychiatry service at MGH,
2 first up, for how many years do you best
3 estimate that you were at Spaulding Rehab and
4 potentially getting referrals from the burn
5 service at MGH?
6    A    I don't recall.  Several years, I'd
7 have to look at my own resume to see.  The years
8 that I indicated that I was the director of the
9 burn program would have been the approximate
10 same years.
11    Q    On your resume it says '96 to 2004,
12 so eight, nine or ten years?
13    A    That sounds about right.

Objection (38:8 to 38:15):
-402
-602
-611 (c)
-Argumentative
-No foundation
-Calls for speculation
-Improper publishing

Ruling:  Overruled.

Objection (38:16 to 39:16):
-602
-611 (c)
-Argumentative
-No foundation
-Calls for speculation
-Improper publishing

Ruling:  Overruled.

Objection (39:17 to 39:24):
-402
-Argumentative
-No foundation

Ruling:  Overruled.

Objection (39:25 to 40:13):
-402
-611 (c)
-Argumentative
-No foundation
-Calls for speculation

Ruling:  Overruled.

Witness_  Joel Stein, M.D. - Vol. 1.txt:  41:8 - 42:2

Bartlett v Mutual

8       Was it common for MGH severely
9 burned patients with having never seen a
10 psychiatrist or psychologist before, to your
11 knowledge, to be referred by MGH Burn Service to
12 psychiatry?
13      A    My understanding was that it was
14 common practice to refer patients with severe
15 burns at Mass General to psychiatry regardless
16 of any premorbid conditions they may have had.
17      Q    When you say "regardless of any
18 premorbid conditions," is what that means for
19 people who might not understand that that they
20 had never seen a psychologist or psychiatrist
21 before that in their life?
22      A    Correct.  Regardless of whether
23 they had that care or not previously it was
24 commonly ordered there.
25      Q    It may or may not seem obvious to
00042
1 those listening to us, why was it common for
2 people in a burn unit to be sent to psychiatry?

Witness_ Joel Stein, M.D. - Vol. 1.txt:  42:5 - 45:4

| Objection (41:8 to 41:24): | Ruling:  Sustained. |
|---|---|
| -402 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

| Objection (41:25 to 42:12): | Ruling:  Sustained. |
|---|---|
| -402 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |
| -Calls for speculation | |

5       A    The nature of burn injuries are
6 that they are both painful and disabling and are
7 rather devastating events when they are severe
8 for the recipient.  There is substantial medical
9 literature documenting the psychiatric impact of
10 major trauma and burns in particular, so for
11 that reason I think this is fairly routine
12 practice at most burn centers.
13      Q    And Dr. Holzer's, the psychiatrist,
14 initial or his May 4th consultation with Karen,
15 that would have come the day after you arrived
16 back at the hospital and first saw Karen on May
17 the 3rd, correct, sir?
18      A    That is correct.
19      Q    And your first written note is
20 Exhibit 33, 1518 on the bottom, correct?
21      A    Yes.
22      Q    And there you record, amongst other
23 things, that you're considering a pulmonary
24 consult regarding a possible tracheostomy
25 decannulation, correct?
00043
1       A    Right.  I think it was -- I just
2 said pulmonary consult regarding possible trach
3 decannulation.  I don't think I was considering
4 it, I believe I was planning it.
5       Q    Thank you.  Tell us what that is,
6 please?
7       A    Trach decannulation is removal of
8 the tracheostomy tube.
9       Q    And tracheostomy tube is what,
10 please?
11      A    It's a tube placed into the trachea
12 to allow the patient to breathe through the
13 tube.  It goes into the front part of the neck.

| Objection (42:13 to 42:18): | Ruling:  Overruled. |
|---|---|
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

| Objection (42:19 to 42:21): | Ruling:  Overruled. |
|---|---|
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

| Objection (42:22 to 43:4): | Ruling:  Overruled. |
|---|---|
| -611 (c) | |
| -Argumentative | |
| -No foundation | |
| -Improper publishing | |

Bartlett v Mutual

14      Q    And it is your -- do you have an
15  understanding of for how long at Mass General
16  and her approximate 65 days there or her about
17  four days at Northeast Rehab or her about eight
18  days at second time at Mass General that Karen
19  was breathing through her neck by means of a
20  tracheostomy?
21      A    I'd have to go back and review the
22  Mass General records.  Generally speaking,
23  someone with her type of medical condition would
24  have probably received a tracheostomy fairly
25  early in her course and had it for the majority
00044
1  of that time, but I'd have to verify that.
2      Q    Please go to Exhibit 32 and let me
3  know when you are there.
4      A    Okay.
5      Q    And that is a couple of days before
6  you arrived back at the hospital, an ocular or
7  eye consult of Karen that was done on April 29,
8  2005, correct?
9      A    That's correct.
10      Q    And that was done by a Dr. Tsai who
11  works at the Massachusetts Eye and Ear
12  Infirmary, right?
13      A    That's correct.
14      Q    And Dr. Tsai under allergies lists
15  NSAIDs, comma, Sulindac, right?
16      A    Actually, that may have been
17  recorded by the staff at Spaulding.  I believe
18  it was.  I don't believe that's her record, but
19  ours.
20      Q    Got ya.  So the way you read this
21  from results down would have been Dr. Tsai's
22  writing and above that was probably this
23  Spaulding recommendation?
24      A    That's correct.
25      Q    Okay.  What Dr. Tsai, then, reports
00045
1  is that Karen on April 29, '05 now at Spaulding
2  for a couple of days is that she has early
3  scarring at corneas and severe dryness, right?
4      A    That's Correct.

Witness_ Joel Stein, M.D. - Vol. 1.txt:  45:7 - 45:24

7        Dr. Tsai's fourth recommendation is
8  to tape eyelids shut when patient is sleeping,
9  right?
10      A    That's correct.
11      Q    Would that have been followed every
12  night while Karen was at Spaulding to tape her
13  eyelids shut when she was sleeping?
14      A    It should have been, but I can't --
15  I would have to review the nursing records to
16  see if that's the case.  Generally speaking,
17  these recommendations would be followed
18  carefully.
19      Q    Why would it have been your

| Objection (43:14 to 44:1): | Ruling:  Sustained. |
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -Calls for speculation | |
| -No foundation | |
| -Misleading | |

| Objection (44:5 to 44:9): | Ruling:  Overruled. |
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

| Objection (44:10 to 44:13): | Ruling:  Overruled. |
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

| Objection (44:14 to 44:19): | Ruling:  Overruled. |
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |
| -Improper publishing | |

| Objection (44:16 to 44:24): | Ruling:  Overruled. |
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |

| Objection (44:25 to 45:18): | Ruling:  Sustained as to lines 45:11 through 45:18.  Otherwise overruled. |
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -Calls for speculation | |
| -No foundation | |
| -Improper publishing | |

**Bartlett v Mutual**

20  understanding that this ophthalmologist or eye
21  doctor is recommending that Karen now
22  approximately 80 days after she first got to
23  Mass General is still having a recommendation to
24  have her eyelids shut, taped at night?

| Objection (45:19 to 45:24): | Ruling:  Overruled. |
|---|---|
| -602<br>-611 (c)<br>-Argumentative<br>-Calls for speculation<br>-No foundation<br>-Assumes facts not in<br>evidence | |

---

Witness_  Joel Stein, M.D. - Vol. 1.txt:  46:3 - 49:8

3      A    Generally speaking, patients who
4  are having corneal damage or dryness or other
5  issues related to corneal injury, one of the
6  major treatments is to protect them from
7  excessive air exposure and using a combination
8  of lubricants during the daytime and taping the
9  eyelids shut at night is fairly common.
10      Q    Dr. Tsai recommends a follow-up on
11  May 2nd, and the next page shows us that she saw
12  Karen Bartlett on May 2nd, correct?
13      A    That is correct.
14      Q    Now, when Mass eye/ear
15  ophthalmologists were seeing Karen while she was
16  soon to become a patient of yours at Spaulding,
17  where were they physically seeing her,
18  Dr. Stein?
19      A    At Mass's Eye and Ear Infirmary.
20      Q    And tell us how she got there and
21  how far it was from Spaulding.
22      A    It is physically attached to Mass

| Objection (46:10 to 46:13): | Ruling:  Overruled. |
|---|---|
| -602<br>-611 (c)<br>-Argumentative<br>-Calls for speculation<br>-No foundation<br>-Improper publishing | |

23  General Hospital, although it is an independent
24  facility, and it's approximately several blocks.
25  It's a ten-minute walk.  Driving it can be
00047
1  anywhere from five minutes to an hour-and-a-half
2  depending on traffic.
3      Q    So she would have been physically
4  transported there, how?
5      A    Typically by ambulance or perhaps
6  by a chair car or ambulette.  I don't know in
7  her case which was used.
8      Q    Is a chair car the same thing as
9  ambulette?
10      A    Yes, they're used interchangeably.
11      Q    What is an ambulette, please?
12      A    It's a van that is designed for
13  transporting patients with medical needs.  It's
14  usually for patients that are wheelchair
15  requiring so that the patient is assisted in the
16  wheelchair into the van and the wheelchair is
17  secured, and they can be driven safely that way
18  as opposed to an ambulance where a patient is
19  brought in by stretcher.
20          Also, the degree of medical
21  supervision is substantially greater in an
22  ambulance.  And our standard practice at
23  Spaulding at the time was to use the lesser
24  degree of medical resources when medically
25  appropriate.
00048
1      Q    Sure.  The very next page on May

Bartlett v Mutual

**2** 3rd show us that she had a consult or a
**3** follow-up with the burn clinic and the
**4** requesting doctor was you, Dr. Joel Stein,
**5** correct?
**6**    A   I am listed as a requesting M.D.  I
**7** don't actually know who wrote the order.  It may
**8** have been written prior -- probably was written
**9** prior to my assuming her care because it would
**10** have been scheduled since I assumed her care on
**11** May 3rd.  It was probably written by Dr.
**12** Lie-Nemeth.
**13**    Q   Thank you, Doctor.
**14**       And same question:  How physically
**15** would Karen have gotten from Spaulding to go
**16** back for a follow-up to the burn clinic?
**17**    A   Either by chair car or by
**18** ambulance.  I'm not certain which.
**19**    Q   And do you know whether that -- can
**20** you tell whether that follow-up occurred on
**21** April 3rd?
**22**    A   It can't be determined from this
**23** note.  I believe it did occur, but I can't
**24** verify that.  It is not atypical for the Burn
**25** Service not to provide a written response on
**00049**
**1** this form, so the absence of that does not
**2** indicate that it did not occur.
**3**    Q   The next page shows it was a third
**4** consult with an ophthalmologist from Mass Eye
**5** and Ear in this instance with a Dr. Azar
**6** Dimitri, correct, sir?
**7**    A   Actually it is signed by Dr. Tsai,
**8** if I'm looking at the same note.  This is 1560?

Objection (48:1 to 48:12):
-602
-611 (c)
-Argumentative
-No foundation
-Calls for speculation
-Improper publishing

Ruling:  Overruled.

Objection (49:3 to 49:8):
-602
-611 (c)
-Argumentative
-No foundation
-Calls for speculation
-Improper publishing

Ruling:  Sustained.

Witness_ Joel Stein, M.D. - Vol. 1.txt:  50:1 - 51:1

Q   Let's go to the last page.  Does
**2** that appear to be a record of a fourth consult
**3** for Karen with Mass Eye and Ear while she was at
**4** Spaulding?
**5**    A   Is this 1562?
**6**    Q   Yes, sir.
**7**    A   Yes, it does appear to be that way.
**8**    Q   And on all four of those consults,
**9** the allergies listed are NSAIDs, Sulindac,
**10** correct?
**11**    A   I have to verify that, but I
**12** imagine so.
**13**       (Perusing document.)  That is
**14** correct.
**15**    Q   And all we spoke about is the eyes.
**16** Also, on the follow-up for the burn clinic and
**17** the consult for the G-tube placement, which is
**18** the feeding tube into her stomach, on both of
**19** those consults the allergies listed are also
**20** NSAID Sulindac, correct?
**21**    A   That is correct.
**22**    Q   Now, go back and move to
**23** Dr. Lie-Nemeth's original history and physical.

Objection (50:1 to 50:14):
-602
-611 (c)
-Argumentative
-No foundation
-Improper publishing

Ruling:  Sustained.

Objection (50:15 to 50:21):
-602
-611 (c)
-Argumentative
-No foundation
-Improper publishing

Ruling:  Sustained.

**Bartlett v Mutual**

24 She states in the physical examination "there is
25 a stage II ulcer on Karen's back with no
00051
1 drainage." What does that mean, Doctor?

| | |
|---|---|
| Objection (50:22 to 51:1):<br>-602<br>-611 (c)<br>-Argumentative<br>-No foundation<br>-Improper publishing | Ruling: Overruled. |

**Witness_ Joel Stein, M.D. - Vol. 1.txt: 51:10 - 53:9**

10      A    That refers to a decubitus ulcer
11 that was graded as stage II.  Staging system
12 indicates the depth.  Stage I is generally
13 redness.  Stage II is superficial skin abrasion
14 or breakdown.  So this is a relatively mild
15 degree of skin breakdown, and her exam indicates
16 that there was no drainage from the wound, which
17 is a -- generally a favorable finding.
18      Q    And then her plan underlined is
19 decreased functional status secondary to toxic
20 epidermal necrolysis syndrome, correct?
21      A    That's correct.
22      Q    Secondary generally means cause,
23 right; in other words, do you interpret
24 Dr. Lie-Nemeth's note to mean that she believes
25 that Karen had decreased functional ability
00052
1 because of her TEN?
2      A    That's correct.
3      Q    And she tells us the components of
4 that decreased functionability are that she has
5 weakness in her legs, she has decreased
6 activities of daily living, she has less mobile
7 and she has less ability to swallow?
8      A    That's correct.
9      Q    And her plan to hopefully treat
10 these medical issues of Karen's is a number of
11 things, including physiatry, PT, OT,
12 speech-language, breathing therapy and
13 psychology, amongst other things, correct?
14      A    I'm not sure what you mean by
15 "breathing therapy," respiratory therapy if
16 that's what you mean.
17      Q    Yes, it is what I meant, and I was
18 going to ask you that.  Other than that
19 correction, is that list all true?
20      A    Yes.
21      Q    And let's start with that.  What is
22 respiratory therapy, Doctor?
23      A    Respiratory therapists are trained
24 in the management and assistance of patients
25 with pulmonary issues with respiratory issues.
00053
1 They, in a hospital setting, would typically
2 assist with trach care, with suctioning, to
3 remove secretions from the tracheostomy tube
4 with oxygen therapy, with anything involving
5 breathing aids or apparatuses.
6      Q    Respiratory therapy is the
7 extremely important task of making sure
8 someone's tube through which they are breathing
9 through their neck is functional?

| | |
|---|---|
| Objection (51:18 to 51:21):<br>-602<br>-611 (c)<br>-Argumentative<br>-No foundation<br>-Improper publishing | Ruling: Overruled. |

| | |
|---|---|
| Objection (51:21 to 52:2):<br>-602<br>-611 (c)<br>-Argumentative<br>-No foundation<br>-Improper publishing | Ruling: Sustained. |

| | |
|---|---|
| Objection (52:3 to 52:20):<br>-602<br>-611 (c)<br>-Argumentative<br>-No foundation<br>-Improper publishing | Ruling: Overruled. |

| | |
|---|---|
| Objection (53:6 to 53:9):<br>-402<br>-611 (c)<br>-701<br>-702<br>-Argumentative<br>-No foundation<br>-Improper opinion by NRE | Ruling: Sustained as to "extremely important."  Otherwise overruled. |

**Bartlett v Mutual**

---

**Witness_ Joel Stein, M.D. - Vol. 1.txt:  53:12 - 54:9**

```
12      A    That is a component of their task,
13  correct.  They share that task with others, such
14  as nursing but that is correct.
15      Q    What is physiatry, Dr. Stein?
16      A    Physiatry is another term for the
17  medical specialty of physical medicine and
18  rehabilitation.
19      Q    And PT that means you -- Dr. --
20  your colleague, Dr. Lie-Nemeth, had planned for
21  her physical therapy?
22      A    Correct.
23      Q    And she had planned for
24  occupational therapy?
25      A    Correct.
00054
1       Q    Now, when she planned for Karen's
2   speech-language pathology, please tell us what
3   that means.
4       A    Speech-language pathology is
5   synonymous speech therapist, the term that they
6   prefer; and they deal with several issues, and
7   in this particular patient, they would have been
8   focusing on her swallowing since I'm not aware
9   that she had any difficulty speaking.
```

---

**Witness_ Joel Stein, M.D. - Vol. 1.txt:  54:11 - 54:25**

```
11          The goals were to have a modified
12  independent to independent level for all
13  activities of daily living and mobility,
14  correct?
15      A    That's correct.
16      Q    Tell us what that means.
17      A    Independent level would mean that
18  you can do everything yourself.  An able-bodied
19  person with no medical issues or disability
20  would be able -- would be independent.
21          Modified independent is when you
22  are able to achieve the activity on your own,
23  but require a device or some modification of the
24  activity to perform it.  For example, walking
25  with a cane would be modified independence.
```

---

**Witness_ Joel Stein, M.D. - Vol. 1.txt:  55:13 - 58:7**

```
13          On the last page, Dr. Lie-Nemeth
14  has "an estimated length of stay of two weeks
15  and potential is good."
16          Does that mean she thinks there is
17  a good chance it might be a two-week hospital
```

| Objection (55:13 to 56:8):<br>-602<br>-611 (c)<br>-Argumentative<br>-No foundation | Ruling:  Sustained through line 56:3.<br>Otherwise overruled. |
| --- | --- |

**Bartlett v Mutual**

```
18  stay?
19      A    Give me one moment.  (Perusing
20  document.)
21      Q    Sure.
22      A    So she is estimating the stay at
23  two weeks.  In terms of potential being good, I
24  think what she is referring to is her overall
25  rehabilitation potential is good.  I don't think
00056
1  that's a reflection on the accuracy of the two
2  weeks estimate, but more on her overall
3  likelihood of improvement and success.
4      Q    Okay.  Thank you, Doctor.  And what
5  it turned out to be is a approximately
6  three-week hospitalization.  We know that from
7  your discharge summary, Exhibit 34, correct?
8      A    That's correct.
9      Q    Now, she was -- your colleague said
10  that her recommendation was to continue Karen on
11  Valium.  What is Valium, Doctor?
12      A    Valium is a benzodiazepine
13  medication.  It's used as an anxiolytic and as a
14  sleep aid, as well.
15      Q    Does anxiolytic mean and in Karen's
16  situation did you understand that it was being
17  given to her because of her anxiety?
18      A    That's correct.
19      Q    Is it also a powerful sedative and
20  muscle relaxer?
21      A    It has both of those
22  characteristics, as well.
23      Q    And the plan was to wean her off
24  methadone which was -- means to hopefully get
25  her off it, correct?
00057
1      A    That's correct.
2      Q    Would it have been your
3  understanding that she was being given methadone
4  for pain management?
5      A    Yes.  It's commonly used in the
6  burn unit, at least it was at the time at Mass
7  General as a pain medication, and it has a
8  favorable pharmacologic profile that they have
9  reasons to select it.
10      Q    Now, she also reports that
11  psychiatry at Mass General had recommended
12  taking Karen off of Seroquel; is that right?
13      A    That is correct.
14      Q    What would have been your
15  understanding as to why psychiatry at Mass
16  General wanted to take her off that drug and
17  tell us what that drug is, please?
18      A    I can't comment on their rationale.
19  I don't have access to their notes.
20          Seroquel is an atypical
21  antipsychotic medication.  It is used as a sleep
22  aid and as an antianxiety medication to some
23  extent, as well.  It has a variety of complex
24  actions that are not fully understood, including
25  the suggestion that it might be of some benefit
00058
1  for depression, as well, although that's not so
```

**Bartlett v Mutual**

2 clear.
3     Q     As we have pointed out, the
4 recommendation to consult psychiatry and
5 psychology was basically following up on
6 something that already occurred at Mass General?
7     A     That's correct.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  59:19 - 59:20

19     Q     Exhibit 33, 1528, at the bottom.
20 Tell me when you're there, please.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  59:25 - 62:22

25     A     Okay, I have that.
00060
1     Q     Is that your May 9th note regarding
2 Karen?
3     A     At the top, yes.
4     Q     Those are your initials about
5 halfway down the page?
6     A     That's my signature.
7     Q     Okay.  Thank you.
8          Tell us what's going on there in
9 terms of your assessment and plan.  This would
10 be approximately Karen's 11th day at the
11 hospital, right?
12     A     Roughly.
13     Q     Tell us what's going on at that
14 time, please.
15     A     She had been decannulated, her
16 tracheostomy tube had been removed.  She was
17 doing well from a respiratory standpoint.  She
18 had had a modified barium swallow and had not
19 done well in terms of her swallowing safety.
20 That was attributed to concerns about anxiety
21 and also the presence of the tracheostomy tube.
22          She was continuing on therapeutic
23 feeds which indicates small amounts of feeding
24 given by the speech therapist rather than more
25 substantial amounts of food for nutritional
00061
1 purposes, and our plan was to repeat the
2 swallowing study shortly.
3          We had also -- were changing the
4 tube feedings that were going through her
5 nasogastric tube at that time to what are called
6 boluses which are larger amounts given less
7 frequently.  And a community outing was being
8 planned.
9     Q     Let's start with the community
10 outing being planned, what's that about, please?
11     A     Part of your program for
12 transitioning patients back to the community is,
13 when feasible, to get them outside the hospital
14 and to participate in activities in the

Bartlett v Mutual

15 community under the supervision of the
16 therapist.
17      Q    What would that entail; in other
18 words, where would you go, what would you do?
19      A    The activities varied.  I couldn't
20 say without seeing the therapist notes what was
21 done here, but the source of things that were
22 commonly done were is there is a science museum
23 several blocks from the hospital, patients would
24 often go there on an outing, they would also
25 sometimes go to the nearby North Station Boston
00062
1 Garden and do shopping there or something.
2      Q    All right.  Tell us from a lay
3 perspective what this modified barium swallow
4 study is, please, and what it is designed to
5 tell a physician.
6      A    A modified barium swallow study is
7 an x-ray study that is performed.  It's a video
8 of the swallowing, and the patient is given a
9 material that is visible on the x-ray images to
10 chew and swallow or to drink.  Different
11 textures are given and the patient's swallow
12 mechanism is observed, whether the food goes
13 down the esophagus, whether it goes down into
14 the trachea and the airways where it doesn't
15 belong.  Those sorts of things are observed.
16      Q    Tell us about the difficulties, if
17 any, of having both a tracheostomy, in other
18 words the tubes that you are breathing through
19 your neck, as well as a nasogastric tube, so you
20 are getting fed through your nose down to your
21 abdomen; does that simultaneous link of medical
22 devices create problems?

| Objection (62:16 to 63:4): | Ruling:  Sustained. |
| --- | --- |
| -402 | |
| -701 | |
| -702 | |
| -Argumentative | |
| -No foundation | |
| -Improper opinion by NRE | |

Witness_ Joel Stein, M.D. - Vol. 1.txt:  62:25 - 64:17

25      A    Both nasogastric tube and a
00063
1 tracheostomy tube can interfere with swallowing
2 to some extent, and the combination certainly
3 could cause additive effects in terms of
4 interfering with swallowing.
5      Q    What was going on with -- in your
6 estimation with Karen's difficulty swallowing?
7      A    I think at that moment in time, or
8 looking back?
9      Q    Looking back.
10      A    Looking back, it appears that there
11 were probably multiple factors.  The presence of
12 the tracheostomy tube was probably a
13 contributing one, the nasogastric tube, as well.
14 In addition she was subsequently evaluated by an
15 ENT physician and found to have evidence of a
16 vocal cord paralysis.
17      Q    We all understand a vocal cord is
18 what we need to speak, but what was your
19 understanding of what caused the vocal cord
20 paralysis, if you have an understanding?

Bartlett v Mutual

21    A    If I could just correct that and
22 say right vocal cord paralysis.
23    Q    Okay.  Thank you.
24    A    The cause of the paralysis was
25 uncertain.  Dr. Suzuki, Bruce Suzuki, who
00064
1 evaluated the patient raised the possibility
2 that it might have been related to her
3 intubation, but it was uncertain.
4    Q    Let me kind of ask a global
5 question.  Looking back from your review of your
6 records regarding Karen Bartlett and those of
7 your colleagues at Spaulding Rehabilitation
8 Hospital, in your estimation was essentially all
9 of Karen Bartlett's physical medical issues a
10 result of and compatible with the fact that she
11 had TEN?
12    A    All of her issues appeared to
13 derive ultimately from that original inciting
14 factor.
15    Q    The inciting factor being the fact
16 that she had TEN?
17    A    Correct.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  64:21 - 65:18

Let's go to Exhibit 31, page 2,
22 and there your colleague Dr. Lie-Nemeth lists 19
23 medications.  And that's what she shows up at
24 Spaulding that Karen is then on, correct?
25    A    That's correct.
00065
1    Q    Excluding the multivitamin and any
2 others that you have to exclude, are essentially
3 all of those medications, looking back, Dr.
4 Stein, in your view, medications that Karen
5 needed as a result of her TEN?
6         Another way of stating that is had
7 she never had TEN, she wouldn't have been on
8 these 19 medications maybe except a
9 multivitamin?
10    A    As far as I know, she was not on
11 any of these medications prior to her
12 hospitalization, so I think it's safe to assume
13 they are all being used to treat the
14 complications of the TEN.
15    Q    And the vocal cord paralysis,
16 secondary to possibly intubation would have been
17 one of many examples of things that occur as a
18 result of TEN, fair?

| Objection (64:21 to 64:25):<br>-602<br>-611 (c)<br>-No foundation | Ruling:  Overruled. |

| Objection (65:1 to 65:14):<br>-602<br>-611 (c)<br>-No foundation<br>-Argumentative | Ruling:  Overruled. |

| Objection (65:15 to 65:22):<br>-602<br>-611 (c)<br>-No foundation<br>-Argumentative | Ruling:  Overruled. |

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  65:21 - 67:16

21    A    Right.  Yes I would agree with
22 that.
23    Q    Let's go, on the same topic, to

Bartlett v Mutual

24 your discharge summary, please, Exhibit 34.
25 Tell me when you're there.
00066
1      A     Okay.
2      Q     Is that your signature on page 2?
3      A     That is my signature.
4      Q     And you list on discharge eight
5 medications that Karen is then on, correct?
6      A     That's correct.
7      Q     Looking back and based upon a
8 reasonable degree of medical certainty, were all
9 of those medications that she was on upon
10 discharge maybe except the multivitamins all as
11 a result of Karen having TEN and the
12 complications thereof?
13      A     Yes.
14      Q     Let's go back to, we previously
15 referenced Dr. Holzer's typed-up psychiatry
16 consult.  It's in the middle of Exhibit 33, tell
17 me when you're there, 1548 at the bottom.
18      A     Okay.
19      Q     And Dr. Holzer, the psychiatrist
20 there, reports on her mental state, towards the
21 right, "became tearful during meeting discussing
22 length of hospital course."  The very last line
23 of the same page she reports, "she does report
24 having a difficult time feeling demoralized,
25 upset about length of hospitalization, misses
00067
1 home."
2          Do you see those entries?
3      A     Yes.
4      Q     I occasionally ask stupid, obvious
5 questions, but is it your understanding that
6 those symptoms, those signs would have been as a
7 result of Karen having TEN in this extremely
8 long hospitalization at many different
9 hospitals?
10      A     Yes.
11      Q     When Dr. Holzer reports, under
12 mental state line, reports chronic
13 claustrophobic SXS.
14          First of all, do you know what that
15 is an abbreviation for?
16      A     Symptoms.

| Objection (66:14 to 67:10): | Ruling:  Sustained. |
|---|---|
| -602 | |
| -611 (c) | |
| -No foundation | |
| -Argumentative | |
| -801 | |
| -802 | |

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  67:19 - 68:8

What do you
20 interpret Dr. Holzer's reporting there when she
21 has claustrophobic symptoms, chronically --
22 strike that.
23          First of all, when he says
24 "chronically," does he mean that the symptoms
25 are appearing over a long period of time?
00068
1      A     It's hard to be certain what his
2 intention was.  I would interpret this as
3 indicating that this may actually precede her

| Objection (67:19 to 68:8): | Ruling:  Sustained. |
|---|---|
| -602 | |
| -611 (c) | |
| -No foundation | |
| -Argumentative | |
| -Calls for speculation | |
| -801 | |
| -802 | |

**Bartlett v Mutual**

4  hospitalization.  It's not rare for people who
5  are otherwise fully functional and not in
6  psychiatric treatment to have feelings of
7  claustrophobia the same way some people are
8  afraid of snakes or heights.

---

**Witness_  Joel Stein, M.D. - Vol. 1.txt:  68:21 - 69:15**

| | |
|---|---|
| 21      Q    He also, in his clinical<br>22  impression, Dr. Holzer, reports "now recovering<br>23  with wide areas of burns complicated hospital<br>24  course."  Do you see that?<br>25      A    Yes.<br>00069<br>1      Q    And then on the next page<br>2  Dr. Holzer says, second line, "right now would<br>3  recommend continuing with Valium as needed,<br>4  which patient reports is helpful for phobic<br>5  symptoms and acute anxiety."  Is that right?<br>6      A    Yes.<br>7      Q    How would you have interpreted<br>8  that; what does that mean?<br>9      A    He is recommending continuing use<br>10  of the Valium as needed which the patient has<br>11  found helpful for some of her symptoms.<br>12      Q    When he says "phobic symptoms,"<br>13  what do you understand that to mean?<br>14      A    Fear, I'm not sure of what.  It's<br>15  unclear from his note. | Objection (68:21 to 69:6):<br>-602<br>-611 (c)<br>-No foundation<br>-Argumentative<br>-Improper publishing<br>-801<br>-802 |

Ruling: Sustained.

---

**Witness_  Joel Stein, M.D. - Vol. 1.txt:  69:20 - 70:2**

20          Who was the pulmonologist, based
21  upon your review of the records, that was
22  involved in Karen's care at Spaulding?
23      A    Dr. Douglas Johnson.
24      Q    Can you please help me find his
25  first note.  I think I found it on page 1523,
00070
1  and it's about two-and-a-half pages long,
2  correct?

---

**Witness_  Joel Stein, M.D. - Vol. 1.txt:  70:7 - 71:9**

7      A    Yes, I see it on 54 on -- yes, the
8  bottom of 1523.
9      Q    Yes, sir.  And would you,
10  Dr. Stein, have reviewed that as part and parcel
11  of your care and treatment?
12      A    I would have, yes.
13      Q    Tell us, then, from your
14  perspective what Dr. Johnson, the lung
15  specialist, the pulmonologist, is reporting

Bartlett v Mutual

16  there that would have been important for you?
17      A    Perhaps I can skip to the
18  impression recommendations, which is the essence
19  of the notes.  He had some concerns based on
20  prior chest x-ray and his examination that she
21  might have a left-sided pleural effusion, and he
22  recommended that we get particular chest x-rays
23  to evaluate that.
24          He removed a suture that had been
25  left in place.  He changed one of her
00071
1  medications or recommended its change to as
2  needed, the albuterol.  And he recommended a
3  culture and gram stain of a sputum specimen.
4      Q    Let's start with pleural effusion.
5  What is that, please, Doctor?
6      A    Fluid around the lung.
7      Q    And that can be caused by many
8  things; can it not?
9      A    That's correct.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  71:16 - 74:10

16      Q    What was going to be used to
17  attempt to hopefully overcome that issue?
18      A    In terms of assessing the issue, a
19  chest x-ray was advised with what are called
20  decubitus films, where the patient lies on their
21  side to see if there is fluid there, whether it
22  is -- how much of it is present and whether it
23  is mobile or if it's fixed in location.
24      Q    And was that -- and this was a May
25  4th note, the day after you started actively
00072
1  treating Karen.  Tell us as time went on was
2  that pleural effusion, did it resolve?
3      A    It appeared to have been improving
4  and required no further treatment during her
5  Spaulding stay.
6      Q    This lung doctor, Dr. Johnson,
7  reports that he removed a tracheostomy retention
8  suture; is that correct?
9      A    That's correct.
10      Q    Please tell us what that is and why
11  it was done.
12      A    It's a suture that's placed at the
13  time of the insertion of the tracheostomy tube
14  to hold it in place and keep it from falling
15  out.  Typically the sutures are removed because
16  after a period of time the tracheostomy is more
17  secure and the risk of it coming out is less
18  substantial.
19          In her case because of her multiple
20  medical issues perhaps and multiple
21  institutions, the suture was left in place
22  longer than is typical and he removed it.
23      Q    Typically how long are these
24  tracheostomy sutures left in?
25      A    I'm not certain.

**Bartlett v Mutual**

```
00073
1      Q    In relation, to give us a visual,
2  of the Adams apple, where are these sutures?
3      A    The tracheostomy tube would be near
4  the Adams apple and the suture would be right
5  adjacent to it that would be holding it to the
6  skin there.
7      Q    And a suture could be, to use an
8  analogy which I'm sure is inaccurate, if we are
9  talking about stitches here, how many stitches
10  would that be?
11     A    One.
12     Q    The actual tracheostomy is round,
13  correct?
14     A    I'm not sure if I understand by the
15  tracheostomy.  The tube itself is cylindrical,
16  it has various other components.  There is a
17  flange on the outside of it, various other
18  pieces.
19     Q    The part that holds to your neck is
20  at the end of a cylinder and it's round; is that
21  right or wrong?
22     A    Correct.  In essence, correct.
23     Q    How does one stitch hold a round
24  presumed piece of plastic to your neck?
25     A    Imagine you have a tube inserted
00074
1  into another tube, which is what's happening
2  here.  The tracheostomy tube is going into the
3  trachea, which is the body's own breathing tube.
4  It rests there, and it is not inclined to move
5  unless it is pulled out.  So what the suture
6  does is prevent it from inadvertently being
7  pulled out or falling out, but it can't
8  otherwise move around very much because it is
9  held in place by the surrounding tissues.  I
10  probably need to draw you a diagram.
```

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  74:17 - 76:3

```
17     Q    Let's go to the next page 1522.  Is
18  the top entry there the entry of the
19  psychologist, Dr. Richard Goldberg?
20     A    Yes.
21     Q    Can you please do us a favor and
22  read into the record because I can't read it.
23     A    "5/04/05 psychology reviewed notes
24  by psychiatry.  Dr. Holzer recommends continuing
25  with Valium.  Patient appears" -- I'm not sure I
00075
1  can read that word -- "in mood, not tearful
2  today," underlined "feels she is finally
3  adjusting better to staff.  Notice she has
4  well" --
5      Q    -- groomed?
6      A    It says "well groomed."  I think
7  that -- I'm not sure.  Notice she is well
8  groomed, perhaps?  It is unclear what that
9  middle word is.
```

| Objection (74:21 to 76:2): | Ruling:  Sustained as to lines 74:21 |
|---|---|
| -602 | through 75:15.  Otherwise overruled. |
| -Calls for speculation | |
| -No foundation | |
| -Misleading/confusing | |
| -801 | |
| -802 | |

Bartlett v Mutual

10          "Sitting up in chair with" -- I
11  can't read the next few words.  The next line,
12  "told me she finally feels she is making some
13  progress, happy that trach retention is removed
14  and looks forward to eventual decannulation.
15  And no trach, no complaints."
16      Q     And so what she is reporting there
17  is the suture that was just removed by
18  Dr. Johnson?
19      A     That's correct.
20      Q     And did it give her -- is it easier
21  to breath when the trach retention is removed?
22  Why is she reporting, to your estimation, that
23  she is better off?
24      A     It's unlikely that she was
25  physically able to feel or be aware of the
00076
1  suture.  I imagine it was more the idea of it
2  being removed.
3      Q     Right.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  76:22 - 78:22


22      Q     Please go to Exhibit 33, 1529 at
23  the bottom.  Tell me when you are there, sir.
24      A     15 --
25      Q     -- 29.
00077
1      A     Okay.
2      Q     What is that page of May 10, '05?
3      A     This is a team rounds note.
4      Q     What is that?
5      A     In a rehab hospital, there is a
6  periodic meeting of the team, generally at least
7  once a week.  It varies from institution to
8  institution, and frankly, I don't recall at the
9  time there how often we were doing this.
10          But the physician, the case manager
11  and the therapy team, nursing typically, get
12  together and review a patient's progress, any
13  barriers to continue progress and they try to
14  determine a discharge plan and estimate the
15  length of stay and the level of functioning at
16  discharge.
17      Q     Is a accurate way to define your
18  role in Karen's treatment from 5 -- from May 3rd
19  through her discharge on May 19th, is that --
20  well, of course, you are not a pulmonologist or
21  a burn surgeon.  You were her attending
22  physiatrist which meant that you led the team in
23  terms of deciding what ultimately would be Karen
24  Bartlett's care and treatment?
25      A     That's correct.
00078
1      Q     On May 10th she was seen by
2  Dr. Richard Goldberg, psychologist.  Again, if
3  you would be kind enough again to read his entry
4  on the next page, I'd appreciate it.
5      A     "Patient seen for psychotherapy.

| Objection (78:1 to 78:21): | Ruling:  Overruled. |
|---|---|
| -602 | |
| -611 (c) | |
| -Argumentative | |
| -No foundation | |
| -Calls for speculation | |

Bartlett v Mutual

6  She is anxious today for two reasons, one,
7  husband last night had tightness in his chest
8  and was taken to Holy Family Hospital Methuen
9  for observation; two, she failed" I think the
10  word is -- "failed the MBS test."
11      Q    Let me stop you right there.  Is
12  that right, true, and accurate?
13      A    It's not a -- I would never -- it's
14  not a pass/fail exam.  It's a common
15  colloquialism among team members, but it's not a
16  very accurate way to describe it.
17      Q    When the team member says that,
18  what does it mean to you?
19      A    It means he is a psychologist and
20  the patient told him that she failed, but I --
21  it's not a pass/fail exam.
22      Q    And then you tell us, how did she

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  79:5 - 80:11

please proceed with reading that,
6  Doctor.
7      A    "Despite anxiety she has been
8  walking."
9      Q    Worked up?
10      A    I think it might be "walking around
11  unit with minimal assistance.  She does not need
12  increase in anxiolytic medications.  She said
13  that she wants to get reports on husband.  He
14  has been feeling" -- I think it might be --
15  "overwhelmed by her being hospitalized at the
16  same time he works as lineman" -- I think that
17  says -- "and takes care of the house."  I'm not
18  sure what that says works at something.  Let's
19  see, something "history of claustrophobia and is
20  very sensitive to changes.  Will follow
21  closely."
22      Q    Thank you.  I'd like to ask you a
23  question about some of Karen's doctors at MGH.
24          First off, as a physiatrist would
25  it be fair to say you're much better at judging
00080
1  someone's prominence in your field, physiatry,
2  than some other field like burn surgery; would
3  that be a fair general statement?
4      A    I guess.
5      Q    With that said, would it be your
6  understanding, both then and now, that Karen's
7  three surgeons, burn surgeons, particularly at
8  MGH that of Dr. John Schultz, Dr. Robert
9  Sheridan and Dr. John Ryan are highly regarded,
10  preeminent burn surgeons widely known for their
11  experience and skill?

| Objection (79:5 to 79:21): | Ruling:  Sustained. |
| --- | --- |
| -602 | |
| -611 (c) | |
| -No foundation | |

| Objection (79:22 to 80:25): | Ruling:  Sustained. |
| --- | --- |
| -402 | |
| -602 | |
| -611 (c) | |
| -No foundation | |

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  80:14 - 83:12

Bartlett v Mutual

14      A    I believe you're referring to
15 Colleen Ryan, not John.
16      Q    I think I'm referring to John.
17      A    John Sheridan -- Rob Sheridan
18 rather, John Schultz, and I think Colleen Ryan.
19           In any case, it's an outstanding
20 team there.  Dr. Sheridan and the rest of the
21 team are nationally renown as burn surgeons, and
22 it is a leading center for burn.
23      Q    And you would include both Dr. Ryan
24 and Dr. Schultz in that category, as well?
25      A    Sure.
00081
1      Q    Who did this ENT consult on --
2      A    That consult on 5/10 was performed
3 by Dr. Bruce Suzuki.
4      Q    And like all the consults, that
5 would have been done on your direction, correct?
6      A    Or Dr. Lie-Nemeth's.  I believe
7 this is probably at my request.
8      Q    And what would you have taken away
9 from this ear nose and throat consult?
10      A    He identified a right vocal cord
11 paralysis, which he attributed possibly to the
12 intubation.  She also had pharyngeal weakness,
13 and he was suggesting a gastrostomy tube to help
14 eliminate the need for the nasogastric tube.
15           He also recommended speech evaluate
16 her for any speech difficulties but noted that
17 she was actually pretty well compensated for her
18 right vocal cord weakness.  She was, in fact,
19 receiving speech and language pathology services
20 already at this time.
21      Q    He says he is considered a peg, and
22 I take it that's a gastronomy tube.
23      A    A peg is another term for
24 gastrostomy tube, that's correct.
25      Q    And that was later put in instead
00082
1 of her nasogastric tube?
2      A    That's correct.
3      Q    And on the next day, May 11th, you
4 have a note, and that would have been for time
5 reference, approximately two weeks into her
6 hospitalization at Spaulding, correct?
7      A    I'm sorry.  On 5/11?
8      Q    Yes, sir.
9      A    Roughly, yes.
10      Q    And roughly two weeks into her
11 hospitalization is one of the things in your
12 assessment and plan you're speaking of is that
13 she is, in fact, going to get this gastrostomy
14 tube instead of her nasogastric tube.
15      A    I indicated that I would discuss it
16 with the patient and then prepare for actually
17 making that -- prepare for that procedure by
18 putting her on Fragmin instead of Coumadin.
19      Q    Those are both blood thinners,
20 correct?
21      A    Anticoagulants, correct.
22      Q    And you're prescribing these
23 anticoagulants/blood thinners because of her

Bartlett v Mutual

24 deep vein thrombi, correct?
25      A    That is correct, because of her
00083
1 history of deep venous thrombosis.
2      Q    A deep vein thrombi is not an
3 uncommon occurrence of either surgeries or
4 lengthy hospital stays, correct?
5      A    It's a common complication seen in
6 patients in her circumstance with complex
7 hospital courses.
8      Q    Okay.  Deep vein thrombi are
9 anticoagulation problems where there is too much
10 clotting, and the clotting forms a clot usually
11 in the legs or arms, and the concern is it might
12 travel to the lungs or pulmonary system, fair?

| Objection (83:8 to 83:12): | Ruling:  Overruled. |
|---|---|
| -611 (c) | |
| -No foundation | |
| -Misleading | |

Witness_ Joel Stein, M.D. - Vol. 1.txt:  83:15 - 87:17

15      A    Broadly stated, yes.
16      Q    You told us that Karen went ahead
17 and got this gastrostomy tube placed in her
18 stomach, correct?
19      A    That's correct.
20      Q    Who did that procedure and where
21 was it done?
22      A    It was done in Mass General
23 Hospital by radiology -- interventional
24 radiology.  I'm not sure I know the
25 radiologist's name.
00084
1      Q    So, again, that would have involved
2 the transfer of Karen by ambulance or ambulette
3 to Mass General for that procedure?
4      A    That's correct.  She would not have
5 been admitted there.  It was simply a same-day
6 procedure.
7      Q    That would have been a couple of
8 hours at MGH and then however long it took to
9 transfer her back?
10      A    That's correct.
11      Q    What day was that done, please?
12      A    It appears to have been done on May
13 16, 2005.
14      Q    You're on page which that tells you
15 that?
16      A    I'm seeing that in my note on page
17 1544.  In fact, there is a note from the
18 resident on duty that evening confirming that
19 she returned after peg placement.
20      Q    The resident's note is on the top
21 of 1544?
22      A    On 1545, it's titled PM&R ROC, and
23 it stands for resident on call.
24      Q    Got it.  Can you read us that
25 resident's note, please?
00085
1      A    "Subjective:  Called to see patient
2 regarding return from peg placement.  Patient
3 complains of increased gas.  Instructions state

4   may use peg if positive bowel sounds.
5   **Objective:** Abdomen plus bowel sound times 4,
6   slightly decreased, mild diffusely tender.
7   Abdomen without rebound. Assessment plan one,
8   status postpeg, positive bowel sound. Okay to
9   use peg. No tube feeds times 24 hours per nurse
10  instructions."
11     **Q**   And when he says "okay to use peg,"
12  does that mean you can turn the peg on or off?
13     **A**   It means it is okay to provide the
14  patient fluids and feedings through the tube, as
15  well as medications.
16     **Q**   Was Karen getting both medication
17  and nutrition through this gastrostomy tube that
18  was surgically inserted in her stomach or
19  abdomen?
20     **A**   Correct.
21     **Q**   And this resident physician made
22  that note on May 15th at 9:00 o'clock?
23     **A**   9:00 p.m.
24     **Q**   What is his or her name?
25     **A**   David Wang.
**00086**
1      **Q**   You would have had many resident
2   physicians who have been involved in the care
3   and treatment of Karen and ultimately reporting
4   to you their observations, correct?
5      **A**   She was not on a teaching service.
6   I don't believe I had a resident following her
7   at the time, so there were probably a few
8   involved, but not many.
9      **Q**   Would those doctors who were in the
10  residency program had been participating in the
11  team meetings that you were ultimately in charge
12  of?
13     **A**   I don't believe they were in her
14  case.
15     **Q**   So the team meetings would have
16  comprised what health care providers, please,
17  that you were in charge of?
18     **A**   Generally or the specific meetings
19  that occurred with her? I can say generally who
20  attends, but --
21     **Q**   Generally, please.
22     **A**   Generally it includes the
23  physician, the case manager, a nurse, the
24  physical, occupational, and speech therapists.
25  That's the core team.
**00087**
1      **Q**   Okay. Thank you.
2          I forgot to ask you something about
3   the pulmonologist's note which I will find, and
4   I'm going back and finding it. Here it is.
5          Dr. Johnson, the pulmonologist,
6   notes on page 25 he speaks of a question of
7   tracheobronchitis; what is that and what was he
8   questioning, please?
9      **A**   Tracheobronchitis is an infection
10  of the trachea and bronchi. It is generally a
11  less severe condition than pneumonia; and he was
12  raising the possibility, although it was
13  ultimately not felt to be the case.

**Bartlett v Mutual**

```
14     Q    Thank you.
15          How many swallow studies did Karen
16  have at Spaulding?
17     A    It appears she had two.
```

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  88:5 - 89:22

```
5           Is this your entry on the bottom of
6  1545 on May 17, '05?
7     A    Yes.
8     Q    Can you read us your assessment
9  plan, please?
10     A    "Begin use of G-tube and G-tube
11  removed.  Resume Coumadin, continue Fragmin
12  overlap, continue IV fluids until tolerating
13  G-tube feeds."
14     Q    Tell us what that means, "continue
15  IV fluids until tolerating G-tube feeds."
16     A    Because she had just had the
17  gastrostomy tube placed, some patients have some
18  certain transient weakness of the stomach
19  muscles, if you will, or reduced stomach
20  activity.  So some people have difficulty in
21  absorbing the tube feeds when initially begun
22  after placement of the tube.
23          To ensure she didn't become
24  dehydrated we were continuing the intravenous
25  fluids until we were confident that she was able
00089
1  to tolerate adequate amounts of fluid and
2  nutrition by the gastrostomy tube.
3     Q    This IV fluid was through IV in her
4  arm or centrally located or where?
5     A    I don't see it in my notes.  I'm
6  not certain.
7     Q    It could have been either?
8     A    Correct.  More than likely it was
9  in her arm, but I can't verify that.
10     Q    And then teach us, please, what is
11  the preferred or more effective route at
12  delivering medications, if there is one, between
13  an IV and a G-tube.
14     A    It's not a question of being more
15  effective.  It depends on the medication.
16  Generally speaking, we prefer to avoid
17  intravenous medications when we can because it
18  creates a greater risk to the patient.  You can
19  get infections through an IV and that sort of
20  thing.  So in general when we can provide oral
21  medications or via a gastrostomy tube, we prefer
22  to do that.
```

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  90:8 - 91:8

```
8     Q    Okay.  Let's go to your discharge
9  summary, please.
```

**Bartlett v Mutual**

A What exhibit is that?
Q Thirty four.
And in your approximate third sentence, fourth line, you said she had a lengthy hospital course and required intubation and tracheostomy placement, as well as nasogastric tube feedings.
So that's referenced to which hospitalizations, please?
A Multiple hospitalizations prior to her Spaulding arrival, so as you have identified previously, initial hospitalization at a community hospital and then subsequent transfer to Mass General at some point, et cetera.
Q Thank you.
And would it be fair to say that
00091
while it wasn't your primary mission to determine the etiology of Karen Bartlett's TEN, it was something, a piece of data that was important to you just like all other data in caring for the patient, and obviously it had potential implications regarding what you might advice the patient to avoid in the future to obviously hopefully avert this situation again?

Objection (90:25 to 91:8):
-602
-611 (c)
-No foundation
-Argumentative
-Assumes facts not in evidence
-Calls for speculation

Ruling: Overruled.

---

**Witness_ Joel Stein, M.D. - Vol. 1.txt: 91:13 - 93:2**

A Yes.
Q Thank you.
And in your second sentence you write, "the exact etiology was" -- you are referring to her TEN and it says -- "exact etiology was unclear. The possibility of nonsteroidal anti-inflammatory drugs" -- or NSAIDs for short -- "or some food were considered."
Is that what you wrote?
A That's what I wrote.
Q Tell us, please, Dr. Stein, are you aware of any patient that you have ever treated
00092
or known of where a conclusion was made that they got TEN from or diagnosis was made that they actually got TEN from Chinese food or food or a stomach flu?
A I have not cared for any patients in whom that was the -- aside from this possibility, but no other patients for whom that was entertained as a diagnosis.
Q Let me be broader then.
Have you ever seen or heard of any study which in your view or estimation where you were told that establishes a causal link or raises a strong evidence of a causal link between any food or Chinese food and getting TEN or toxic epidermal necrolysis?
A I have not seen any literature to that affect; although, this is not an area of

Objection (91:24 t0 93:2):
-402
-611 (c)
-No foundation
-Calls for speculation
-701
-702
-Improper opinion by NRE

Ruling: Overruled.

Bartlett v Mutual

18  expertise for me, and it's not literature that I
19  normally would seek out or read.
20      Q    Understood.  Is it also fair to say
21  that while you know of a lot of literature and
22  hear about a lot of literature as the -- as a
23  doctor, even though it's not in your particular
24  area of expertise, where you might read the
25  JAMA, you might occasionally read an NAJM, even
00093
1  though it's not in your particular area of
2  expertise, fair?

Witness_ Joel Stein, M.D. - Vol. 1.txt:  93:5 - 93:6

5      A    I do read articles in general
6  medical journals about a variety of topics.

Witness_ Joel Stein, M.D. - Vol. 1.txt:  93:11 - 94:3

11          Have you ever read or heard of a
12  published case series or even a case report,
13  meaning a single case, where any doctor in any
14  publication ever reported in his or her
15  estimation a link at all between any food,
16  Chinese food included, and getting TEN, toxic
17  epidermal necrolysis?
18      A    I have not seen any such reports.
19      Q    Bearing in mind that the Mass
20  General infectious disease consults we have
21  looked at including the one of March 24, '05
22  that diagnosed TEN likely secondary to NSAIDs,
23  and both infectious disease consults had NSAID
24  at the top of their differential without mention
25  of Chinese food as a possible cause; is it also
00094
1  your understanding that the NSAID Sulindac would
2  have been the more likely cause of Karen
3  Bartlett's TEN and not some food she ate?

Witness_ Joel Stein, M.D. - Vol. 1.txt:  94:6 - 94:12

| Objection (93:11 to 94:11): | Ruling:  Sustained as to lines 93:11 |
|---|---|
| -402 | through 93:25 (up to "possible cause"). |
| -611 (c) | Otherwise overruled. |
| -No foundation | |
| -Calls for speculation | |
| -701 | |
| -702 | |
| -Improper opinion by NRE | |
| -602 | |
| -801 | |
| -802 | |

6      A    I have indicated I am not an expert
7  in this area.  My limited knowledge of it would
8  lead me to suspect that the nonsteroidal
9  anti-inflammatory medication might be a more
10  likely candidate, but it's a very limited
11  knowledge of this area.
12      Q    But bearing in mind it's, what you

Witness_ Joel Stein, M.D. - Vol. 1.txt:  95:1 - 95:8

Case: 13-cv-00555-LJD Doc — LSTMQQ FilEill SQ13A/1619B Pg - 0937 5012

**Bartlett v Mutual**

1    Q   Sure. Is what supports the
2 testimony you just gave that the NSAID Sulindac
3 is more likely the cause of Karen Bartlett's TEN
4 is the lack of ever hearing any study that ties
5 food with TEN and the lack of ever hearing any
6 colleague of yours in your medical career tell
7 you that they believed anyone they had ever seen
8 got TEN from food, Chinese food included?

| Objection (95:1 to 95:8): | Ruling: Overruled. |
|---|---|
| -402 | |
| -602 | |
| -611 (c) | |
| -No foundation | |
| -Misrepresents prior | |
| testimony | |
| -701 | |
| -702 | |
| -801 | |
| -802 | |
| -Improper opinion | |
| testimony from NRE | |
| -Misleading | |

Witness_ Joel Stein, M.D. - Vol. 1.txt: 95:11 - 95:18

11    A   To reiterate, it has not been a
12 topic that I have invested a lot of time in, so
13 you are correct in your conjecture that I have
14 not heard about this from others, you know as
15 food as a cause, but I -- there is a long list
16 of things that may cause it that I haven't heard
17 about, so I really have to reemphasize that this
18 is not an area of expertise of mine.

Witness_ Joel Stein, M.D. - Vol. 1.txt: 95:21 - 96:5

21     My questions obviously asked about
22 food or Chinese food. Let me be a little
23 broader, Doctor.
24     Have you ever heard of any study
25 that claims there is a causal link or is
00096
1 evidence of a causal link between -- I used the
2 word any food before, let me elaborate, I mean
3 food poisoning, seafood, fruit, Mexican food,
4 Greek food on the one hand, and getting TEN on
5 the other hand?

| Objection: | Ruling: Overruled. |
|---|---|
| -402 | |
| -602 | |
| -611 (c) | |
| -No foundation | |
| -Misrepresents prior | |
| testimony | |
| -701 | |
| -702 | |
| -801 | |
| -802 | |
| -Improper opinion | |
| testimony from NRE | |
| -Misleading | |

Witness_ Joel Stein, M.D. - Vol. 1.txt: 96:8 - 96:19

8    A   I'm unaware of any such studies --
9 let me restate that. I have not seen any such
10 studies.
11    Q   And of course, there's studies in
12 the next question.
13     Have you ever heard of any
14 published case series of even a single case
15 report where any doctor in the world ever
16 suggested that there might be a link between any
17 type of food, food poisoning, seafood, fruit
18 Italian, Mexican, Greek on the one hand and
19 getting TEN on the other hand?

| Objection (96:11 to 96:19) | Ruling: Overruled. |
|---|---|
| -402 | |

Witness_ Joel Stein, M.D. - Vol. 1.txt: Page 96, Line 22

Bartlett v Mutual

---

22      A    I have not seen any such reports.

Witness_  Joel Stein, M.D. - Vol. 1.txt:  96:24 - 99:13

It is a medical term for a
25  stomach flu, fair?
00097
1      A    Sure.
2      Q    Have you ever heard of any study
3  that supports a causal link or is evidence of a
4  causal link between a stomach flu or
5  gastroenteritis on the one hand and getting TEN
6  on the other hand?
7      A    No.
8      Q    Have you ever heard any doctor at
9  any time in your career or read any medical
10  record any time in your career that lead you to
11  believe that any doctor thought, conjectured,
12  concluded, or diagnosed that the stomach flu or
13  gastroenteritis on one hand caused TEN on the
14  other hand?
15      A    It was alluded to in this patient's
16  record, aside from that, no.
17      Q    You and Keith Jensen, for the
18  record, have never met before, correct, Dr.
19  Stein?
20      A    Not in person, no.
21      Q    We have spoken approximately how
22  many times before your deposition, sir?
23      A    I believe twice.
24      Q    Okay.  And how many of those
25  approximate two conversations were substantive;
00098
1  let me define substantive as conversations that
2  actually involved your care and treatment of
3  Karen Bartlett as opposed to
4  when-can-you-be-available-for-your-deposition-
5  type communications?
6      A    Just one of them.
7      Q    When was that conversation?
8      A    Early this week.
9      Q    Did I advise you that you had the
10  right to, if you chose, to send me a bill for
11  your customary hourly rate to compensate you for
12  time spent away from your practice of seeing and
13  treating patients for the time you spent
14  reviewing these records of your former patient
15  or speaking with me or giving your deposition
16  today?
17      A    Yes.
18      Q    What is your customary and hourly
19  rate that you might intend to charge in that
20  regard?
21      A    $225 an hour.
22      Q    As we sit here now, just best
23  estimate, sir, what's your estimate of how many
24  hours that you've spent in reviewing the records
25  and/or speaking with me and now giving your
00099

| Objection (96:23 to 97:16) | Ruling:  Overruled. |
|---|---|
| -402 | |
| -602 | |
| -611 (c) | |
| -No foundation | |
| -Misrepresents prior testimony | |
| -701 | |
| -702 | |
| -801 | |
| -802 | |
| -Improper opinion testimony from NRE | |
| -Misleading | |

| Objection (97:17 to 97:20) | Ruling:  Overruled. |
|---|---|
| -402 | |
| -611 (c) | |

| Objection (98:9 to 99:13): | Ruling:  Overruled. |
|---|---|
| -402 | |
| -611 (c) | |

Bartlett v Mutual

1  deposition for a couple, three hours?
2        A    In addition to the time today, I
3  believe approximately two hours of time prior to
4  that.
5        Q    Would it be fair to say, Dr. Stein,
6  that while you've been kind enough at my request
7  to review your old medical records from
8  Spaulding Rehab of your care and treatment of
9  Karen Bartlett and I have agreed to compensate
10  you for your time away from your medical
11  practice that I have not retrained you in any
12  way in relation to this lawsuit?
13        A    Correct.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  123:4 - 124:24

4        Q    Dr. Stein, has all of your
5  testimony that you provided today been to your
6  ability based on a reasonable degree of medical
7  certainty or probability?
8        A    I'm not sure I fully understand
9  that term, but to the best of my understanding
10  of that term, yes.
11        Q    Do you recall the questions you
12  were asked by counsel for the defendant
13  regarding whether or not you've published or
14  gotten sought or received grants regarding
15  studying the cause or etiology of TEN or adverse
16  reactions?
17        A    Yes.
18        Q    Have you ever published or sought
19  grants regarding the proper utilization of
20  NG-tubes or G-tubes or the treatment of VRE
21  bacteremia, SVTs, ARDS, DVT or maintaining
22  proper anticoagulation levels, any of those
23  things?
24        A    Yes.
25        Q    Which ones?
00124
1        A    I've published a little bit on the
2  use of anticoagulation and the risk of false --
3  on anticoagulation, and I have published on the
4  use of feeding tubes, gastrostomy tubes in
5  stroke survivors.
6        Q    Got ya.  The other area is
7  NG-tubes, VRE bacteremias, SVTs, ARDS, DVTs.
8  You've never published or sought any grant
9  moneys to research those areas, fair?
10        A    That is correct.
11        Q    Nonetheless, do you consider
12  yourself capable and qualified of knowing how
13  and when and why to prescribe and administer
14  NG-tubes and competent and qualified to know
15  how, when, and why to manage and respond to or
16  refer to specialists if you are dealing with VRE
17  bacteremia, SVTs, ARDS and DVT?
18        A    Yes.
19        Q    Simply stated, is it fair to state
20  that you have expertise as the medical doctor

| Objection: | Ruling:  Overruled. |
|------------|---------------------|
| -402       |                     |

**Bartlett v Mutual**

21  you are, double board-certified, licensed in two
22  states, professor at Harvard for many, many
23  years, in many areas that you've never published
24  and never sought any grant money for?

Witness_ Joel Stein, M.D. - Vol. 1.txt:  125:2 - 125:4

2       A    I would agree that I have expertise
3  in areas outside of those in which I have
4  published or sought grant funding.

Witness_ Joel Stein, M.D. - Vol. 1.txt:  125:13 - 125:20

Speaking of food
14  additives, Dr. Stein, have you ever heard of a
15  study that links causally or that provides
16  evidence to anyone's estimation of a causal
17  relationship between food additives on the one
18  hand and getting TEN on the other hand?
19       A    I'm not familiar with any such
20  study.

| Objection: | Ruling: Overruled. |
|---|---|
| -402 | |
| -602 | |
| -No foundation | |

Witness_ Joel Stein, M.D. - Vol. 1.txt:  126:1 - 127:14

Have you ever heard
2  of any published case series or even a single
3  case report or any doctor in your career ever
4  musing, diagnosing, or concluding that any
5  patient in the history of the world has ever
6  gotten TEN, toxic epidural necrolysis, from a
7  food additive?
8       A    With the exception of this
9  particular case where there is speculation about
10  the role of food, I'm not familiar with any
11  other reports.
12       Q    Is it correct to state that you
13  understood, even though you are not a burn
14  surgeon, but you were the director of burn
15  rehabilitation at Spaulding Rehab for
16  approximately eight or ten years that you then
17  understood and still now understand that TEN is
18  an extremely serious disease, defining serious
19  as having a very high risk of death and often
20  involving ocular complications including
21  blindness?
22       A    That is consistent with my
23  understanding of TEN, yes.
24       Q    And when you mentioned to counsel
25  for the defendant that if you were to -- I think
00127
1  you used the word critique your discharge
2  summary, you might have mentioned her eye
3  involvement.

| Objection (126:1 to 126:11): | Ruling: Overruled. |
|---|---|
| -402 | |
| -602 | |
| -No foundation | |

| Objection (126:12 to 126:23): | Ruling: Sustained. |
|---|---|
| -402 | |
| -602 | |
| -No foundation | |
| -701 | |
| -702 | |
| -Improper opinion by NRE | |

| Objection (126:24 to 127:16): | Ruling: Overruled. |
|---|---|
| -402 | |
| -602 | |
| -No foundation | |
| -701 | |
| -702 | |
| -Improper opinion by NRE | |

Bartlett v Mutual

4          Would it be fair to say that if, in
5  fact, it is true that as we sit here in August
6  2009, Karen Bartlett has undergone eight
7  different eye surgeries all under the care of
8  Mass Eye & Ear Infirmary and might soon undergo
9  a ninth and has extremely limited vision, many
10  doctors would define it as legally blind in both
11  eyes, those are, if true, rather severe
12  complications which have lasted at least
13  approximately four years beyond your last care
14  and treatment, fair?

Witness_ Joel Stein, M.D. - Vol. 1.txt:  127:16 - 128:6

16        A    Yes, I would agree.
17        Q    Do you recall the defense
18  attorney's questions regarding a history of
19  atopic conditions?
20        A    Yes.
21        Q    And you mentioned there is a note
22  of eczema somewhere in the record?
23        A    Yes.
24        Q    What is an atopic condition?
25        A    I'm not an expert in atopic
00128
1  dermatitis, but generally it's sort of a skin
2  rash typically that often characterizes eczema,
3  as well.  People with atopic dermatitis or
4  eczema are also prone to certain other allergic
5  phenomenon or, for example, they may have asthma
6  or related conditions.

Witness_ Joel Stein, M.D. - Vol. 1.txt:  128:9 - 128:24

Have you ever heard of
10  either a study linking or a study purporting to
11  provide evidence in favor of a causal link
12  between or have you ever heard of a case series
13  or case report or have you ever heard of a
14  doctor in your entire career opine, conclude,
15  surmise, mention that any atopic condition on
16  the one hand might be a cause for toxic
17  epidermal necrolysis on the other hand?
18        A    I'm not familiar with any such
19  literature, again, reminding you that I'm not
20  someone that follows this literature, and I
21  couldn't speculate on what might be published
22  that I haven't read.
23            MR. JENSEN:  After the word
24       literature, nonresponsive.

| Objection (128:9 to 128:22): | Ruling:  Overruled. |
|---|---|
| -402 | |
| -602 | |
| -No foundation | |
| -701 | |
| -702 | |
| -Improper opinion by NRE | |

Witness_ Joel Stein, M.D. - Vol. 1.txt:  129:2 - 129:11

**Bartlett v Mutual**

2      Q    And have you ever heard any doctor
3  in your entire career conclude, opine, mention
4  that they believe some atopic condition had ever
5  caused TEN in any patient of theirs or any
6  patient they knew of?
7      A    No.
8      Q    And what your discharge summary
9  stated -- tell me when you are there, please,
10  sir.
11      A    Yes, I'm there.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  130:13 - 130:25

13           Is your entry of previously healthy
14  woman in your discharge summary, is what that
15  means, Doctor, is from your perspective from all
16  the information you had, (a) to the extent you
17  looked at electronic records from Mass General,
18  and (b) from all the physicians that and other
19  health care providers with whom you worked at
20  Spaulding, there is nothing about Ms. Bartlett's
21  history which contributed to any of the
22  conditions you treated, other than the NSAID,
23  which was identified in the Spaulding records by
24  the Mass Eye & Ear Infirmary doctors as Sulindac
25  or the concept that was floated of some food?

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  131:3 - 131:16

3      A    The statement said that she was
4  previously healthy it's an overall
5  characterization of her state of health.  I
6  wouldn't read it as anything more than that.
7      Q    Referring you, Doctor, to Exhibit
8  32.  Tell me when you are there, please.
9      A    Okay.
10      Q    Those six pages are four consults
11  from Mass Eye & Ear, one consult from Mass
12  General burn surgery and one consult from Mass
13  General radiology for a G-tube placement.  And
14  all six of them all identify an allergy to NSAID
15  and specifically identifies Sulindac and no
16  other NSAID, correct?

---

Witness_ Joel Stein, M.D. - Vol. 1.txt:  131:19 - 132:10

19      A    Just to clarify, these forms which
20  were sent from Spaulding to the outside
21  facilities all list nonsteroidal
22  anti-inflammatory drugs, as well as Sulindac as
23  allergies, nonsteroidal anti-inflammatory drugs
24  being a broader category that includes Sulindac.
25  That was recorded by the Spaulding nursing or

**Bartlett v Mutual**

00132
1 clerical staff from the record of allergies.
2     Q    Thank you, Doctor.
3           And you've never seen any reference
4 to any NSAID other than Sulindac at any
5 Spaulding record or any Mass General record; is
6 that correct?
7     A    I have not seen any.
8           MR. JENSEN:  Thank you again
9        for your excellent care and
10          treatment of Karen Bartlett, Doctor.

---

Witness_ Joel Stein, M.D. - Vol. 1.txt: 135:4 - 135:20

| | |
|---|---|
| 4     Q    Doctor, have you ever heard anyone<br>5 in the history of medicine suggest that when you<br>6 start taking a medication like Phenytoin, brand<br>7 name Dilantin, well after you get TEN, like in<br>8 this example that the defense attorney just<br>9 showed you on May 8th, and she had TEN by<br>10 February 2nd or February 4th at the latest, so<br>11 this is three months and about five days later,<br>12 have you ever heard anyone suggest that taking a<br>13 drug three months after you get TEN might have<br>14 caused your TEN three months before then?<br>15     A    No.<br>16     Q    Simply stated, a drug can't<br>17 possibly cause a disease when you had that<br>18 disease three months before you took the drug;<br>19 is that a fair and correct statement?<br>20     A    Yes. | **Objection:**<br>-402      **Ruling:**  Sustained (from line 132:8<br>through 135:20). |

---

**Deposition of Joel Stein, M..D. – August 6, 2009**

**Pg: 18 Ln: 1 - 5**

| RULING: | Objection:   Irrelevant. |
|---|---|
| Sustained. | |

**Annotation:**
18: 1        Q    Do you know whether or not you
    2    would have had access to that page after Karen
    3    Bartlett was transferred to Spaulding
    4    Rehabilitation Hospital?
    5        A    It's unlikely.

**Pg: 18 Ln: 6 - 10**

| RULING: | Objection:   Irrelevant. |
|---|---|
| Sustained | |

**Annotation:**
18: 6        Q    Exhibit 23 is a typed-up physical
    7    therapy service record.
    8            Would you have had access to that
    9    document at Spaulding?
    10        A    I don't believe so.

**Pg: 25 Ln: 8 - 15**

| RULING: | Objection:   Irrelevant. |
|---|---|
| Sustained. | |

**Annotation:**
25: 8            Would you have likely seen Exhibits
    9    29 and 30, which are the history and physical
    10    and discharge summary respectively from
    11    Northeast Rehab Hospital?
    12        A    Most likely not.  Occasionally
    13    these records are duplicated, xeroxed and sent
    14    with the patient's chart, but I would say that's
    15    infrequent and unlikely to have been the case.

**Pg: 91 Ln: 15 - 23**

| RULING: | Objection: | Irrelevant. |
|---|---|---|
| Overruled. | | Rule 401. |
| | | Rule 403. |
| | | Rule 26(a)(2)(A). |

**Annotation:**
91:15        And in your second sentence you
16    write, "the exact etiology was" -- you are
17    referring to her TEN and it says -- "exact
18    etiology was unclear.  The possibility of
19    nonsteroidal anti-inflammatory drugs" -- or
20    NSAIDs for short -- "or some food were
21    considered."
22        Is that what you wrote?
23      A   That's what I wrote.

**Pg: 110 Ln: 8 - 25**

| RULING: | Objection: | Subject of Plaintiff's Motion In Limine No. 14 |
|---|---|---|
| Overruled. | | Rule 401. |
| | | Rule 403. |
| | | Rule 26(a)(2)(A). |

**Annotation:**
110: 8     Q   We had marked this document
9    previously.  I don't remember what the exact
10    number was, but this is the document that in the
11    first paragraph "history of present illness
12    provides the exact etiology was unclear, though
13    the possibility of nonsteroidal
14    anti-inflammatory drugs or some food was
15    considered."  Did I read that correctly?
16      A   Yes.
17      Q   And that's your statement, Doctor?
18      A   It is.
19      Q   What is etiology?
20      A   Cause.
21      Q   Did you reach any conclusion to a
22    reasonable degree of medical or scientific
23    certainty about the cause of Mrs. Bartlett's
24    condition?
25      A   No.

**Pg: 118 Ln: 4 - 6**

| RULING:<br><br>Overruled. | Objection: Subject of Plaintiff's Motion In Limine No. 14<br>Rule 401.<br>Rule 403.<br>Rule 26(a)(2)(A). |
|---|---|

**Annotation:**

118: 4     Q    Would you agree that an opinion on
    5    that issue would be beyond what you saw and what
    6    you did to and for Ms. Bartlett?

**Pg: 118 Ln: 17 - 23**

| RULING:<br><br>Overruled. | Objection: Subject of Plaintiff's Motion In Limine No. 14<br>Rule 401.<br>Rule 403.<br>Rule 26(a)(2)(A). |
|---|---|

**Annotation:**

118:17     Q    Doctor, my question is a little
    18    different.  If I understand your prior testimony
    19    correctly, tell me if I'm wrong, but as you sit
    20    here today, you do not have an opinion to a
    21    reasonable degree of scientific medical
    22    certainty about what caused Ms. Bartlett's SJS
    23    or TEN?

**Pg: 120 Ln: 1 - 6**

| RULING:<br><br>Overruled. | Objection:   No Question asked. |
|---|---|

**Annotation:**

120: 1     A    The impression that -- from the
    2    prior physicians that cared for her and carried
    3    forward in my notes is that it was due to an
    4    uncertain cause, perhaps a nonsteroidal
    5    antiinflammatory medication, perhaps food
    6    related.

**Pg: 120 Ln: 7 - 10**

| RULING:<br><br>  Overruled. | Objection:  Irrelevant.<br>                  Rule 26(a)(2)(A). |
|---|---|

**Annotation:**

120: 7 Q So your testimony is consistent
    8   with the statement in your discharge summary,
    9   correct?
   10     A   Correct.

**Pg: 120 Ln: 22 - Pg: 121 Ln: 6**

| RULING:<br><br>  Sustained. | Objection:  Subject of Plaintiff's Motion In Limine No. 14<br>                  Rule 401.<br>                  Rule 403.<br>                  Rule 26(a)(2)(A). |
|---|---|

**Annotation:**

120:22 Do you knowif Ms. Bartlett had a
   23   history of atopic conditions prior to the
   24   incident that required your care and treatment?
   25     A   I don't recall seeing that in the
121: 1   record.  It was indicated.  I'm sorry.  If you
    2   look at page 9 of the -- what do they call them?
    3     Q   The Bates number?
    4     A   Bates number, thank you.
    5        Eczema is listed as a past medical
    6   history item.

**Pg: 121 Ln: 7 – 13**

| RULING:<br><br>Sustained as to<br>lines 121:11 through<br>121:13.  Otherwise<br>overruled. | Objection: Irrelevant. |
|---|---|

**Annotation:**

121: 7     Q   How many patients have you treated,
    8   Doctor, that have experienced SJS or TEN?
    9     A   I'm not certain.  If I had to make
   10   an estimate, it would be less than five.
   11     Q   Is SJS and TEN a rare condition?
   12     A   I'm not sure the definition of
   13   rare, but it is, I would say, relatively rare.

**Pg: 121 Ln: 14 - 18**

| **RULING:** | **Objection:** Rule 401. |
|---|---|
| Sustained. | Rule 26(a)(2)(A). |

**Annotation:**
121:14    Q   Do you have an understanding one
    15   way or the other if SJS and TEN are a recognized
    16   adverse event with a wide variety of drugs?
    17      A   That is my understanding, that
    18   there are multiple causes.

**Pg: 132 Ln: 16 - 24**

| **RULING:** | **Objection:** Rule 401. |
|---|---|
| Sustained. | Rule 403. |
| | Rule 26(a)(2)(A). |

**Annotation:**
132:16    Q   You've been asked a couple of times
    17   now about all kinds of literature concerning a
    18   possible association between NSAIDs and SJS or
    19   TEN, and I think basically you've testified that
    20   you don't follow the literature in that regard.
    21      And my question to you specifically
    22   is that following the literature in that regard,
    23   would any event be outside the course and scope
    24   of your treatment of Ms. Bartlett, correct?

**Pg: 133 Ln: 11 - 13**

| **RULING:** | **Objection:** Irrelevant. |
|---|---|
| Overruled. | Improper inclusion of statement by Counsel which cannot possibly be evidence or relevant. |

**Annotation:**
133:11   treatment at Spaulding, do you know if she
    12   received a medication called Phenytoin?
    13      MR. JENSEN:  Can you say that

**Pg: 134 Ln: 19 - 24**

| RULING: | Objection: | Rule 26(a)(2)(A). |
|---|---|---|
| Sustained. | | Irrelevant. |
| | | Rule 401. |
| | | Rule 403. |

**Annotation:**
134:19    Q    Do you know if Phenytoin sodium has
    20    been associated with SJS or TEN?
    21        A    Absolutely.  That's a yes.  It is
    22    one of the more, to my limited knowledge of the
    23    field, one of the more commonly identified
    24    causes.

**Plaintiff's Counter Designation.**

**Pg: 135 Ln: 4 - 20**

**Annotation:**

Objection
sustained
(<u>see</u> <u>infra</u>)

135: 4        Q    Doctor, have you ever heard anyone
    5    in the history of medicine suggest that when you
    6    start taking a medication like Phenytoin, brand
    7    name Dilantin, well after you get TEN, like in
    8    this example that the defense attorney just
    9    showed you on May 8th, and she had TEN by
    10    February 2nd or February 4th at the latest, so
    11    this is three months and about five days later,
    12    have you ever heard anyone suggest that taking a
    13    drug three months after you get TEN might have
    14    caused your TEN three months before then?
    15        A    No.
    16        Q    Simply stated, a drug can't
    17    possibly cause a disease when you had that
    18    disease three months before you took the drug;
    19    is that a fair and correct statement?
    20        A    Yes.

## <u>JOEL STEIN DEPOSITION – AUGUST 6, 2009</u>

**Pg: 49 Ln: 15 - 25**

**Annotation:**

```
49:15      A    Right.  I think it says that on top
   16   because that's who the appointment was made
   17   with; however, it seems quite clear that
   18   Dr. Tsai wrote this note.  I imagine she saw the
   19   patient.  I don't know who Dr. Azar was.  It's
   20   possible he was a resident or fellow.
   21           I don't -- it's really difficult
   22   for me to determine each person's role, but it
   23   seems fairly clear that Dr. Tsai did, in fact,
   24   evaluate the patient and wrote this note on May
   25   9th.
```

| RULING: | OBJECTION:       No question.  Irrelevant. |
|---|---|
| Sustained. |  |

**Pg: 112 Ln: 10 - 17**

**Annotation:**

```
112:10      Q    Do you have an understanding, one
   11   way or another, if there are food additives that
   12   can cause Stevens-Johnson syndrome or TEN?
   13      A    I'm unaware.  I don't know.
   14      Q    Just so I understand your testimony
   15   correctly, you did not diagnose Stevens-Johnson
   16   syndrome or TEN in Ms. Bartlett, correct?
   17      A    No, I did not.
```

| RULING: | OBJECTION:       The first question and answer are irrelevant.  The fact that he has no knowledge on a topic defines irrelevance.  It is also the lack of an undesignated opinion. |
|---|---|
| Overruled. |  |

148

**Pg: 113 Ln: 7 - 17**

**Annotation:**

113: 7    Q    As I understand your prior
     8    testimony, you were unable because you were not
     9    available at the facility to treat Ms. Bartlett
    10    for the entire course of her stay at Spaulding
    11    Rehab; is that correct?
    12        A    I was only available for a portion
    13    of it, that's correct.
    14        Q    Why were you unavailable for a
    15    portion of her treatment?
    16        A    I'm not certain.  I'm guessing I
    17    was on vacation, but I really don't know.

| RULING: | OBJECTION:        Second question and answer are irrelevant. |
| --- | --- |
| Sustained. | |

**Pg: 113 Ln: 24 - Pg: 114 Ln: 20**

**Annotation:**

113:24    Q    Can you read for me or I'll read
    25    it, sir, on hospital course, which is Exhibit 4,
114: 1    page 3, bottom of the page, "patient was
     2    admitted for multidisciplinary rehabilitation
     3    program.  She made steady gains in all areas.
     4    Her skin healed well, and she had no significant
     5    open lesions at the time of discharge.  She was
     6    advised to use moisturizers and avoid sun
     7    exposure."
     8        A    That's correct.
     9        Q    "The patient made steady gains with
    10    regard to her respiratory function.  She was
    11    decannulated and had no further difficulty with
    12    regard to her pulmonary function."
    13        Did I read that correctly, sir?
    14        A    Yes.
    15        Q    And, Doctor, can you tell me if
    16    that is a fair and accurate summary of her
    17    condition at the time she left Spaulding Rehab
    18    Hospital?

```
19        A    Those statements are fair and
20    accurate.  There are other statements that I
```

| RULING: | OBJECTION:        The remaining portion of his answer after "accurate" should be excluded as it is responsive to the question. |
|---|---|
| Overruled. | |

**Pg: 116 Ln: 8 - Pg: 117 Ln: 3**

**Annotation:**

```
116: 8        Q    Did Mr. Jensen comment to you about
   9    the claims or defenses in the lawsuit?
  10        A    He indicated the lawsuit was
  11    contending that the nonsteroidal
  12    anti-inflammatory medication was the cause of
  13    her TEN and subsequent medical conditions, so
  14    that's sort of the essence of the lawsuit.
  15        Q    Did he identify for you which
  16    nonsteroidal anti-inflammatory medication was
  17    allegedly at issue?
  18        A    I believe he said Sulindac.  He may
  19    have used the generic name.  I don't recall.
  20        Q    Do you have an understanding if
  21    Sulindac is a generic or branded product?
  22        A    You know, I'm not certain.
  23        Q    There was some discussion about
  24    your review of the scientific literature.  Did,
  25    in fact, you review any of the scientific
117: 1    literature concerning adverse drug events prior
   2    to the deposition today?
   3        A    No.
```

| RULING: | OBJECTION:        The questions at lines 20 & 23 are irrelevant. |
|---|---|
| Sustained as to lines 116:8 through 117:3. | |

150